— **EXHIBIT  D** —

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**EMILY TEMAN**, individually and on behalf of a class of all persons and entities similarly situated,

               *Plaintiff*,

    v.

**SELECT JUSTICE, LLC**,

               *Defendants*.

Case No. 1:24-cv-12656-LTS

## EXPERT DECLARATION OF AARON WOOLFSON

I, Aaron Woolfson, state and declare as follows:

1.      I have been retained by Plaintiff's counsel to provide structure to, and then analyze, the electronic Call Detail Records ("CDR" or "CDRs"), customer lists, and other associated information that has been, or will be, provided in this lawsuit reflecting the calling done by or on behalf of Select Justice, LLC ("Select Justice LLC" or "Select Justice" or "Defendant").

2.      More specifically, I have been asked to opine whether there is a reliable method to identify which calls in call detail records ("CDRs") containing the calls made by or on behalf of Defendant to telephone numbers (a) that were called two (2) or more times in a twelve (12) month period by the Defendant, and (b) that were registered on the National Do Not Call Registry ("DNC") for more than thirty days (30) before the date of each of the calls.

3.      As described in this Declaration, it is my conclusion that there is a reliable method to identify which calls were made to telephone numbers (a) that were called two (2) or more times in a twelve (12) month period by the Defendant, and (b) that were registered on the DNC for more than (30) thirty days before the date of each of the calls using the call records that I understand will be produced in this matter.

4.      It is also my opinion that there is a reliable method to identify calls with other particular criteria based on the additional types of information included in the CDRs, records of

leads, and/or other records maintained by or on behalf of Defendant, including whether calls were made to any telephone number on a date after Defendant's records reflect that a person requested that Defendant not call them.

5.    I was not retained in this matter to determine the legal standards of any court decisions or their applicability to this case, and I was not involved in the sampling or selection of data provided by the Defendants. This report reflects the results of my study of the underlying facts, independent analysis of the data and documents provided by Motive to counsel for Plaintiff, and third parties.  My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances.

6.    I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

**Qualifications and Expert Engagements.**

7.    I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls.  I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries.   My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

8.    My qualifications and curriculum vitae are attached to this expert report as Exhibit 1.  A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2.  I have been qualified by both Federal and State courts.[1]  My testimony has been relied upon by courts in both individual and class actions,[2]

---

[1] *ABM Industries Overtime Cases* (Case No. JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") (*ABM Industries Overtime Cases*, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)). (Exhibit 3).

[2] "The Court notes that Mr. Woolfson's expert report appears to include information related to the (footnote continued)

2

by plaintiffs and defendants. My opinions have also been relied upon in arbitrations, including those involving TCPA claims.

9.  I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff.  These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and timekeeping integration technologies.  It also required me to build interfaces to the ACH[3] exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information.  Other processes necessitated integrating fax and OCR[4] capabilities as well as enhanced call routing – inbound and outbound – including predictive elements of enhanced call processing, and the precise timings of these events.

10.  I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day.  To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services.[5]

11.  I have developed highly available, upwardly scalable databases for use in the telecommunications industry.  The databases and telephone systems that I have personally

---

merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No. 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015, ECF 132, at 3.

[3] Automated Clearing House ("ACH").

[4] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

[5] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones inputted via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

3

Declaration of Aaron Woolfson                                    Case No. 1:24-cv-12656-LTS

developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

12.    Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

13.    I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

14.    I held a Certificate of Public Convenience and Necessity[6] ("CPCN") – a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a re-issue of my initial CPCN granted to TelSwitch, Inc. on June 10, 1994, which I held for approximately eighteen (18) years before taking a hiatus from providing public telephone services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built and programmed, with the phone network for the purpose of providing wholesale and retail telecommunications services.

---

[6] Certificate of Convenience and Necessity U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009).

Declaration of Aaron Woolfson                                    Case No. 1:24-cv-12656-LTS

15.     I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls and, among other things, compare call records for their inclusion on the national DNC list.

16.     For example, in *Wright v. eXp Realty, LLC*, No. 6:18-cv-01851-PGB-EJK (M.D. Fla.), I was engaged on behalf of defendant eXp to analyze call records and, among other things, compare them against records of leads from various sources, and to identify which numbers were authoritatively associated with telephone companies on the dates that the calls were made.

**Expertise Specifically Related to Database Work.**

17.     I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR)). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …."

18.     I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin).

19.     In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No. JCCP 4502, San Francisco Superior Court).  Relying upon my expert finding, the Appellate Court reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes.  The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit 3).

20.     I was also expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing Company, Inc., Ag Force, LLC, Fowler Marketing International LLC,* (Case No. 1:15-CV-00420-DAD-SAB ED, Ca.), where the employer used Datatech to maintain an accounting of piece-work and non-piece-work hours worked by agricultural workers. The court order in *Fowler Packing* is attached as Exhibit 4.

Declaration of Aaron Woolfson                                    Case No. 1:24-cv-12656-LTS

21.    I have applied similar methods to structure large amounts of unstructured data on behalf of defendants Verizon Wireless and Collecto in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the District Court of the Northern District of California to reconstruct a database from information that was in Verizon's possession that the plaintiff stated was "un-structurable" and useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit 5.

**Expertise Specifically Related to Outbound Dialing Systems in Call Centers.**

22.    I have over twenty-five years of hands-on experience in telecommunications, in the design and programming of the equipment that handles calls. In specific, I was responsible for the development of specialized hardware and software systems, called Rapid Announce and Rapid Record that have been used in both telephone company central offices and in call centers, for the pacing, dialing, and measurement of phone calls, and has cumulatively handled hundreds of millions of calls. At its peak use, Rapid Announce processed 240,000 inbound and 280,000 outbound calls per day for companies such as First National Collection Bureau.

23.    Rapid Announce was primarily used to match the pacing of outbound calls with the availability of agents to accept the calls once they were answered. Rapid Announce also evaluated the connected calls to determine whether the phone was answered by an answering machine or a live person. Based upon the availability of the agents and the type of call that was being placed, the system would then transfer the call to the correct type of agent, or skill-set group, to handle the particular circumstances for which the call was received, or dialed.

24.    Rapid Record was responsible for handling the recording and media storage of inbound calls, as well as the implementation of a technology that I developed called AggravationSense. AggravationSense was designed to measure the cadence and speed at which an individual spoke. By measuring the cadence and speed of the speech against a baseline of background noise, AggravationSense would proactively patch in a customer service supervisor in

6

Declaration of Aaron Woolfson                                          Case No. 1:24-cv-12656-LTS

advance of any party asking to speak with one.

**Materials and Documents Reviewed and Relied Upon.**

25.    In conducting my analysis and preparing my conclusions and opinions, I relied upon the following materials and information:

      `

I.    **Materials that I relied upon in connection with my Declaration:**

    (a)    Complaint (ECF 1).

II.    **Materials that I will rely on in connection with my supplemental declaration:**

    (a)    Call Detail Records containing the specifics of the telephone calls that were made by, or on behalf of, the Defendant.

III.    **Electronic database resources that are available to me:**

    (a)    The National Exchange Carrier Association ("NECA") North American Numbering Plan 1000-block assignments database.

    (b)    External, publicly available databases, including iConectiv's WDNC[7,8] for use in identifying the type of line (and the carrier) and the Federal TCPA-eligible area code (and DNC) list that is published daily by the FTC[9].

**Methods and Tools Used to analyze Records.**

26.    I create and analyze databases using Structured Query Language (SQL).    A

---

[7] FCC order FCC-15-35A1 (03/27/2015) explicitly mandated *continued* availability of iConectiv's data for purposes of compliance with the TCPA. (¶.142).  The historical information *does not* contain subscriber information, only carrier of record and line type.  Before number portability, this would have been a simple task of looking at the Local Exchange Routing Guide ("LERG"), or absent access to the LERG, finding the area codes and prefixes from an online collection of national phone books.  TelSwitch, Inc. is a reseller and authorized user of iConectiv data.

[8] In *Perrong v Call Identified as Connor* (Case No. 1:22-cv-04479-CPO-EAP, DC, New Jersey, Camden Vicinage), "plaintiff has queried the database of iConectiv, the company charged by the Federal Communications Commission to administer the Number Portability Administration Center, which is the master database which lists which telephone provider services a particular number, among other information required to route telephone calls to the proper provider" (ECF 3)

[9] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10376173-476173-21.

Declaration of Aaron Woolfson                                          Case No. 1:24-cv-12656-LTS

database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information.  Tables that share at least one attribute in common are "related."  Tables without a common attribute may still be related via other tables with which they do share a common attribute.  The pathways relating those separate tables are called "joins."  Once tables have been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information.  To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages."  The most common query language is SQL.  A proper query in this language consists of one or more "clauses."  Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses.  Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the syntax of the specific query language.

27.     By using a set of standardized SQL queries, I am able to tag each call record according to (a) the date of a telephone call; and, (b) the disposition of the call, if one is present; and, (c) whether a telephone number is wireless as of the date of the call; and, (d) whether the number was ported, and if so, whether the number the port occurred within fifteen (15) days of the call; and, (e) any other data field contained in the call records; and, (f) to which telephone company (by way of its' Operating Company Number, or OCN) the telephone number was assigned on the dates when called.   I am also able to optionally tag whether (g) whether the number was on the Federal DNC list, and if so, when it was added; and (h) whether the number appears in any other file that was produced, such as on lead lists or summary sheets.

**Steps I will take to Organize and Analyze the Call Records.**

28.     I will start by opening each of the files that contain call records data (collectively referred to as "Call Detail Records" or "CDRs").  I do this to (a) determine the format that the

Declaration of Aaron Woolfson                                    Case No. 1:24-cv-12656-LTS

records are stored in, and then (b) to determine what pre-processing that I would need to conduct in order to achieve an import of the calls.[10]

29.    I will then import the CDRs file into SQL database tables using Microsoft SQL™ Enterprise Manager.  I will then place the totality of the calls into a database called *dbo.calls*, upon which I will run SQL statements.

30.    To identify calls made to numbers on the DNC, I will apply a set of filters to include only calls:

   a.    that were made either (a) to a number that contained precisely ten digits and started with a 2 through 9, or (b) to a number that contained precisely eleven digits and started with a 1 followed by a 2 through 9; and,

   b.    that were contained within structurable data; and,

   c.    that had an associated date; and,

   d.    that have a disposition or duration indicating the conveyance of call.

31.    I will then tag each of the calls within the database that I constructed with information from the Federal DNC Database.

32.    I will then exclude from the database any calls to telephone numbers that (a) that were not called two (2) or more times in a twelve (12) month period by the Defendant, and/or (b) that were not registered on the DNC for thirty days before the date of each of the calls.

33.    By doing so, I will be able to identify any calls that were made to telephone numbers (a) that were called two (2) or more times in a twelve (12) month period by the Defendant, and (b) that were registered on the DNC for more than thirty (30) days before the date of each of the calls.

---

[10] I typically do not need to apply any pre-process to the CDRs, as most CDRs originate from electronic call data capture systems that are already Electronic Data Interface ("EDI") capable.

9

Declaration of Aaron Woolfson                                    Case No. 1:24-cv-12656-LTS

**Conclusions.**

34.    It is my opinion that using the call records maintained by or on behalf of Defendant there is a reliable method to identify which calls in the call records were made to telephone numbers (a) that were called two (2) or more times in a twelve (12) month period by the Defendant, and (b) that were registered on the DNC for more than thirty days (30) before the date of each of the calls.

35.    It is also my opinion that there is a reliable method to identify calls with other particular criteria based on the other data included in the CDRs, records of leads, and/or any other records maintained by or on behalf of Defendant, including whether calls were made to any telephone number on a date after Defendant's records reflect that a person requested that Defendant not call them.

36.    Using SQL, I am able to also associate other information that is extrinsic to the worksheets provided that may provide additional guidance to the trier of fact, such as the name of the telephone company to which the number was serviced by on the date that the number was called.

37.    However, all of this depends upon a key item – the *telephone number* – the item that would ordinarily be contained within the CDR.  Without the telephone number, I am unable to identify whether a telephone number had been wireless as of the date of the call, and whether the telephone number had been ported within fifteen (15) days of the call.[11]

38.    Once I receive the call detail records, containing the date and the telephone numbers that were called, I will be able to perform the steps of identifying whether the telephone number was wireless as of the date of the call, and whether the number had been ported within fifteen (15) days.  I am also unable to whether the call was to a telephone number was within the FTC's index of TCPA-eligible area codes. (Exhibit 6), and whether the number to which the call

---

[11] It is my understanding that defendant has withheld this information pending motion practice in Court.

Declaration of Aaron Woolfson                                    Case No. 1:24-cv-12656-LTS

1  was placed was wireless as of the date of the call.

2

3

4  I declare under penalty of perjury under the laws of the State of California that the foregoing is

5  true and correct. Executed this 13th day of June, 2025 in Pleasant Hill, California.

6

7

8  _____

9  Aaron Woolfson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Aaron Woolfson                                    Case No. 1:24-cv-12656-LTS

EXHIBIT 1

**Curriculum Vitae**                                                    **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

## Career Summary

25 Years of Experience developing extremely large scale, highly efficient and accurate Database Applications, for commercial, government, aerospace, telecommunications and payroll industry, with special emphasis in IVR systems.

- Database transition planning and disaster recovery experience

- Efficient Database Design through Data modeling

- Efficient Database Table Structuring and Indexing Techniques

- Comprehensive data transformation, tallying through data analysis

- Presentation of sophisticated data in easily-understood terms

- Client-Server Database Application Design and Development

- Full understanding of Database libraries, and transaction handlers

- RDO/ADO interface techniques, incl. port 1433 direct interface

- VB6 and .NET(2.0) bounded and unbounded objects

- Web-Services data integration and multi data-source integration

- Developed extremely high performance IVR system  (1.5m calls/day)

- Deep knowledge of Electronic Time Keeping Techniques

- Point of Sale Time Keeping Integration with Payroll

- GPS "as-Time Keeping" object, tracking, and analysis techniques

- Networked Multi-Location Database Components related to Timekeeping

- An early investor in, and partial developer of QL2, a data-analysis tool for turning web-pages into rich-data searchable sources of information. QL2's customers include 7 of the top 10 global airlines, 5 of the top global online travel agencies, and Global 100 energy, car rental, retail, pharmaceutical and life science companies.

## Professional Experience (*consulting that resulted in deliverables*)

**University of Illinois, Champaign-Urbana** (1986, 1987, 1988). Employed to Program computer terminals attached to a Mainframe computer system (PLATO) that were used to generate databases containing class schedules based upon prospective students' interests and SAT scores.  Curriculum was graphically represented on Plasma Display Terminals attached to the University's PLATO computer Plato Computer Mainframe.  Student Curriculums included travel time between classrooms in different buildings and items related to classroom proximity.  Worked under the auspices of Don Bitzer, inventor of the Plato Computer System and co-inventor of the Plasma Display Panel, and Hugh Satterlee, Ombudsman of the University of Illinois, Champaign-Urbana.

**Computer Services Office, San Joaquin Delta College, Stockton California** (1991, 1992).  Maintained campus-wide network of mainframe-based computer terminals used for class scheduling and curriculum development;

**Delta Telecommunications, Stockton, Ca** (1993). Founded a California Based Public Utility (U-5410-C) focusing on a network of telephone switching systems connected to databases that were used to route telephone calls of customers within the State of California.  I invented the efficient IXC-10 Network Switch and the associated databases, as there were no highly efficient telephone switches during that time that took up a small amount of space, yet could handle the demands of a full-scale telephone switching office.

**Curriculum Vitae**                                                    **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

**TelSwitch, Inc., Stockton, Ca** (1994). I authored the Airnet Billing and Call Collection Database software that was used at TelSwitch, Inc for the purpose of billing residential and commercial long distance customers for the calls that they made. I wrote database formulas to establish the rating of telephone calls based upon the elements provided by the switching network: call setup, call type, call routing, and rate plan assigned to customer. Determined the rates and taxes to charge the customers on each call, based upon the rate plans assigned, the time of day, the time and duration of the call, and whether that call was intrastate, interstate, or Intra-lata. Processed millions of telephone calls through my database.

**Japan Telecom America, San Ramon, Ca** (1996). I adopted the Airnet Billing Software and Call Collection Database that I had authored to specifically meet the needs of an international telecommunications corporation doing business in the United States, Japan, and in Canada, presenting bills to customers in multiple languages and font sets, accepting  various currencies, which all had to be computed against the dollar in real time.

**Oersted Corporation (Sunstrand Contract)** (1997). Designed and authored an Automation Control and Database system used for the mass-production of mission-critical magnetic armatures used in Air Conditioning, and Electric Vehicle, and Aerospace applications. I created the process control mechanism that allowed the machine to "manufacture the part" and measure the results, and report the results to a master database that contained Quality Control statistics. This machine continues to operate at a Sunstrand Corporation facility in Wisconsin and has successfully manufactured hundreds of thousands of components.

**Network Services Solutions, LLC., Reno, Ca** (2001). Customized a database for tracking the overlapping time elements of telephone calls, and establish audit trails of telephone calls through the phone network, based upon origination, destination, time, and jurisdiction. The system is in use to track the costs for telephone lines and services to hundreds of schools, dozens of hospitals, and is the backbone for a national communication network, with over five million transactions being tracked through my database monthly.

**Decisionet, St. Charles, Il. (Experian Project)** (2004). I was contacted to build a Database and Electronic Gateway "Appliance" Device for customers to acquire credit reports from Experian's secure database. The system was used to facilitate the delivery of 7.2 million credit reports to commercial users, including credit unions, banks, car dealerships. The system tracked usage, report lengths, type of reports, and reporting tools to Experian's customers to view the quantities of reports that were used through the system, types of reports, and other information pertaining to the acquisition of reports. The service allowed Decisionet to extend the life of legacy interface environments between Experian and its' clients by several years.

**BankVOD / Billing Solutions, Inc. - (Bank of America, Wells Fargo Bank, JP Morgan Chase, PNC, Bank of the West)** (2005). Designed and built a network of Database Applications for the mortgage industry using Microsoft SQL and ASP.net. The system created a protocol for banks and mortgage brokers to exchange information on the status underwriting of loan applications, providing tracking of Verification of Income, Verifications of Deposit and Verification of Mortgage applications, as well as providing the analysis back to the banks for items such as Check Verification(s). The database also triggered the disbursements of processing costs and reimbursements toward the banks. To date, my system has been an integral part of the processing of over 1.2 million mortgage applications.

**SAIC - Patriot Missile Systems / Training Division  (Subcontract)  (DPAS Rated)** (2007). Designed the hardware, software, and firmware used within the modern-day re-instrumented version of Patriot Missile consoles. I was tasked with developing a hardware and software combination that retained full compatibility with both modern and legacy equipment, that could provide data to commercial and proprietary databases efficiently and reliably in extreme environments. I am proud that my work is considered to be an integral part of the battle-field readiness and preparedness of ground troops, and that dozens of our implements are in use throughout the world.

**Curriculum Vitae**                                                    **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

**Department of Justice, Sacramento California** (2007). Authored a specialized interface to work with a telephone company database.

**Practice Technologies, Inc.** (2007).  I was contracted to develop the database to maintain the billing and session tracking portion of Real Deal Docs, part of the Real Practice Suite of document management tools used by dozens of law firms, including Littler.  I had been tasked with developing the billing methods for tracking the use of Real Deal Docs, a Web Site that indexes the documents that are filed by publicly-held companies, into searchable terms, and maintaining presentations.

**Cogent Communications, Inc.** (2008).  I was tasked with authoring the database system for tracking the timings and overlaps of telephone calls, and establishing an audit trail of telephone calls through the phone network, based upon time, duration, origination, destination, and other characteristics.  The database continues to be used to capture hundreds of thousands of telephone transaction per month that traverse the Cogent Communications Network, and maintains a detailed audit trail of service changes and inventories of equipment and.

**Gallium Visual Systems - ATS (Air Traffic Control System)** (2008). Incorporate modern software, hardware, and firmware into Aircraft Control Training Systems. I was tasked with manufacturing Operator Keyboards and Consoles using modern day technologies as part of the Air Traffic Control Training System, enabling ATS equipment to work with USB-enabled computers, and modern data collection systems, including databases.

**First National Collection Bureau, Reno, Nv.** (2008).  Built a system of interconnected databases and computers capable of capturing over 250 million telephone records per year, and deep-content analyze the telephone calls for type-of-call, timing characteristics, and customer contact effectiveness.  System had to maintain a minimum of 56 million phone calls per year, any of which could be instantly retrieved.  The Microsoft SQL database components required that I author an exacting set of high-performance SQL database analysis scripts in conjunction with several inter-related computers, all operating autonomously operating software programs that I wrote.  I have been told that I wrote the highest performance (civilian use) telephone call analysis system in the world.

**American Automated Payroll, Charleston, Sc** (2009) - Payroll and Time Keeping.  I Authored a set of scripts to work with databases to allow payroll companies to integrate their payroll systems with the telephone network.  The program that I wrote allows the electronic entry of time keeping records via telephone. Employees can use a telephone to clock in and out of work sites, or an employer can use the telephone to enter time entries into their payroll production.   I am an ongoing consultant to American Automated in the area of timekeeping, payroll database integration, paycheck and time clock reporting, and phone network integration.  Additionally, I authored a database system that comprises of an automated inbound and outbound calling interface for customers of payroll companies to be able to input their daily time sheets into payroll programs, for purposes of generating payroll.  The software and hardware mechanism that I authored interfaces with system such as "Evolution" (a popular and widely used payroll program), as well as Microsoft SQL, Oracle, and mySQL American Automated Payroll and TelSwitch, Inc. are engaged in an ongoing partnership tasked with developing further market verticals for my software.

**Reunion Communuications, La Grange, Il** (Airlink Wireless) (2010).  Database for keeping track of usage, balances, and remaining minutes for a National Prepaid Wireless provider. I authored a database, and associated network interface protocol, so that customers may access real-time information about their accounts via telephone calls from their handsets. The system also maintains real-time analysis of telephone the telephone companies' databases to determine where the telephone callers are going to be routed, based upon their "OEM" handset ID, calling characteristics, and other factors.  The Database, located downtown Los Angeles, is used tens of thousands of times every day by prepaid mobile carriers and their

**Curriculum Vitae**                                                    Aaron David Woolfson

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

customers all over the country, who rely my high-performance database application's speed and accuracy to delivery timely information on real-time usage.

**Rapid Announce, a Product of TelSwitch, Inc.** (2010). I authored the combined software (database) and hardware application that is used to conduct millions of daily inquiries into several linked databases.  The databases, which contain approximately three hundred thousand new collection accounts per day, are analyzed to determine to whom automated dialers should call and what those called individuals are being contacted regarding.  The calls are indexed, and are reported to time tracking databases for later analysis and quality assurance.  The system is currently in use by collection bureau(s), and makes decisions on hundreds of thousands of transactions per day. The system is also had been used for automated notifications in several non-collection industries.

**SAIC - Patriot Missile Systems / Training division** (2011).  Tasked with adopting some of the database SQL analysis tools that I use in expert database analysis toward use in personnel management and battlefield equipment positioning.  Expand the methods I developed for analyzing GPS data points, so that data points coming from disparate data sources could uniformly be applied into databases and then analyzed.  According to SAIC, the database formulas that I had applied in my capacity as an expert in the Moreno, et al. v. J. Redfern, Inc. (RG08375539) closely mimic the GPS data point analysis that is conducted GPS data points from projectiles (missiles) and personnel movement.

**AggravationSense and VoiceVault, a Product of TelSwitch, Inc.** (2011).  Built a database to analyze the voice characteristics of telephone calls in real-time, to determine when someone becomes aggravated, so that they can be proactively routed to customer Service supervisors.  VoiceVault contains approximately 130 characteristics of the human voice, and can be used to determine whether a telephone caller is who they say they are, with a very high degree of accuracy.  The partners in this project were Qwest, AT&T Business Services, Network Services Solutions LLC, and American Automated Payroll;

---

Education:

San Joaquin Delta College (1991-1994); Majored in Sociology and Cultural Anthropology.

---

Publications, Awards, Authored Works

1996, Young Entrepreneur of the year, San Joaquin County; California.

Authored Foundational White Paper on Voice Over Internet Protocol, and filed patent application on Wide Area Centrex using Internet as Communication Backbone, as part of the Tempo Networks LLC partnership between me and two of the co-founders of Worldcom.

Authored patent application for SMS (Text Message) Initiation of a telephone call between two people by connecting two outbound calls initiated by a phone switch in a foreign country.  One leg was placed to the "initiating party" and the other leg to the "called party", which were connected together to create a circuit through an intermediate county.

Co-wrote a paper presented to DARPA on the best-practices method of designing a database to conduct the analysis of large volumes of Telephone Calls.  Authored in conjunction with Ted Kubaitis, the founder and Chief Software Architect of QL2.

Analysis of Scheduled Flights and the Merger Effect on Flight Availability re: Merger of United Airlines and Continental Airlines (Declaration) – In Matter of the Merger of United Airlines and Continental Airlines, before the Senate Judiciary Subcommittee to Examine United/Continental Merger, May 27th, 2010, 2:15pm – Dirksen-226

**Curriculum Vitae**                                                    **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

## Professional Certifications:

1994-2011; Certification Granted by California Public Utilities Commission (U-5410-C) to operate as a California Public Utility, after passing the standards for expertise necessary related to the operation of telephone communication systems and telephonic records database recording and billing / rating mechanisms.

2004; NACHA certification achieved for network integration of Payment Transaction Processing between financial institutions; (Bank Interchange Network).

2006-2012; Credit Card Interchange Network Certification issued by Global Payments for Software written by Aaron Woolfson related to the Networked Interchange of card member payment transactions between merchants and correspondent banks, on behalf of Master Card/Visa/American Express/Discover.

2010-2012; Certificate of PCI DSS Compliance issued by Security Metrics for maintaining best-practices in database management related to secure transaction processing between mechanized database systems.

2016-2023: Participant in the Apple Developer Program for handset based applications and programs running under iOS.

2017; Certification Granted by California Public Utilities Commission (U-7327-C) to operate as a California Public Utility as Tel-One Network Services, Inc. The company continues to operate as a *stand-alone* company.

2017-2023; TelSwitch, Inc. is registered with the Federal Trade Commission ("FTC") as Organization ID is 10159990-70991, Subscription Account Number ("SAN") 10376173-476173-21 for the daily download and use of the Federal Do-Not-Dall database.

2019-2023; Certificate of PCI DSS Compliance issued by Trusted Site for maintaining best-practices related to secure transaction processing between interconnected computer systems.

2023; Authorized reseller of iConnectiv for resale of WDNC data used for maintaining compliance with TCPA; availability of, and use of data authorized by FCC-15-35A1 (03/27/2015).

## Summary:

I continue to be actively involved in the development of telecommunications technology, including that used by call centers. I also continue to maintain Airnet AMS, which is used by providers of telecommunications services to bill their customers and conduct network planning.

Additionally, I been retained as either a consulting or testifying expert in database analysis in over 1,000 cases involving the analysis of timekeeping, payroll records, telephone call records, Do-Not-Call ("DNC") database records, credit card records, reimbursement records, travel records (e.g., GPS data and locations where employees worked), as well as provide analysis of technology related to Call Center and Collection Operations.

I have worked with both plaintiffs and defendants, and have been qualified by State and Federal courts as an expert in databases and as an expert in telecommunications.

**Curriculum Vitae**                                                      **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

<u>Materials, and supplies – billed to client:</u> Airfare, Hotels, Meals, Parking, Gasoline, Car Rental.

Billable travel time charged at ½ of the regular rate, and is calculated as a measurement of the most efficient routing, not the actual duration of the flights that we choose. You will be billed for the lesser of (a) the amount of time for the flight that is actually booked, or (b) the amount of time for the alternative flight that would have been most efficient, even if we elect to take a longer flight or a flight with more connections.  Time is capped at eight hours per day.

**Payments are due at time of deposition by deposing party.**

No deposition will be provided if the requesting counsel (e.g. opposing counsel) owes a balance for work done for that firm in other matters.  In other words, no depositions will be given to any parties where balances are owed. This is non-negotiable.

# EXHIBIT 2

**Aaron Woolfson's List of Cases in which Testimony was Provided
(as a Deponent or as an Expert at Trial within approx. previous four years)**

- *Taylor Carroll et.al. v SGS Automotive Services, Inc.* (Case No. 16-537-SDD-RLB (MD, La)

- *Adrian Diaz et. al. v. Bald Eagle Security Services, Inc.* (Case No. 37-2018-00009703-CU-OE-CTL, Superior Court of California, Los Angeles County)

- *Christopher Dueker et. al. v. CRST Expedited, Inc.* (Case No. 2:18-cv-08751-FMO-FFM, ND Ca)

- *Bruce Wright, Jorges Valdes, Edwin Diaz, individually and on behalf of himself and all others similarly situated, v. eXp Realty, LLC, a Washington Limited Liability Company* (Case No. 6:18-CV-01851-PGB-TBS MD Fl)

- *Joseph Cabardo, Donnabel Suyat, Mactabe Bibat, Marissa Bibat, Alicia Bolling, Renato Manipon, Carlina Cabacongan, And John Dave Cabacongan, on behalf of all current and former employees and the State Of California v Marilyn Patacsil and Ernesto Patacsil* (Case No. 2:12-cv-01705-TLN-KLN, ED, Ca, Sacramento Div.)

- *Robert Fischer et al v. Trivita, Inc.*
(Case No. 6:19-cv-02333-CEM-EJK, MD Fl, Orlando Division)

- *Austin and Marrero et al v Public Reputation Management*
(Case No. 9:20-CV-80161-RS, SD Fl.)

- *Deanna Hicks et al v Houston Baptist University*
(Case No. 5:17-cv-00629-FL, E.D., NC, Western Div.)

- *Paramjit Lalli et al v. First Team Real Estate Orange County*
(Case No. 8:20-cv-000270-JLS-ADS, C.D. Cal., Southern Division)

- *Jodi Judson et al v. Goldco Direct, LLC*
(Case No. 2:19-cv-06798-PSG-PLA, CD, Ca)

- *ABM Industries Overtime Cases*
(Case No JCCP 4502, San Francisco Superior Court)

- *Kenneth Johansen, et al. v. Bluegreen Vacations Unlimited, Inc.*
(Case No. 9:20-cv-81076-SMITH, S.D. Fla.)

- *Jeremy Gilmore et al v. Vansh, Inc.*
  (Case No. HG18930348, Superior Court of California, County of Alameda)

- *Aldapa et al. v. Fowler Packing, Co., et al.*
  (Case No. 1:15-CV-00420-DAD-SAB, ED, Ca, Fresno Division)

- *Anderson et al v. The Berry Man, Inc. and All About Produce, Inc. et al.*
  (Case No. 16-cv-0377, Superior Court of California, County of San Luis Obispo)

- *Raymunda E. Menjivar v Angelo's Gourmet Deli, Inc., Jae Choi, Anna Lee, et al*
  (Case No. C20-00885, Superior Court of California, County of Contra Costa)

- *Amanda Boardman et al v Green Dot Corporation*
  (Case No. 21-cv-00174-FDW-DSC, W.D., Nc, Charlotte Div.)

- *Annette Barnes et al v. Allsup Employment Services, LLC.*
  (Case No. 1:21-cv-21121, S.D. Fl,, Miami Div.)

- *Pineda et al. v Lithographix, Inc.*
  (Case No. BC612372, Superior Court of California, County of Los Angeles)

- *Andrew Perrong et al. v Victory Phones LLC.*
  (Case No. 2:20-cv-05317-GEKP, E.D. PA)

- *Floyd Steve Bales et al v. Bright Solar Marketing, LLC*
  Case No. 5:21-cv-00496-JSM-PRL, M.D. Fl, Ocala Div.

- *George Moore et al v. Club Exploria, LLC*
  Case No.1:19-cv-02504, ND. Illinois, Eastern Div.

- *Eric Laguardia, Sophia Wingate, Lindsay Rucker and Nicole R. Austin v Designer Brands Inc., F/K/A DSW, Inc., an Ohio Corporation; and DSW Shoe Warehouse, Inc., a Missouri Corporation.* (Case No. 2:20-cv-02311-SDM-EPD, SD OH, Eastern Div.)

- *Varas et al v Paras et al* (Case No. RG20072221, Superior Court of California, County of Alameda, Eric C. Davidson Courthouse)

- *Marisol Gomez and Ignacio Osorio et al, v. J Jacobo Farm Labor Contractor, Inc. et al*
  (Case No. 1:15-cv-01489, ED, Ca)

- *Robert E. Stafford, Jr., Melissa Bonetti, Michelle Layton, Herbert Mallet, Jacqueline Johnson, Cathrine Allen, Devron Jones, Laura Shope, Tabitha Daniel, Damian Prentice, Debra Call, Laquasha Osaghee, Ronda Cole, Marquita Smith, Jennifer Wester et al v. Bo Jangles', Inc.* (Case No. 3:20-cv-266-MOC, WD, Nc, Charlotte Div.)

- *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Il, Eastern Div.)

- *Mark Fitzhenry v Brokers Data, Inc.* (Case No 2:21-cv-04043-RMG, DC, Sc)

- *Nathan Rowan v Brock Pierce* (Case No 2:21-cv-04043-RMG, DC, PR)

- *Samantha Doup v Van Tuyl Group LLC et al* (Case No. 3:20-cv-02742-X, ND, TX)

- *Teresa E. Mendez Villegas, Maria Navarro, Loyda Aguilar, Olimpia Cano De Peral et.al. v. Duarte Nursery, Inc., Jeff Duarte, John Duarte, Patricia Lopez, Engracia Lopez* (Case No. 2014-212, Superior Court of Stanislaus County)

- *Annette Bayles v Hertz Corporation* (Case No. 1:22-cv-01092-JRS-MKK, SD, IN, Indianapolis Div.)

- *Dennis Glazer et al v. Sunnyvale Massage LLC and Lisa Meteyter* (Case No. CIV 527399 Superior Court of California, County of San Mateo).

- *Juan Navas et al. v. Fresh Venture Foods, et al.* (Case No. 17-CV-02222, Superior Court of California, County of Santa Barbara)

- *Carbajal et al v. Imperial Maintenance et al* (Case No. STK-CV-UOE-2016-0001100, Superior Court of California, County of San Joaquin)

- *Faucett et al v. Move.com et al* (Case No. 2:22-cv-04948-ODW-AS, CD, Ca, Western Div.)

- *Mackey et al v. Bankers Life & Casualty et al.* (Case No. JCCP No. 4954, Superior Court of California for the County of San Diego)

- *Dancey et al v.* Walmart, Special Coordinated Proceeding 5136, *Tamara Dancy v. Walmart Inc., et al* (Superior Court, County of Santa Clara, Case No. 19CV360648)*;*

and *Lynette Branco v. Walmart Associates, Inc.* (Superior Court, County of Santa Clara, Case No. CV-20-002265).

- *Mohamed Mallem et al, v C&C Security Patrol, Inc.*; and, *C&C Security Patrol, Inc.* (cross-complainant) v *Manning & Kass, Ellrod, Ramirez, Trester LLP* (cross-defendant); and, *Manning & Kass, Ellrod, Ramirez, Trester LLP* (cross-complainant) v *C&C Security Patrol, Inc.* (cross-defendant)  (Case No. RG16814153, Superior Court of California, County of Alameda)

- *US EEOC and Anonymous Plaintiff Intervenors 1 through 4 v. Fresh Venture Foods LLC, and Babe Farms, Inc.* (Case No. 2:21-CV-07679-CBM-DFM, CD, Ca)

- *Ma de Jesus Vergara, Pahola Ramos, Roberto Reyes, et al v. Kombu Kitchens SF, LLC (dba Nybll), Keven Thibeault, Kristen Thibeault, Alfonso Ventura et al* (Case No. RG20057449, Superior Court of California, County of Alameda) and *Aja de Coudreaux, Zena Evans, Daeun Hwang, Vera Lopez, Myriah Sims, Nicole Vassallo et al v. Kombu Kitchens SF, LLC (dba Nybll), Keven Thibeault, Kristen Thibeault, et al* (Case No. RG20058323, Superior Court of California, County of Alameda)

- *Julie Campbell, Diana Bickford And Kerrie Mulholland, Et Al V. Sirius Xm Radio, Inc.* (Case No. 2:22-cv-02261-CSB-EIL, CD, Il, Urbana Division)

- *Dan L. Boger v. The Maids International, LLC* (Case No. 8:24-cv-01466-TDC, DC, Md.)

- *Robert Hubble v. Loan Depot.com LLC* (Case No. 1:24-cv-11173-TLL-PTM, ED, Mi.)

# EXHIBIT 3

Filed 12/11/17; Certified for Publication 1/10/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ABM INDUSTRIES OVERTIME CASES | JCCP No. 4502 |
| | A132387, A133077 & A133695 |
| | (City & County of San Francisco Super. Ct. No. CJC-07-004502) |

Respondent ABM Industries, Inc. (collectively with related respondents, ABM) is a large facility services company with employees throughout the United States, including thousands of janitorial workers at hundreds of job sites in California. Appellants (referred to herein as plaintiffs) are present or former ABM janitorial employees. On behalf of themselves and similarly situated Californians, plaintiffs filed their complaint in this coordinated proceeding in September 2007, alleging that ABM violated California labor laws by, among other things, failing to properly record and compensate employees for meal breaks; requiring employees to work split shifts without appropriate compensation; and failing to ensure that employees were reimbursed for expenses incurred when traveling between work sites. In June 2010, plaintiffs moved for class certification of a general class of ABM workers and various subclasses of such workers who had been subjected to particular wage and hour violations. After briefing and argument, the trial court found plaintiffs' expert evidence inadmissible and indicated orally that it was denying the class certification motion. In response, plaintiffs filed a

1

motion pursuant to Code of Civil Procedure section 473, subdivision (b) (the 473(b) motion), attempting to supplement the evidence previously provided with respect to the qualifications of their expert. By order dated June 29, 2011, the trial court denied plaintiffs' 473(b) motion. Thereafter, on September 1, 2011, the trial court issued its written order, formally denying plaintiffs' class certification motion. We conclude that the trial court's wholesale exclusion of plaintiffs' expert evidence in this case was error. We further determine that the trial court's refusal to grant class certification on these facts was an abuse of discretion, and therefore reverse.

## I.  BACKGROUND

### A.  *Facts Underlying the Consolidated Complaint*

ABM's numerous California janitorial employees work at customers' workplaces scattered throughout the state. ABM's job sites in California are organized into two regions (Northern California and Southern California), various branches within a region, and dozens of distinct districts within a branch. A district is a number of buildings within a geographic area. Each branch is under the supervision of a different branch manager. Employees report to an individual site supervisor, who in turn reports to the branch manager. According to ABM, the site supervisor is responsible for "the daily operations of the location, including assurance that employees are paid properly and provided with their meal and rest breaks . . . ." However, it appears that ABM's wage and hour policies are controlled centrally and thus applied uniformly throughout all janitorial job sites. In addition, ABM pays all of its employees through use of a single software application, the Labor Management System (LMS).

ABM provides janitorial services to clients under contracts obtained through competitive bidding. According to ABM, "[t]he low cost of entry in the facility services business has led to strongly competitive markets comprised of a large number of mostly regional and local owner-operated companies, primarily located in major cities throughout the United States." In order to compete, ABM provides various contracts at agreed-upon prices. For instance, ABM provides a fixed price contract where "the client agrees to pay a fixed fee every month over a specified contract term." Under the cost-

plus arrangement, "the clients reimburse [ABM] for the agreed-upon amount of wages and benefits, payroll taxes, insurance charges and other expenses associated with the contracted work." Given the fixed-price nature of these contracts, it is ABM, not the customer, who is responsible for higher labor costs if their employees cannot finish their assigned work within budgeted timeframes. As Faisal Algaheim, ABM's Regional Operations Manager for Northern California, testified: "The customer paid the contracted amount; the contracted price. And if it is a fixed job—which means the customer will only pay us a contracted amount—whether we work more or less, it is our problem to maintain the cleaning specifications, and pay the employees currently."

All of ABM's non-exempt janitorial employees, who provide the services under these contracts, are entitled to the benefits prescribed by California's labor laws and the related wage orders promulgated by the Industrial Welfare Commission (Wage Orders). For instance, "[p]ertinent meal period provisions require that '[n]o employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes . . . .' (Cal. Code Regs., tit. 8, § 11050, subd. 11(A).) '[A]n employer's obligation is to provide a first meal period after no more than five hours of work and a second meal period after no more than 10 hours of work.' (*Brinker* [*Restaurant Corp. v. Superior Court* (2012)] 53 Cal.4th [1004,] 1049 [*Brinker*].) To qualify as a lawful meal break under California law, an employee must be relieved of all duties for an uninterrupted 30 minutes. (*Id.* at p. 1040; Cal. Code Regs., tit. 8, § 11050, subd. 11(A).) If an employer fails to comply with these requirements it must pay one hour of pay at the employee's regular rate 'for each workday that the meal period is not provided.' (Cal. Code Regs., tit. 8, § 11050, subd. 11(B); see Lab. Code, § 226.7, subd. (c).)" (*Alberts v. Aurora Behavioral Health Care* (2015) 241 Cal.App.4th 388, 400 (*Alberts*).) We refer to any extra hours of wages potentially due to employees under the labor laws as premium pay.

Similarly, pursuant to Wage Order 5-2001(4)(C): "When an employee works a split shift, one hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday . . . ." (See Lab. Code, § 1197 ["The minimum wage for

employees fixed by the commission or by any applicable state or local law, is the minimum wage to be paid to employees, and the payment of a lower wage than the minimum so fixed is unlawful."]; see also *id.*, §§ 1194, subd. (a) & 1194.2 [allowing civil action for recovery of unpaid wages].)  For purposes of this requirement, "split shift" is defined to mean "a work schedule which is interrupted by non-paid non-working periods established by the employer, other than bona fide rest or meal periods."  (Wage Order 5-2001(2)(R).)  Although the Wage Order does not define "bona fide meal period," the Division of Labor Standards Enforcement (DLSE) has historically taken the position that a bona fide meal period "is one that does not exceed one hour (60 minutes) in length."  (DLSE Of Counsel H. Thomas Cadell, Jr., letter to Paul K. Schrieffer, Dec. 11, 2002.)[1]

Finally, California law requires employers to fully reimburse employees for expenses actually and necessarily incurred in the discharge of their duties, including automobile expenses.  (Lab. Code, § 2802; *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 569 (*Gattuso*).)  This right to reimbursement cannot be waived.  (*Gattuso*, *supra*, 42 Cal.4th at p. 561.)  However, an employer can discharge its reimbursement obligation in a number of different ways, including through reimbursement for actual expenses or mileage, or through lump sum payments.  (*Id.* at pp. 567–571.)

On September 19, 2007, plaintiffs filed their consolidated class action complaint in this matter (Complaint).  The Complaint alleges numerous violations of California's labor laws and Wage Orders, including violations related to missed meal periods, failure to provide mandatory split shift premium pay, and failure to compensate ABM employees for travel expenses incurred when travelling between job sites.  The Complaint additionally alleges unfair competition under Business & Professions Code section 17200, based on the asserted labor law violations.  Finally, it contains a claim

---

[1] Although the DLSE is responsible for enforcing California's labor laws, including Wage Orders, its interpretations of Wage Orders—while entitled to consideration and respect—are not binding.  (*Aleman v. Airtouch Cellular* (2012) 209 Cal.App.4th 556, 573 (*Aleman*).)

under the Private Attorneys General Act of 2004, Labor Code section 2698 et seq. (PAGA), to collect penalties based on ABM's alleged systemic wrongdoing.

**B.**    ***Class Certification Motion***

After a number of years of discovery and other preliminary matters, plaintiffs filed their motion for class certification on June 14, 2010.  The motion sought certification of a general class described as "[a]ll non-exempt janitorial employees and former non-exempt janitorial employees employed by ABM in the State of California at any time from April 6, 2002 to the present" (ABM Workers) (italics omitted).  This putative class was estimated as of 2007 to include approximately 35,000 ABM janitorial employees.  In addition, the motion proposed seven subclasses of ABM Workers, the following four of which are relevant here:  (A) "ABM Workers who . . . suffered an automatic deduction of a half-hour although the employee actually worked through the deducted meal period . . ." (Unpaid Time/Meal Period Subclass);  (B) "ABM Workers who were not paid premium meal period wages when they (1) worked shifts of at least five hours without an uninterrupted meal period of at least 30 minutes, (2) worked shifts of at least 10 hours without a second uninterrupted meal period of at least 30 minutes, or (3) were provided a first meal period *after* the fifth hour of work" (Unpaid Meal Premium Subclass);  (C) "ABM Workers who were scheduled or required in a workday to work two or more shifts separated by a period of time that was not a bona fide meal period, but were not paid an additional hour of wages for each split shift" (Unpaid Split-Shift Premium Subclass);  and (D) "ABM Workers who were not reimbursed for expenses that were necessary to carry out their duties, including (1) the use of their own vehicles to travel between jobsites, or transport ABM supplies or equipment" (Reimbursement Subclass).[2]

Plaintiffs argued that class certification was warranted because, among other reasons, common legal and factual issues predominated.  For instance, plaintiffs alleged

---

[2] Plaintiffs declined to appeal from the denial of class certification for their other three proposed subclasses—the Unpaid Rest Premium subclass, the Unpaid Reporting Time subclass, and the Paystub subclass.

that ABM applied a uniform payroll policy which compensated employees according to anticipated work *schedules* rather than for hours actually worked, leading to uncompensated time.  In particular, according to plaintiffs, the LMS, ABM's payroll system, automatically deducted 30 minutes of work time for a meal period whenever an employee was scheduled for a shift of five or more hours, without sufficient documentary evidence that those meals were actually taken.  In addition, plaintiffs averred that analysis of the LMS disclosed a company policy of never paying statutorily required premium wages for missed meal periods or split shifts, despite the fact that some employees were scheduled to work split shifts and, reportedly, many routinely missed meals if they otherwise had insufficient time for cleaning.  Finally, plaintiffs claimed that, although ABM scheduled route workers to provide janitorial services at different locations within the same workday—and required them to travel between sites—the LMS disclosed very few instances in which employees were reimbursed for expenses.

According to plaintiffs, the legality of these common practices could most appropriately be decided on a classwide basis, and ABM's computerized payroll records could be used both to identify violations and to establish common policies.  In support of their motion, plaintiffs submitted declarations from 50 ABM Workers, including four named plaintiffs, stating that the schedules under which employees were paid often bore little relationship to the hours actually worked.  For instance, they often worked through meal periods because there was too much work to do.  In addition, plaintiffs provided evidence of company practices from various ABM supervisors and officials.  Finally, plaintiffs also submitted expert declarations from Aaron Woolfson, a provider of database services who analyzed certain timekeeping and payroll data maintained by ABM with respect to its employees.  For example, Woolfson determined that, of the 1,141,903 shifts greater than five hours that failed to show any time-out/time-in entries during the scheduled workday, 1,070,517 of those shifts (94 percent) nevertheless showed an automatic 30-minute meal period deduction.  Further, there was no indication in the records that premium pay was ever provided for missed meal periods.  In addition, although Woolfson identified 6,331 employees for whom ABM reported at least one shift

6

containing shift segments separated by more than one hour, there was no indication in the payroll records that split shift premium pay was ever provided. Finally, as stated above, analysis of the payroll records disclosed very few instances in which employees were reimbursed for travel expenses (12,834 checks to 826 employees out of the 6,396 employees who worked 155,485 shifts at more than one job site).

ABM opposed plaintiffs' class certification motion, claiming that plaintiffs had failed to offer any "common evidence of a pattern or practice of wrongdoing." Rather, ABM asserted, it promulgated its written meal policy both in its employee handbook and, as of late 2006, on timecards used by some employees.[3] ABM also had a policy for travel reimbursement, and stated that its practice was not to schedule split shifts. With respect to payroll, ABM acknowledges that there is no data in the LMS that describes when a meal period is taken. Rather, the LMS shows the hours scheduled for each employee, by listing the scheduled start and end time for each shift. In addition, the LMS automatically deducts a 30-minute meal period when warranted due to the length of the scheduled shift. According to ABM, when employees have worked their regularly scheduled shifts, they are paid according to their schedule as listed on the LMS. In contrast, if an employee worked additional time, including through a meal break, the site supervisor was required to submit an exception report for input into the payroll system, showing that the employee worked different hours than scheduled.[4] Under these

---

[3] Specifically, the employee handbook stated: "If you are a non-exempt employee . . . you may receive at least one half hour time off as a meal period. Your supervisor schedules meal . . . periods." The timecards, as of late 2006, stated more directly: "State law requires that you take a meal break of at least thirty (30) minutes whenever you work five consecutive hours or more in a day. The meal period must begin before you exceed five hours of work and you must sign in and out for your meal period." According to the plaintiffs, however, timecards that recorded meal breaks were used by less than 15 percent of ABM employees.

[4] According to Woolfson, however, despite ABM's "timesheet maintenance" policy, of the 1,836,083 time entries in the data he reviewed, only 5,625 (0.3 percent) contained any adjustments to pay. Moreover, at least one ABM manager testified that exception reports did not list missed meal breaks and that, in fact, supervisors were not required to report missed meals.

circumstances, ABM argued that class treatment was inappropriate because resolution of plaintiffs' claims would turn on multiple individualized inquiries, such as whether and when each employee took lunch breaks, why an employee failed to take a lunch break, how many miles a particular employee drove between work sites, whether a split shift employee received total wages for that day less than the minimum wage that they would otherwise have been owed, and whether the employee requested a split shift.

In support of its opposition, ABM submitted declarations from 14 current employees as well as excerpts from the depositions of certain of plaintiffs' declarants. According to ABM, the deposition testimony of plaintiffs' declarants cast "serious doubts" on their credibility. With respect to expert testimony, ABM did not provide its own expert, but argued generally that Woolfson's expert declaration should not be considered. ABM also requested that the court take judicial notice of certain deposition testimony provided by Woolfson in another case.

After hearing on April 19, 2011, the trial court issued its oral ruling denying class certification. As a preliminary matter, the court opined that the evidence submitted by Woolfson was inadmissible because his declarations failed to qualify him as an expert on anything material to the class certification motion. Although the court did not strike the Woolfson material, it concluded that it was not admissible "because it doesn't prove anything." When asked about the validity of the many factual findings set forth in the Woolfson declarations, the trial court responded that the question at hand was "whether or not a class should be certified" and that, in this regard, it was "not sufficient to ferret out individualized common questions." With respect to Woolfson himself, the court found many of the statements regarding his expertise conclusory and thus believed that he had not "demonstrated that this court should accept him as a person with particular background, experience, skills, [or] expertise to differentiate him from the rest of the world so he should be accepted by this court as an expert."[5] Since the trial judge rejected

---

[5] Although there was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court, it was attached to an attorney declaration rather than incorporated into Woolfson's own declaration. Under these

Woolfson as an expert, he was not qualified "to present to me opinions that are not generally understood by the rest of the world and to allow him to present hearsay material to rely on and to give me opinions."

On the merits, the trial court found certification inappropriate due to issues with the subclass definitions. In particular, the court appeared concerned that the subclasses were defined in terms of individuals who had been harmed, making class members unascertainable until the conclusion of the case. In addition, it concluded that the plaintiffs had failed to meet their burden to show that common issues of fact and law predominated over individual questions, "given the employment structure and the variety of circumstances that each worker finds him or her under." The trial court further noted with regards to predominance that the number of declarations submitted by plaintiffs disclosing labor code violations was insufficient standing on its own to establish commonality. Rather, it believed "evidence besides declarations would have to be submitted to show a common practice." However, when asked about whether the existence of ABM's auto-deduct policy for meal periods was evidence showing a common issue sufficient to support certification, the trial court responded: "Your class definition is wrong. It's not up to me to ferret through what you present and to see if I can craft a class somehow from what you are arguing." In the end, the trial court opined: "[T]he concept is not whether we can find a common question here. There are plenty of common questions, but the question is whether the common questions predominate over individual questions so that it would be appropriate to utilize the class action mechanism. And it's just a procedural device for the convenience and efficiency of the court and for the efficiency and economic self-interests of the litigants . . . . [¶] . . . Just because you might have a common question in here somewhere doesn't mean it's appropriate to have this case proceed as a class action."

Plaintiffs filed notices of appeal with respect to this oral ruling in June 2011 (case No. A132387).

---

circumstances, the court found it to be hearsay and indicated, regardless: "I feel it's my job to figure out whether somebody is an expert."

**C.**    *Motion for Relief Under Section 473, Subdivision (b)*

In the meantime, on May 11, 2011, following the oral denial of their class certification motion, plaintiffs filed their 473(b) motion, asking to augment the record with further evidence of Woolfson's credentials and expertise. Plaintiffs sought introduction of this additional evidence in hopes that the trial court would accept Woolfson as an expert, reassess its ruling that Woolfson's declarations were hearsay, and reconsider its class certification decision in light of Woolfson's expert findings and conclusions.[6] In support of their motion, plaintiffs argued that it was excusable neglect not to have made a more thorough demonstration of Woolfson's qualifications prior to the hearing on the class certification motion because ABM had given no indication that it was raising a serious challenge to those qualifications. Specifically, ABM had failed to lodge a formal objection to the evidence, move to strike the declaration, depose Woolfson on his credentials or conclusions, and/or provide their own contrary expert opinion. Instead, ABM simply made a brief argument in its opposition papers that Woolfson was not qualified to analyze the data in question and that the opinions he offered were conclusory and based on common experience.[7]

The trial court denied plaintiffs' 473(b) motion after hearing on June 8, 2011. According to the court, plaintiffs had not shown grounds for relief under that statute. In particular, the trial court opined: "Well, the problem with your certification motion was discussed in great detail at the hearing on the motion, and the problem was multifaceted. It covered a full range of matters, none of which falls into the category of a technical

---

[6] Code of Civil Procedure section 473, subdivision (b), provides in relevant part: "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect."

[7] This was apparently in contrast to a previous case where counsel for ABM (representing a different party) had vigorously challenged the same Woolfson declaration by submitting written objections, filing rebuttal declarations by defense experts, and extensively cross-examining Woolfson at deposition. According to plaintiffs' 473(b) motion, these efforts failed and Woolfson was nevertheless qualified as an expert in that case.

failing by the lawyer; in other words, the idea that the problem here is that the lawyers did something wrong and therefore I should relieve the parties from the lawyers' mistake is not what happened here."

According to the trial court, the real issue in the case was that ABM Workers were not a group of workers that were susceptible to being treated as a class, and thus there were no predominant questions of fact or law.  The trial court also reiterated its problems with the plaintiffs' proposed class definitions.  In the end, the court indicated that it had reviewed the supplemental evidence provided by plaintiffs and that—even if it agreed to consider it—it would not change the court's view on certification.  As the court opined: "Whether or not this witness is qualified to give the opinions, the opinions are not material to this case . . . ."  A written order memorializing the trial court's denial of the 473(b) motion was filed on June 29, 2011, and a timely notice of appeal with respect to that order was filed on August 29, 2011 (case No. A133077).

**D.    *Order Denying Class Certification***

The trial court's written order denying class certification was ultimately filed on September 1, 2011.  The court first reiterated its conclusion that the Woolfson declarations submitted by plaintiffs in support of their class certification motion were inadmissible, stating "there is no evidence that Mr. Woolfson is an expert in any area that is material to this case."  As discussed above, the record did contain two orders (from state and federal courts) certifying Woolfson as an expert.  The trial court, however, found that the facts set forth in those orders were hearsay and concluded, regardless: "Whether Mr. Woolfson was accepted as an expert in state and federal court is immaterial:  the Court does its own work regarding the admissibility of expert testimony."

With respect to the merits, the trial court first concluded that plaintiffs' class definition was unworkable.  It found plaintiffs' general class definition permissible:  "All non-exempt janitorial employees and former non-exempt janitorial employees employed by ABM in the State of California at any time from April 6, 2002 to the present."  However, noting that courts have rejected class claims when the class definition is simply

shorthand for persons possibly wronged by the defendant, the trial court found fault with the plaintiffs' seven subclasses, opining that "defining the proposed class(es) by reference to the alleged injury or injuries sustained is a fatal defect, because the members of the class cannot be ascertained until the lawsuit is concluded." According to the trial court, under such circumstances, "it is impossible to identify who is a member of the putative class, which makes it impossible to provide them with notice of the lawsuit, and which therefore also makes it impossible to determine who will be bound by the judgment." The trial court also found fault with the fact that the sum of the seven subclasses did not add up to the entire general class.

In addition to these ascertainability issues, the trial court also concluded that class treatment of plaintiffs' claims was inappropriate because plaintiffs failed to demonstrate that common questions predominate over individual inquiries. In particular, the court found that plaintiffs did not provide sufficient evidence of a common scheme with respect to the negotiation of contracts which, by their terms, led to ABM employees being underpaid. In addition, the court determined that the declarations submitted by plaintiffs regarding claimed labor law violations were insufficient in number, "without additional evidence," to demonstrate a common practice. In sum, the court opined that "consideration of all the factors relevant to class certification demonstrates that individual inquiries will predominate in determining all of the putative class members' claims, and therefore class certification is not a superior method of resolving the instant case."

Following entry of the trial court's written order denying class certification, appellants filed a third notice of appeal (case No. A133695). By order dated January 26, 2012, the three cases were consolidated for all future proceedings in this court. In addition, at the parties' request, we stayed the matter pending issuance by the Supreme Court of its decision in *Brinker*, *supra*, 53 Cal.4th 1004. Once the Supreme Court's opinion in *Brinker* was final, a briefing schedule was set, and the matter is now before us for decision.

## II.    DISCUSSION

### A.    *Admissibility of Expert Evidence*

As a preliminary matter, we must address the trial court's decision to disregard the declarations of plaintiffs' expert, Woolfson, in making its class certification determination.  As both parties have accurately asserted, we review a trial court's ruling on the admissibility of expert evidence for abuse of discretion.  (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 187.)  " 'However, the discretion to admit or exclude evidence is not unlimited.  "The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown." ' "  (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 291–292 (*Kotla*).)  This is especially true when, as here, a trial court's exercise of discretion "implicates a party's ability to present its case."  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon Enterprises*); see *Brown v. Colm* (1974) 11 Cal.3d 639, 647 (*Brown*) ["the exclusion of the sole expert relied upon by a party because of an erroneous view of his qualifications is, in a case where expert testimony is essential, an abuse of discretion as a matter of law requiring reversal"].)  Indeed, in this context, courts must "be cautious in excluding expert testimony" as the trial court's gatekeeping goal "is simply to exclude 'clearly invalid and unreliable' expert opinion."  (*Sargon Enterprises*, at p. 772.)

Should we determine in this case that an abuse of discretion has occurred, that conclusion alone is not sufficient to support reversal of the trial court's certification decision.  Rather, the "judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial."  (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799 (*Grail Semiconductor*); see Code Civ. Proc., § 475.)  Article VI, section 13, of the California Constitution further provides that "a judgment may not be set aside based on the erroneous admission of evidence 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error

complained of has resulted in a miscarriage of justice.' " (*Grail Semiconductor*, *supra*, 225 Cal.App.4th at p. 799; see Evid. Code, § 353.)  "In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Grail Semiconductor*, at p. 799.)  Thus, our task on appeal is to determine whether an abuse of discretion has occurred and, if so, whether it is reasonably probable that a result more favorable to plaintiffs would have been obtained absent the error.

As detailed above, the trial court in the present case based its decision to exclude Woolfson's expert declarations on two separate grounds—that Woolfson had not properly established himself as an expert and that, regardless, the information that he presented via expert declaration was not material to this case.  With respect to Woolfson's expert qualifications, although the trial court acknowledged in its order denying class certification that Woolfson indicated an expertise "in creating, managing and analyzing large databases," it rejected him as an expert, finding no evidence that he had "formal training or degrees that would qualify him as an expert to review the timekeeping and payroll data at issue."  The trial court also noted that "Mr. Woolfson's declaration does not set forth any evidence that he holds certificates, has obtained any kind of college or other professional degree, belongs to any professional organizations, has published any articles, taught or has ever testified as an expert witness at trial."  Further, at the April 2011 hearing denying class certification, the trial court indicated that it believed the qualification information supplied by Woolfson in his expert declaration was too general to establish him as an expert.  For example, the trial court stated: "[Woolfson] says he has extensive experience in creating, managing, and analyzing large databases, including, and then he lists a number of things.  I have no idea what the term 'extensive' means.  It looks to me like a conclusion that he hasn't explained in any way. He doesn't say how many years, how many assignments, what the nature of the assignments were, what the nature of his tasks were or anything of the like."  Similarly, the trial court noted that "without any detail" Woolfson stated that he "has provided

payroll and timekeeping database analysis for attorneys in numerous wage-hour cases. That does not communicate any specific facts of the type that is usually relied upon to qualify an expert."

While the better course of action in this case clearly would have been to provide the trial court with a more extensive explanation of the specifics of Woolfson's expertise, we believe that, under the circumstances, the trial court erred by refusing to qualify Woolfson as an expert in database management and analysis based on the materials before it. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, *or* education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a), italics added.) "Expertise, in other words, 'is relative to the subject,' and is not subject to rigid classification according to formal education or certification." (*People v. Ojeda* (1990) 225 Cal.App.3d 404, 408.) Rather, an expert's qualifications can be established in any number of different ways, including "a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion." (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115 (*Howard Entertainment*).) In sum, with respect to expert qualification, "[t]he determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and no hard and fast rule can be laid down which would be applicable in every circumstance." (*Brown*, *supra*, 11 Cal.3d at p. 645; see *Howard Entertainment*, at p. 1115.)

Once this threshold has been met, questions regarding *the degree* of an expert's knowledge go more to the weight of the evidence presented than to its admissibility. (See *People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1079–1080; see also *Jordan v. Allstate Insurance Co.* (2004) 116 Cal.App.4th 1206, 1217 [where expert declaration was sufficient to demonstrate " 'special' " knowledge of the subject matter, the "weight and value" of the expert opinion was a matter for the trier of fact].) Finally, the ability of an expert witness to testify as to either facts or opinions is limited to matters that are not

15

common knowledge.  Thus, for example, "[e]xpert testimony as to facts may be necessary where the facts from which conclusions are to be drawn are peculiarly within the expert's knowledge and are not a matter of common knowledge as to which an ordinary witness may competently testify."  (1 Witkin, Cal. Evid. (5th ed. 2012) Opinion Evidence, § 27, p. 638.)  Similarly, expert opinion should be excluded " ' "when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' " ' "  (*Kotla*, *supra*, 115 Cal.App.4th at p. 291; see Evid. Code, § 801, subd. (a).)

Here, Woolfson provided a declaration indicating that he was a founder of TelSwitch, Inc., a company which "builds and develops telephonic database service for several major telecommunications companies to manage their billing, as well as calculating and maintaining extensive databases related to the accurate calculation of the rates and rounding mechanisms used on telecommunications services."  Woolfson further declared that he was a managing partner of Merkt-Woolfson, a company which "produces billing and database mechanisms for banks to keep track of the paperwork that banks require to maintain mortgage and loan origination" and also provides "extensive database management services to both government and private industries," including "the largest banks, military contractors, and publicly held telecommunications carriers where accuracy and accountability are a necessity."  Moreover, according to Woolfson, a "typical transaction load" for an "average database" maintained by his company was approximately one million records a day; he was "accustomed to, and comfortable with, working with a large amount of data across a variety of industries, including for litigation purposes"; and he had "extensive experience in creating, managing, and analyzing large databases," including specifically timekeeping databases.

Woolfson's expert declaration additionally indicated that he had provided "payroll and timekeeping database analysis for attorneys in Northern and Southern California involving numerous wage and hour class action cases."  He then described the timekeeping records he had received from ABM—including, for example, "1,836,083 Time Entries in Microsoft Excel™ files covering 27,183 employees who performed

16

1,500,175 shifts of work at 5380 Job Site locations from 12-08-02 through 07-18-07"—and walked through his step-by-step analysis of those records. Indeed, Woolfson went so far as to set forth the specific Structured Query Language (SQL) queries he used to extract relevant information from ABM's records.[8]

We reiterate that additional information regarding the specifics of Woolfson's expertise in matters relevant to this case would clearly have been preferable.[9] However,

_____

[8] As stated above, in addition to Woolfson's expert declarations, the plaintiffs submitted an attorney declaration that, among other things, attached two court orders from cases in which Woolfson had reportedly been qualified as an expert under similar circumstances. (See *Avalos v. La Salsa, Inc.* (Super. Ct. Santa Barbara County, 2010, JCCP No. 4488 (*Avalos*) [order dated May 17, 2010, granting in part and denying in part plaintiff's motion for class certification]; see also *Hines v. KFC U.S. Properties, Inc.* (S.D. Cal., Oct. 22, 2010, No. 09-cv-02422-JM (POR) (*Hines*) [order granting in part and denying in part motion for class certification, which states at page 6 that "Mr. Woolfson is an expert in the compilation and analysis of databases, based upon his declaration which sets forth his qualifications and the methods and procedures adopted to analyze the data."].) At the April 2011 hearing on class certification, the trial court initially indicated that it believed there was evidence in the record that Woolfson had *not* previously qualified as an expert. When plaintiffs' counsel mentioned the two cases cited above as instances where Woolfson had been qualified, the court opined that the referenced court orders were hearsay and that, regardless, it chose not to take judicial notice of them because it believed it was the court's job "to figure out whether somebody is an expert." The court's written order denying class certification reiterated this sentiment, stating that whether Woolfson was "<u>accepted as an expert in state and federal court is immaterial; the Court does its own work regarding the admissibility of expert testimony.</u>" We agree with both the trial court and ABM that one court is not *required* to adopt another court's conclusion that an individual is an expert in a particular matter, although it may do so. (See *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 513–514.) However, that a proposed expert has been previously qualified seems, at the very least, relevant to another court's subsequent qualification analysis and we question the trial court's perhaps overly technical application of the hearsay rule when establishing prior expert qualification via judicially noticed court order. Nevertheless, we need not finally reach the issue, as we would find error here regardless of whether Woolfson's history as a qualified expert is considered.

[9] For instance, in a supplemental declaration filed in connection with plaintiffs' 473(b) motion, Woolfson clarified that he had *over 24 years* of experience developing highly accurate database applications for companies such as Japan Telecom America, Experian, Bank of America, and JP Morgan Chase; that his database techniques were

we conclude that the materials submitted in advance of the April 2011 hearing on class certification in this case were sufficient to qualify Woolfson as an expert in database management and analysis, and that the trial court's conclusion to the contrary was an abuse of discretion.  In particular, we find that the trial court's emphasis on formal education and membership in professional organizations was misplaced with respect to Woolfson's stated expertise, given his clear familiarity with numerous, highly complex transactions in that subject matter.  (See *Howard Entertainment*, *supra*, 208 Cal.App.4th at p. 1115.)  Indeed, while admittedly not detailed, Woolfson's declaration did indicate that he had "extensive experience" in database management and analysis, including statements that he held leadership positions in two database companies which serviced the "largest banks, military contractors, and publicly held telecommunications carriers"; that his company handled typical transaction loads of approximately one million records per day on "average" databases it maintained; and that he had previously provided payroll and timekeeping database analysis in numerous wage and hour class action cases in California.  Moreover, although ABM did argue briefly before the trial court that Woolfson was not qualified to analyze the data at issue and that certain of his conclusions were overly broad and lacked sufficient factual foundation, ABM did not challenge the veracity of any of Woolfson's qualifications as set forth in his declaration, nor did it contest *even a single one* of the myriad factual findings made by Woolfson during the course of his analysis.

---

used by the federal government, including by the Department of Justice and the Patriot Missile Defense Training System; that he had a number of relevant professional certifications; that his authored works included an analysis of the merger between Continental Airlines and United Airlines that was presented to the Senate Judiciary Committee in 2010; that he had qualified as an expert in *Avalos* and *Hines*, both wage and hour class actions in which the courts relied on his analysis in granting class certification; and that he had been retained as an expert in over 40 cases (90 percent class actions) by both plaintiffs and defendants to analyze "timekeeping, payroll records, telephone call records, credit card records, reimbursement records, and travel records (e.g., gps data and locations where employees worked)."

Under these circumstances, plaintiffs' evidence supporting Woolfson's expert qualifications showed that he had "sufficient skill or experience" in the field of database management and analysis such that his declarations should have been considered by the trial court.  (See *Brown*, *supra*, 11 Cal.3d at p. 645.)  Nevertheless, the trial court chose to reject all of the information provided by Woolfson, despite the fact that, as we discuss further below, Woolfson's analysis of the ABM database was central to plaintiffs' class certification motion, and thus the trial court's decision effectively foreclosed plaintiffs' ability to put on their case.  (See *Sargon Enterprises*, *supra*, 55 Cal.4th at p. 773; *Brown*, *supra*, 11 Cal.3d at p. 647.)  This was error.

While we do not here pass on the admissibility of *every* opinion reached by Woolfson based on his manipulation of ABM's database, we find the many facts generated by Woolfson's analysis clearly admissible as matters beyond the common knowledge or experience of an ordinary witness.[10]  (See *Business Objects, S.A. v. MicroStrategy, Inc.* (Fed. Cir. 2005) 393 F.3d 1366, 1368 [noting that SQL requires the user to "understand the structure and content of the relational database as well as the complex syntax of the specific query language" and that "[t]hese complexities generally prevent laypersons from drafting queries in query languages."].)  Moreover, as evidence of ABM's common wage and timekeeping practices, Woolfson's results would unquestionably aid a jury in its search for the truth regarding any alleged classwide wage or hour violations in this case.  (See *Brown*, *supra*, 11 Cal.3d at p. 645; *Howard Entertainment*, *supra*, 208 Cal.App.4th at p. 1115; see also *Brinker*, *supra*, 53 Cal.4th at p. 1033 ["Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment."].)

---

[10] As just one example, Woolfson identified ABM workers scheduled to work shift segments separated by more than one hour on the same day, without any indication of premium pay, through use of the following SQL queries:  "1.  *select count (\*) from workdata where SplitShiftViolation='YES' and isWork ='YES'*  [¶]  2. *select distinct reference from workdata where SplitShiftViolation ='YES' and iswork ='YES'*."

Frankly, we are somewhat mystified by the trial court's wholesale exclusion of the entirety of Woolfson's evidence in this matter. Upon review, it appears that the trial court's conclusions regarding the admissibility of the Woolfson materials were impermissibly tainted by its strong views with respect to the underlying merits of plaintiffs' class certification motion—that is, that class certification was improper due to the individualized inquiries that would be required to establish which ABM employees, if any, had been harmed in this matter. This determination, moreover, appears to have been based, at least in part, on the mistaken notion that database analysis of timekeeping and payroll records cannot be used as a means to show common practices for purposes of class certification. Indeed, at the June 2011 hearing on plaintiffs' 473(b) motion, through which plaintiffs were attempting to bolster Woolfson's expert credentials, the trial court opined that ABM workers were "not susceptible to be treated as a class, period" and that the "basic problem" in the case was that "individualized analysis of working situations" would be needed "to understand why a worker may not have been given a lunch break." Thus, in the opinion of the trial court: "*Whether or not this witness is qualified* to give the opinions, the opinions are not material to this case." (Italics added.)

In sum, it was error for the trial court to completely disregard plaintiffs' proffered expert evidence of common practice, rather than accepting it for what it was and weighing it against the existence of any individualized inquiries that might properly have defeated plaintiffs' request for class certification. Moreover, as we discuss in detail below, the trial court's decision clearly prejudiced plaintiffs, as it left them without any evidence of systemic wrongdoing other than the information contained in the declarations and deposition testimony submitted in connection with their class certification motion, materials which the trial court found insufficient in number to demonstrate predominant common questions. Indeed, the trial court expressly stated: "The number of declarations [submitted by plaintiffs] compared to the number of employees by itself would not be sufficient [to demonstrate predominance]. . . . What I'm suggesting is that *evidence besides declarations would have to be submitted to show a common practice*." (Italics added.) Yet this was precisely the evidence that the trial court excluded. Since we find it

20

reasonably probable that a result more favorable to the plaintiffs would have been reached in the absence of this error, the trial court's order denying class certification cannot stand.  (See *Kotla*, *supra*, 115 Cal.App.4th at p. 294.)[11]

**B.    *Class Certification Issues***

    1.    *Rules Governing Class Actions and Standard of Review*

The requirements for class certification are well established and were recently summarized by our high court in *Brinker*, *supra*, 53 Cal.4th 1004, 1021:  "Originally creatures of equity, class actions have been statutorily embraced by the Legislature whenever 'the question [in a case] is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .'  [Citations.]  Drawing on the language of Code of Civil Procedure section 382 and federal precedent, we have articulated clear requirements for the certification of a class.  The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  [Citations.]  'In turn, the "community of interest requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' "

" '[T]his state has a public policy which encourages the use of the class action device.' "  (*Sav-On Drug Stores, Inc*. *v. Superior Court* (2004) 34 Cal.4th 319, 340 (*Sav-On*).)  Further, whether class certification should be granted is a procedural question, and not a question of whether the action is " 'legally or factually meritorious.' "  (*Id.* at p. 326.)  As a general matter, " 'a class action is not inappropriate simply because

---

[11] Because we conclude that the trial court erred in failing to consider Woolfson's expert declarations when making its class certification determination at the hearing in April 2011 (as memorialized by the court's order denying plaintiffs' motion for class certification filed on September 1, 2011), we need not reach the issue of whether the trial court also erred in refusing to grant plaintiffs' 473(b) motion so that additional evidence of Woolfson's expert qualifications could be brought before the court.

each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery or as to the amount of his or her damages.' " (*Id.* at p. 333.)

In addition, with respect to the superiority of the class action mechanism—and as is pertinent to our present inquiry—we have previously noted that "[c]ourts regularly certify class actions to resolve wage and hour claims. [Citations.] In this arena the class action mechanism allows claims of many individuals to be resolved at the same time, eliminates the possibility of repetitious litigation and affords small claimants with a method of obtaining redress for claims which otherwise would be too insignificant to warrant individual litigation. [Citation.] Moreover, the issues slated for contest are primarily common issues involving common evidence. It would not be efficient or fair to relegate these complaints to multiple trials." (*Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1208 (*Bufil*); see *Brinker*, *supra*, 53 Cal.4th at p. 1033.)

Indeed, as our high court elaborated in *Brinker*, a theory of liability that an employer "has a uniform policy, and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment." (*Brinker*, *supra*, 53 Cal.4th at p. 1033.) "[I]n the general case to prematurely resolve such disputes, conclude a uniform policy complies with the law, and thereafter reject class certification . . . places defendants in jeopardy of multiple class actions, with one after another dismissed until one trial court concludes there *is* some basis for liability and in that case approves class certification. [Citation.] It is far better from a fairness perspective to determine class certification independent of threshold questions disposing of the merits, and thus permit defendants who prevail on those merits, equally with those who lose on the merits, to obtain the preclusive benefits of such victories against an entire class and not just a named plaintiff." (*Id.* at p. 1034.)

"California courts consider 'pattern and practice evidence, statistical evidence, sampling evidence, expert testimony, and other indicators of a defendant's centralized practices in order to evaluate whether common behavior towards similarly situated plaintiffs makes class certification appropriate.' " (*Jaimez v. Daiohs USA, Inc.* (2010)

22

181 Cal.App.4th 1286, 1298 (*Jaimez*).)  Other relevant factors include " 'whether the class approach would actually serve to deter and redress alleged wrongdoing.' "  (*Ibid.*)  Moreover, in the wage and hour context, "[w]e have recognized that retaining one's employment while bringing formal legal action against one's employer is not 'a viable option for many employees,' " and thus a class action may be appropriate as "a current employee who individually sues his or her employer is at greater risk of retaliation." (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 459, abrogated on other grounds as stated in *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 359–360; see also *Williams v. Superior Court* (2017) 3 Cal.5th 531, 558, citing *Gentry*.)  And, in *Gentry* our high court noted that class actions may be particularly useful for immigrant workers with limited English language skills, as illegal employer conduct might otherwise escape their attention.  (*Gentry*, at p. 461.)

A ruling on class certification is reviewed for abuse of discretion.  (*Brinker*, *supra*, 53 Cal.4th at p. 1022; *Sav-On*, *supra*, 34 Cal.4th at p. 326.)  Under this standard, " '[a] certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.' "  (*Brinker*, *supra*, 53 Cal.4th at p. 1022; see *Bufil*, *supra*, 162 Cal.App.4th at p. 1204 [noting that while "[t]rial courts enjoy wide discretion with regard to class certification," we will nevertheless reverse and order denying class certification "if the order is based on improper criteria or incorrect assumptions"].)  Moreover, "[a]n appeal from an order denying class certification presents an exception to customary appellate practice by which we review only the trial court's ruling, not its rationale.  If the trial court failed to conduct the correct legal analysis in deciding not to certify a class action, ' "an appellate court is required to reverse an order denying class certification . . . , 'even though there may be substantial evidence to support the court's order.' " '  [Citation.]  In short, we must ' "consider only the reasons cited by the trial court for the denial, and ignore other reasons that might support denial." ' "  (*Alberts*, *supra*, 241 Cal.App.4th at p. 399.)

On the issue of predominance, a trial court's finding is generally reviewed for substantial evidence. (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) Thus, "[w]e must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' " (*Ibid.*) However, since the focus of this type of certification dispute "is on what type of questions—common or individual—are likely to arise in the action, rather than on the merits of the case [citations], in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the *theory of recovery* advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment. [Citations.] 'Reviewing courts consistently look to the allegations of the complaint and the declarations of attorneys representing the plaintiff class to resolve this question.' " (*Sav-On*, *supra*, 34 Cal.4th at p. 327, italics added.)

In the instant case, plaintiffs contend that the trial court abused its discretion, both in concluding that their proposed subclasses are not ascertainable and in determining that common issues do not predominate over individual inquiries. We consider each claim in turn.

### 2. *Ascertainability*

As stated above, the trial court refused to certify this matter as a class action because, among other reasons, it believed the subclasses proposed by appellants were not ascertainable. In particular, the trial court opined that defining the proposed subclasses by reference to the alleged Labor Code violations sustained was a "fatal defect," because the putative subclass members could not be identified without a determination on the merits of each class member's case. The court reasoned that, when the "class definition is simply shorthand for persons possibly wronged by the defendant," it is impossible to identify putative class members until the lawsuit is concluded, making it impossible both to provide appropriate notice and to determine who will be bound by the judgment. The trial court also found fault with the fact that the sum of the seven subclasses did not add up to the entire general class of non-exempt janitorial employees, because some members of the general class may not have suffered any harm. Unsurprisingly, ABM agrees with

24

the trial court on appeal, arguing that "the only means by which the many subclasses could be ascertained was by a trial on the merits, requiring the testimony of each and every putative class member on each and every claim, a concept that is antithetical to the very concept of class litigation."   In our opinion, however, both the trial court and ABM have fundamentally misapprehended the concept of ascertainability as it applies to the circumstances of this case.

"Ascertainability is achieved 'by defining the class in terms of objective characteristics and common transactional facts making the ultimate identification of class members possible when that identification becomes necessary.' " (*Bomersheim v. Los Angeles Gay & Lesbian Center* (2010) 184 Cal.App.4th 1471, 1483; see *Nicodemus v. Saint Francis Memorial Hospital* (2016) 3 Cal.App.5th 1200, 1212 (*Nicodemus*); *Aguirre v. Amscan Holdings, Inc.* (2015) 234 Cal.App.4th 1290, 1300 (*Aguirre*).)  "In determining whether a class is ascertainable, the trial court examines the class definition, the size of the class and *the means of identifying class members*." (*Bufil*, *supra*, 162 Cal.App.4th at p. 1207, italics added.)  Thus, a plaintiff is not required to establish the identity of class members at the class certification stage of the proceedings. (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1274.)

Moreover, "[w]hile often it is said that '[c]lass members are "ascertainable" where they may be readily identified without unreasonable expense or time by reference to official records' [citations], that statement must be considered in light of the purpose of the ascertainability requirement." (*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 101 (*Medrazo*).)  " 'Ascertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata.' " (*Aguirre*, *supra*, 234 Cal.App.4th at p. 1300.)  Therefore, "[t]he goal in defining an ascertainable class 'is to use terminology that will convey "sufficient meaning to enable persons hearing it to determine whether they are members of the class plaintiffs wish to represent." [Citation.] " '. . . Otherwise, it is not possible to give adequate notice to class members or to determine after the litigation has concluded who is barred from relitigating." ' " (*Id.* at pp. 1300–1301; see also *Medrazo*, at p. 101

[ascertainability requirement is satisfied if "the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation"].)

In sum, a class is ascertainable if a plaintiff supplies a reasonable means of identifying potential class members and the class is defined in terms of objective characteristics and common transactional facts sufficient to allow a class member to identify himself or herself as having a right to recover based on that description.  So long as these requirements are met, a class is ascertainable "even if the definition pleads ultimate facts or conclusions of law."  (*Hicks v. Kaufman and Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915–916 (*Hicks*); see *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 226, 240–241 (*Faulkinbury*) [directing certification of subclasses based on meal break, rest break, and overtime violations]; *Jaimez*, *supra*, 181 Cal.App.4th at pp. 1291–1292, 1295–1296 [directing certification of classes found ascertainable by the trial court, including a meal break class "based upon the failure to permit or authorize meal breaks and the failure to pay one hour of wages for each meal break violation" and an overtime class "based upon the failure to pay overtime to the class"]; *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1529, 1539 [directing certification of two subclasses based on failure to pay earned wages and overtime and failure to provide mandatory rest breaks].)  Under this established analytical framework—and when one considers the data supplied by Woolfson—the trial court's conclusion that the proposed subclasses in this case are unascertainable due to the need for individualized merit determinations is simply not defensible.

Indeed, we recently considered and rejected a similar argument in *Nicodemus*, *supra*, 3 Cal.App.5th 1200.  In that case, the plaintiff filed an action alleging that she was overcharged for copies of her patient medical records, which were sought in anticipation of litigation by her attorney pursuant to Evidence Code section 1158.  The named defendants were the plaintiff's hospital (Saint Francis) and HealthPort Technologies, LLC (HealthPort), a company that, during the relevant timeframe, provided Saint Francis

with patient medical record release of information services pursuant to a contract. (*Nicodemus*, at pp. 1205, 1207.)  The plaintiff moved for certification of a class comprised of all patients who requested medical records from a California medical provider through an attorney prior to litigation and who were charged by HealthPort more than the statutory maximum set forth in Evidence Code section 1158.  (*Id.* at pp. 1205–1206, 1208.)  The trial court concluded that the plaintiff's proposed class was unascertainable.  (*Id.* at p. 1210.)  Although HealthPort tracked all attorney requests using a separate billing code in its database, the trial court concluded that the data set was over-inclusive because the plaintiff "had not presented a mechanism for determining whether attorneys' requests were submitted ' "prior to litigation" . . . without individualized inquiry, for example, by asking' each attorney."  (*Ibid.*)

On appeal, we concluded that the trial court erred as a matter of law in finding that the proposed class was not ascertainable.  (*Nicodemus*, *supra*, 3 Cal.App.5th at pp. 1213–1217.)  Because it is highly relevant to the case at hand, we set out our reasoning in some detail:  "[E]ven assuming the attorney request data set does include some unknown number of requests that were submitted after litigation was commenced (or after defendants' first appearance) or for reasons unrelated to litigation, this fact would not defeat ascertainability.  HealthPort argued, and the trial court concluded, that a class is not ascertainable if the class members who are entitled to recover from the defendants cannot be identified without an individualized inquiry.  That is not, however, the standard for determining whether a class is *ascertainable*.  As noted, '[a]scertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata.  [Citations.]  . . . As long as the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation, the ascertainability requirement is met.' (*Medrazo*, *supra*, 166 Cal.App.4th at p. 101.)  Plaintiff here has identified the class in terms of objective characteristics, tracking the provisions of section 1158; if it is determined later in the litigation that the '07' data set includes requests not made

pursuant to section 1158, 'those [persons] can be eliminated from the class at that time.'
(*Aguiar v. Cintas Corp. No. 2*, *supra*, 144 Cal.App.4th at p. 136 (*Aguiar*); see also *Sav-On*, *supra*, 34 Cal.4th at p. 333 [' "a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery" ']; *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 743 [class of all employees in certain job categories ascertainable even though some employees may not have worked overtime and thus may not be entitled to any recovery].)  Nor should a court 'decline to certify a class simply because it is afraid that insurmountable problems may later appear at the remedy stage.' " (*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1214.)  Thus, contrary to the trial court's belief, possible over-inclusiveness in the method proposed for identifying potential class members does not defeat ascertainability.

In reaching our conclusion in *Nicodemus*, we distinguished *Hale v. Sharp Healthcare* (2014) 232 Cal.App.4th 50 (*Hale*)—a case relied on by ABM here—in which a class was decertified after nearly three years of litigation, discovery, and notice to potential class members.  (*Id.* at pp. 53–55; see *Nicodemus*, *supra*, 3 Cal.App.5th at pp. 1215–1216.)  *Hale* involved an allegation that a class of persons who self-paid for emergency room treatment were overcharged when compared to insured persons.  (*Hale*, at p. 53.)  In moving to decertify, the defendant argued that the class was not ascertainable because the defendant did not keep records in such a way "as to reasonably and readily identify those included in the class definition without individualized inquiries."  (*Id.* at p. 55.)  The trial court agreed with the defendant and the appellate court affirmed, opining with respect to ascertainability that "[i]t is the inability to reasonably distinguish those individuals [later determined to qualify for coverage] from individuals who were actually uninsured and then to identify any disparity in amounts paid that make it unreasonable to ascertain the defined class."  (*Ibid.*)  In *Nicodemus*, we distinguished *Hale*, both because of its "distinctive procedural posture" and because, under *Hale*'s facts, "it was indisputably demonstrated that there was simply no way to

28

avoid a complicated individualized inquiry to determine not just eligibility for damages but *to prove liability*." (*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1216, italics added.)

In contrast, we found *Bufil*, *supra*, 162 Cal.App.4th 1193, instructive. In *Bufil*, which involved meal and rest break claims, "[t]he proposed class was defined as employees for whom the defendant's records showed a meal period not taken because the employee was the only person in the store or was the only person present except for a trainee." (*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1216.) "Although employees who missed a meal period could be identified from the defendant's records, employees who missed a rest period could not." (*Ibid.*) However, Bufil submitted evidence that the defendant had a policy that hourly employees who were working alone or only with a trainee were not allowed to go off duty for any type of break, and argued that the records identifying class members who missed meal periods for the reasons specified thus also identified those who missed rest breaks. (*Bufil*, at pp. 1206, 1208.) Under these circumstances, the appellate court reversed the trial court's denial of class certification, concluding that "the class was ascertainable from the defendant's records." (*Nicodemus*, at p. 1216.) "In doing so, the court rejected the defendant's 'speculation' that an employee who missed a meal break nonetheless might have received a rest break, observing 'speculation that goes to the merits of ultimate recovery [was] an inappropriate focus for the ascertainability inquiry.' (*Ibid.*, citing *Medrazo*, *supra*, 166 Cal.App.4th at p. 101 [defendant's sales records offered an objective means of identifying potential class members, and plaintiff's inability at the class certification stage to identify precisely which buyers qualified as class members was "irrelevant"] and *Harper v. 24 Hour Fitness, Inc.* (2008) 167 Cal.App.4th 966, 976 ["the need to individually examine each member's contract to ultimately determine whether he or she qualifies for inclusion in the class does not . . . demonstrate a lack of ascertainability or manageability"].)

Adopting this analysis in *Nicodemus*, we concluded that potential class members could be readily identified by reference to HealthPort's attorney request data set, and the "speculation" that the data set might be over-inclusive went "to the merits of each class member's recovery" and thus "was an inappropriate focus of the ascertainability inquiry."

29

(*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1216.)  Our analysis of ascertainability in the present case mirrors our conclusions in *Nicodemus*.  Here, as established by Woolfson, the potential subclass members are all readily identifiable by reference to ABM's own employment and payroll records.

For instance, the subclass of ABM Workers who "suffered an automatic deduction of a half-hour although the employee actually worked through the deducted meal period" can be identified through ABM's timekeeping and payroll records showing numerous instances where a meal deduction was made for a shift without any corresponding time entry indicating that a meal period was taken.  The subclass of ABM Workers who were not paid premium meal period wages when they worked shifts of a particular length without a recorded meal period can similarly be ascertained through reference to the same records, reviewed to determine whether any required premium wages were paid where no meal period was recorded.  The Unpaid Split-Shift Premium Subclass— "ABM Workers who were scheduled or required in a workday to work two or more shifts separated by a period of time that was not a bona fide meal but were not paid an additional hour of wages for each split shift"—can be identified by examining ABM's timekeeping and payroll records to determine which employees worked two or more shifts in the same day separated by more than an hour, but were not paid premium wages related to the split shift(s).[12]  Finally, members of the Reimbursement Subclass—ABM Workers who were not reimbursed for expenses related to the use of their own vehicles for travel between jobsites—can be identified by searching ABM payroll records to determine which employees worked at multiple jobsites separated by a certain baseline number of miles during the same workday, but did not receive reimbursement for travel.[13]

---

[12] As discussed above, the DLSE has historically taken the position that a bona fide meal period is one that does not exceed one hour in length.  (See *ante* at p. 4 & fn. 1.)

[13] Woolfson opined below that the ABM databases contained location information for each worker's shift and that from this information, along with the addresses of the

In addition, the subclasses are all defined using objective characteristics and common transactional facts sufficient to allow a potential class member to identify himself or herself as having a right to recover pursuant to that subclass. For example, the nonexempt ABM workers who would receive notice as part of the general class would all be aware whether they worked though meal periods, failed to receive reimbursement for their travel expenses between worksites, or otherwise fell within the articulated subclasses. Under these circumstances, ABM's speculation that some potential class members identified in the data may ultimately not be entitled to relief—because, perhaps, they actually took an otherwise unrecorded meal, or were not entitled to a split shift premium on a particular day, or did not drive themselves between job sites—goes to the merits of each class member's recovery and, as such, was an inappropriate focus of the trial court's ascertainability inquiry. (See *Sav-On*, *supra*, 34 Cal.4th at p. 338 [class can be certified based on partial commonality, meaning not every single member of the proposed class needs to be exposed to the wrongful practice nor does the practice have to be unlawful or lawful as to every class member].)[14]

### 3.    *Predominance.*

Having determined that the plaintiffs have proposed ascertainable classes, we must next address the trial court's conclusion that class certification was inappropriate in this matter because individual inquiries predominate over common questions. As mentioned above, "[t]he 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would

---

work locations, it would be possible to calculate the mileage each worker traveled each day.

[14] In this regard, we note additionally that "if necessary to preserve the case as a class action, the court itself can and should redefine the class where the evidence before it shows such a redefined class would be ascertainable." (*Hicks*, *supra*, 89 Cal.App.4th at p. 916.) Thus, as this action progresses, the trial court should be open to making modifications to the class definitions as necessary to avert developing certification problems or to otherwise enhance the efficiencies of the class certification model.

be advantageous to the judicial process and to the litigants.' [Citations.]  The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.]  A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible.  'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' "  (*Brinker*, *supra*, 53 Cal.4th at pp. 1021–1022, fn. omitted.)  Indeed, "at the class certification stage, as long as the plaintiff's posited theory of liability is amenable to resolution on a classwide basis, the court should certify the action for class treatment even if the plaintiff's theory is ultimately incorrect at its substantive level, because such an approach relieves the defendant of the jeopardy of serial class actions and, once the defendant demonstrates the posited theory is substantively flawed, the defendant 'obtain[s] the preclusive benefits of such victories against an entire class and not just a named plaintiff.' "  (*Hall v. Rite Aid Corp.* (2014)  226 Cal.App.4th 278, 293–294, italics omitted.)

In short, when analyzing the element of predominance for purposes of class certification "the focus must be on the policy the plaintiffs are challenging and whether the legality of that policy can be resolved on a classwide basis."  (*Lubin v. The Wackenhut Corp.* (2016) 5 Cal.App.5th 926, 940.)  Thus, for example, in *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341, the Court of Appeal affirmed the trial court's denial of class certification in a case alleging that the company required employees to purchase company clothing to wear to work but failed to reimburse such purchases. Because there were no clear companywide policies requiring employees to purchase company clothing as a condition of employment or describing what an employee was required to wear, the trial court determined there was no common method to prove the *fact of liability* on a classwide basis.  Rather, individualized inquiries would need to be made regarding, among other things, what employees were told by store managers about

32

wardrobe, how employees interpreted any such discussion, and what each store manager actually required employees to purchase. (*Id.* at pp. 1356–1357.)

 In contrast, numerous other cases have held that individualized issues regarding *proof of the amount of damages* class members may recover does not defeat a class action so long as there are *common questions of liability* amenable to class resolution. (See, e.g., *Faulkinbury*, *supra*, 216 Cal.App.4th 220, 232–240 [common issues of fact predominated for subclasses related to meal, rest, and overtime violations because liability could be determined classwide based on uniform policies, or lack thereof; individual issues, such as whether individuals took rest breaks, went to the issue of damages and did not preclude class certification]; *Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 997 [a uniform policy denying compensation for preshift work presented predominantly common issues of fact and law because liability depended on the existence of the uniform policy, rather than individual damages determinations]; *Benton v. Telecom Network Specialists, Inc*. (2013) 220 Cal.App.4th 701, 726 [theory that defendant violated wage and hour requirements by failing to adopt meal and rest break policies is amenable to class treatment; whether employee was able to take required breaks goes to damages].)

The common theme in these cases is that the plaintiff's theory of liability could be determined based on common uniform policies applicable to the class as a whole. (See also *Department of Fish & Game v. Superior Court* (2011) 197 Cal.App.4th 1323, 1356 ["Class treatment is not barred where a single wrongful act has different effects on different claimants such that some may have claims while others may not. ' "In such cases, the Courts will generally certify a class if the defendant's action can be found to be wrong in the abstract even if no individual person has been damaged. [Citations.] These situations are distinguishable from situations where the Court cannot determine the wrongfulness of an action without reference to individuals." ' "].)

In line with this precedent, and of particular relevance to the case at hand, is the Second District's opinion in *Jaimez*, *supra*, 181 Cal.App.4th 1286. In *Jaimez—*a case, like this one, involving claims of various wage and hour violations, including meal break

33

issues—the appellate court concluded that the "trial court misapplied the criteria [for determining whether a class should be certified], focusing on the potential conflicting issues of fact or law on an individual basis, rather than evaluating 'whether the *theory of recovery* advanced by the plaintiff is likely to prove amenable to class treatment.' " (*Id.* at p. 1294.) Since the plaintiff's theory of recovery focused on uniform policies and practices (such as the defendant's failure to compensate employees for missed meals, rest breaks, and earned overtime), it was "more amenable to class treatment than individual disposition." (*Id.* at p. 1300.) Indeed, in *Jaimez*, the defendant had a policy and practice of automatically deducting 30 minutes per shift for each employee's meal break regardless of whether that meal break was actually taken, and the appellate court expressly found that this policy raised common legal and factual issues. (*Id.* at pp. 1294, 1304.)

Further, in balancing these common issues against any individual inquiries necessary, the *Jaimez* court rejected the trial court's notion that common questions of fact and law did not predominate because the defendant had submitted declarations indicating that some employees did, in fact, get meal breaks, rest breaks, and proper pay stubs and thus there was a " 'strong indication that there could be conflicting testimony regarding whether these employees have common factual issues to be presented at trial.' " (*Jaimez*, *supra*, 181 Cal.App.4th at p. 1296.) Specifically, the appellate court declared that the trial court had improperly "focused on the *merits* of the declarations, evaluating the contradictions in the parties' responses to the company's uniform policies and practices, not the policies and practices themselves." (*Id.* at p. 1300.) Unfortunately, the trial court in this case fell prey to the same errors that infected the trial court's certification decision in *Jaimez*.

Specifically, instead of identifying the principal legal issues presented in this matter and determining whether those "operative legal principles, as applied to the facts of the case, render the claims susceptible of resolution on a common basis' " (*Alberts*, *supra*, 241 Cal.App.4th at p. 399), the trial court here improperly focused on the minutiae of each individual janitor's personal situation. This was a legal error and appears also to

have been the reason the trial court found Woolfson's evidence irrelevant to the class certification inquiry. However, when the merits of the ultimate damages issues are set aside and Woolfson's analysis of ABM's payroll practices is considered, along with the other evidence submitted by plaintiffs, it becomes clear that numerous common issues predominate in this matter, rendering class certification appropriate.

For instance, the legality of ABM's uniform payroll policy—which assumes each employee works his or her scheduled shift and takes any legally required meal breaks absent some type of exception report—is a legal question that can be determined by reference to facts common to all class members. Certainly, the evidence provided by Woolfson that a mere 5,625 of the 1,836,083 time entries for ABM Workers he investigated (0.3 percent) contained adjustments to pay calls into question the efficacy of ABM's asserted "timesheet maintenance" procedure, as does the evidence presented by plaintiffs that ABM does not generate exception reports for missed meals periods. Moreover, the legality of ABM's auto-deduct policy for meal breaks in light of the recordkeeping requirements for California employers is also an issue amenable to classwide resolution. (See Cal. Code Regs., tit. 8, § 11050, subd. (7)(A)(3).) In addition, ABM's apparent uniform practice of never providing premium pay to its employees, either for split shifts or missed meal breaks, is susceptible to classwide treatment. Moreover, ABM's defenses with respect to split shift premium pay—that voluntary split shifts are not compensable and that class members are paid more than the threshold under which premium pay is mandated—are also susceptible to common proof. (See *Saechao v. Landry's, Inc.* (N.D. Cal. Mar. 15, 2016, No. C 15-00815 WHA) 2016 U.S. Dist. LEXIS 33409 at pp. *22–23; *Kamar v. Radio Shack Corp.* (C.D. Cal. 2008) 254 F.R.D. 387, 405; see *Aleman*, *supra*, 209 Cal.App.4th at pp. 574–575 [interpreting split shift Wage Order as a legal matter].) Finally, whether ABM fails to properly reimburse its employees for work-related travel, despite its asserted policy to do so, is also subject to common proof. (See *Brewer v. General Nutrition Corp.* (N.D. Cal. Nov. 12, 2014, No. 11-CV-3587 YGR) 2014 U.S. Dist. LEXIS 159380 at pp. *27–30 [predominance of common questions on a travel reimbursement claim supported by evidence of

35

"exceedingly small percentage of employees who sought reimbursement"; evidence of mileage incurred could be determined on a class-wide basis where all relevant locations known].)  Under these circumstances, fear that the determination of individual damages might prove overly complex should not have provided a basis for denial of class certification.

Indeed, although we do not reach the issue, the trial court's concern regarding the need for numerous individualized damage inquiries in this case may turn out to be over-exaggerated, given existing precedent indicating that the burden of proof shifts to employers "in the wage and hour context when an employer's compensation records are so incomplete or inaccurate that an employee cannot prove his or her damages."  (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1189; see *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 961 (*Cicairos*) [" '[W]here the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee.  In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages.' "], overruled on another ground as stated in *York v. Starbucks Corp.* (C.D. Cal. Sept. 12, 2012, No. CV 08-07919 GAF (PJWx)) 2012 U.S. Dist. LEXIS 190086.)  Thus, for example, since employers have a duty to record their employees' meal periods, "[i]f an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided."  (*Brinker*, *supra*, 53 Cal.4th at p. 1053 [Werdegar, J., conc.]; see Cal. Code Regs., tit. 8, § 11050, subd. (7)(A)(3).) Under such circumstances, a court may award damages, even if they are only approximate and based on statistical sampling.  (*Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th at pp. 746–751.)

In summary, given that the classes proposed by plaintiffs in this case were ascertainable and plaintiffs' allegations presented predominantly common questions, the trial court's determinations to the contrary cannot stand.  Rather, we conclude that the trial court's denial of class certification—including its decision regarding the admissibility of the Woolfson materials—rested on improper criteria and erroneous legal

36

assumptions, amounting to an abuse of discretion. Plaintiffs have made a showing sufficient to allow them to take the next step in attempting to prove the merits of their contentions on a classwide basis.[15]

### III.        DISPOSITION

The trial court's order denying class certification is reversed and the matter remanded for certification of classes as set forth in this opinion. Plaintiffs are entitled to their costs on appeal.

---

[15] In making this determination, we are cognizant of the trial management concerns raised by counsel for ABM at oral argument in this case, issues which may make the ultimate resolution of all or parts of this matter on a classwide basis problematic. However, as detailed above, our review following a denial of class certification is limited. (See *Alberts*, *supra*, 241 Cal.App.4th at p. 399.) Because the trial court's order was based on improper criteria and erroneous legal assumptions, we reverse. Moreover, based on the record before us and as we have detailed at length above, it appears that plaintiffs have identified a number of common questions suitable for classwide resolution. Should plaintiffs' trial plan subsequently prove unworkable, however, ABM may address any such issues to the trial court.

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.

Filed 1/10/18

## CERTIFIED FOR PUBLICATION

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| ABM INDUSTRIES OVERTIME CASES | JCCP No. 4502 |
| | A132387, A133077 & A133695 |
| | (City & County of San Francisco Super. Ct. No. CJC-07-004502) |
| | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION |
| | (NO CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed December 11, 2017, be modified as follows:

The citation to *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949 located on page 36 of the opinion shall be modified to delete the reference to subsequent history such that the case citation shall read in full: "see also *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 961 (*Cicairos*) [" 'Where the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee. In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages' "].)

There is no change in the judgment.

1

In addition, the opinion in the above matter was not certified for publication in the Official Reports when filed on December 11, 2017. For good cause it now appears that the opinion, as modified herein, should be published in the Official Reports and it is so ordered.

Dated: _____          _____

                                          RUVOLO, P. J.

| | |
|---|---|
| Trial Court: | City & County of San Francisco Superior Court |
| Trial Judge: | Hon. Richard A. Kramer |
| Counsel for Appellants: | Weinberg, Roger & Rosenfeld, David A. Rosenfeld, Christian L. Raisner, Emily P. Rich, Roberta D. Perkins; Mallison & Martinez, Stan S. Mallison, Marco A. Palau, Joseph D. Sutton; Rastegar & Matern, Matthew J. Matern |
| Counsel for Respondents: | Littler Mendelson, Keith A. Jacoby, Dominic J. Messiha, Lauren E. Robinson |

# EXHIBIT 4

1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   BEATRIZ ALDAPA and ELMER              No.  1:15-cv-00420-DAD-SAB
     AVALOS, on behalf of themselves and
12   others similarly situated,

13                  Plaintiffs,            ORDER GRANTING MOTION FOR CLASS
                                           CERTIFICATION IN PART AND DENYING
14          v.                             MOTION FOR TRIAL PLAN

15   FOWLER PACKING COMPANY, INC., a       (Doc. Nos. 145, 149)
     California corporation; AG FORCE LLC, a
16   California limited liability company;
     FOWLER MARKETING
17   INTERNATIONAL LLC, a California
     limited liability company; and DOES 1–10,
18
                    Defendants.
19

20          This wage-and-hour class action suit was initially filed by plaintiffs in this court on March

21   17, 2015 (Doc. No. 2), and currently proceeds on plaintiffs' first amended complaint ("FAC")

22   filed on October 20, 2016 (Doc. No. 129).  On February 3, 2017, plaintiffs filed a motion to

23   certify one main class and thirteen subclasses.  (Doc. No. 145.)  A hearing on the motion was held

24   May 17, 2017, following which the court ordered additional briefing, which the parties timely

25   submitted.  (Doc. Nos. 171, 178, 181, 183.)  At the hearing, attorneys Mario Martinez, Ira

26   Gottlieb, and Dexter Rappleye appeared on behalf of plaintiffs and the prospective class.

27   Attorneys Howard Sagaser and Ian Wieland appeared on behalf of defendants.  Following

28   supplemental briefing by the parties, the matter was taken under submission for decision.  For the

                                               1

1    reasons set forth below, the court will grant the motion for class certification in part.

2                                    **BACKGROUND**

3          This lawsuit stems from a variety of alleged state and federal labor law violations by

4    defendants, who employ seasonal workers for a variety of tasks necessary in commercial

5    agricultural operations.  Some of the farms on which the agricultural workers are employed are

6    owned by defendants, while others are owned by third-party growers who contract with

7    defendants to provide a labor force.  Defendant Fowler Packing is a commercial grower, packer,

8    and shipper of various fruits, while defendant Ag Force is a farm labor contractor.  Defendant

9    Fowler Marketing International is responsible for marketing and selling the crops owned by

10   Fowler Packing and harvested by the employees of Ag Force.  These three corporate entities are

11   all owned by Grant Parnagian and members of the Parnagian family.

12         In their FAC, plaintiffs allege twelve separate claims:  (1) violations of the Migrant and

13   Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801, *et seq.* for failing to pay all

14   wages due or provide necessary tools; (2) failure to compensate for rest breaks in accordance with

15   California Labor Code § 226.7[1] and Wage Order 14; (3) failure to pay all wages due under the

16   employment contract by requiring off-the-clock work and allowing the use of "ghost workers";

17   (4) failure to pay overtime, as required by state law; (5) failure to pay the minimum wage, in

18   violation of Labor Code § 1194; (6) failure to pay waiting time penalties in violation of Labor

19   Code § 203; (7) failure to provide necessary tools or reimburse for tools in violation of Labor

20   Code § 2802; (8) violations of California Business and Professions Code § 17200 by underpaying

21   workers, failing to provide rest periods, and retaining the benefits of the labor without reasonable

22   compensation; (9) violations of Labor Code § 226 by failing to keep accurate records or provide

23   accurate statements to the employees; (10) failure to record and/or pay for travel time and wait

24   time, in violation of Labor Code § 1194 and 29 U.S.C. § 1801, *et seq.*; (11) failure to reimburse

25   for vehicle expense, in violation of Labor Code § 2802; and (12) failure to provide meal periods

26   /////

27

28   _____
     [1]  All subsequent references to the "Labor Code" are to the California Labor Code.

                                         2

1    and keep accurate records of meal periods, in violation of Wage Order 14 and 29 U.S.C. § 1801,

2    *et seq.*

3       Plaintiffs seek certification of the following class[2] and thirteen subclasses:

4       **Main Class**

5       All individuals who have been employed, or are currently
6       employed, by Defendants Ag Force, LLC, Fowler Packing, Co.
        and/or Fowler Marketing, Int'l. as a non-exempt "field worker" or
        agricultural worker, any time from March 17, 2011 up to the
7       present, excluding supervisors, "swampers," office, clerical, or
        other non-agricultural workers.
8

9       *Subclasses*

10      1. <u>Piece Rate Rest Period Subclass</u>: All individuals who have been
        employed, or are currently employed, by Defendants as a non-
        exempt "field worker" or agricultural worker, who worked on a
11      piece rate basis at any time from March 17, 2011 up to the present,
        and were not separately compensated for rest periods during their
12      piece rate shifts.

13      2. <u>Ghost Worker Crew Subclass</u>: All individuals who have been
        employed, or are currently employed, by Defendants as a non-
14      exempt "field worker" or agricultural worker, any time from March
        17, 2011 up to the present, who worked on a crew piece rate basis
15      and were not compensated properly due to the inclusion of
        payments to ghost workers in their crew(s).
16

17      3. <u>Unpaid Travel Time Subclass</u>: All individuals who have been
        employed, or are currently employed, by Defendants as a non-
18      exempt "field worker" or agricultural worker, any time from March
        17, 2011 up to the present, who worked at two or more fields in one
        day but were not compensated for their time spent travelling
19      between fields.

20      4. <u>Waiting Time Subclass</u>: All individuals who have been
        employed, or are currently employed, by Defendants as a non-
21      exempt "field worker" or agricultural worker, any time from March
        17, 2011 up to the present, who spent time waiting before harvest
22      work would commence and were not paid for that waiting time.

23      _____

24      [2]  The court will review each subclass individually to determine whether it meets the requirements
        of Rule 23.  Further, the plaintiffs have not indicated that there are any members of the main class
25      that do not fall within one of the subclasses.  Therefore, the court will decline to certify the main
        class and will instead certify the subclasses individually as determined appropriate.  *See, e.g.*,
26      *Meyer v. Bebe Stores, Inc.*, No. 14-CV-00267-YGR, 2016 WL 8933624, at *11–12 (N.D. Cal.
        Aug. 22, 2016) (certifying subclasses but declining to certify main class); *Evans v. Linden*
27      *Research, Inc.*, No. C 11-01078 DMR, 2012 WL 5877579, at *10, 19 (N.D. Cal. Nov. 20, 2012)
        (same); *Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 596 (S.D. Cal. 2010) ("Because the Court
28      certifies only the Plan 3 Subclass, it need not certify an overarching main class at this time.").

3

5.  <u>Pre-Shift Work Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who performed uncompensated and unrecorded work before the fixed start time of a daily shift.

6.  <u>Post-Shift Work Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who performed uncompensated and unrecorded work after the fixed end time of a daily shift.

7. <u>Tools Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who incurred unreimbursed tool expenses while working for Defendants.

8. <u>Meal Period Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who did not receive a meal period and/or for whom a meal period was not recorded.

9. <u>Inaccurate Wage Statement Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who due to the violations claimed herein (other than the violations in subclasses 4 and 8), received an inaccurate itemized wage statement.

10. <u>Vehicle Expense Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who worked at two or more fields in one day and drove their own cars between fields but were not reimbursed by Defendants for their vehicle expenses.

11. <u>AWPA Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who, due to the violations claimed herein, were not provided employment consistent with the terms of the "working arrangements" made with them by Defendants.

12. <u>Section 17200 Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who, due to the violations claimed herein, were employed under "unlawful, unfair, or fraudulent business acts or practices."

13. <u>Final Paycheck Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March

1    17, 2011 up to the present, who were not paid all wages due when
2    they were laid off each season, discharged, or quit, as required by
     the California Labor Code.

3    (Doc. No. 145 at 2–5.)

4                              **LEGAL STANDARDS**

5    **A.    Pertinent Class Action Law**

6          The class action is a procedural mechanism whereby the "usual rule that litigation be

7    conducted by and on behalf of the named parties only" is swept aside so that multiple parties—

8    unwieldy in number but possessing similar or identical claims—may pursue common redress in

9    an efficient and economical manner. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-*

10   *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)); *see also Abdullah v. U.S. Sec. Assocs.,*

11   *Inc.*, 731 F.3d 952, 963–64 (9th Cir. 2013). Federal Rule of Civil Procedure 23 controls class

12   certification and imposes a two-step process designed to ensure not only that this system of

13   representative adjudication nets expediencies for the litigants and the judiciary, but that it does

14   not sacrifice procedural fairness or zealous advocacy in the process of doing so.

15         Rule 23(a) is the first hurdle that must be overcome for a case to proceed as a class action.

16   It consists of four prerequisites, often described as: (1) numerosity, (2) commonality, (3)

17   typicality, and (4) adequacy. If—and only if—a putative class satisfies these four requirements

18   may it then proceed to show it also satisfies one of the three subsections of Rule 23(b). The party

19   seeking class certification bears the burden of establishing conformity with these requirements,

20   and must do so by producing facts "affirmatively demonstrat[ing]" that certification is warranted.

21   *Comcast*, 569 U.S. at 33; *Dukes*, 564 U.S. at 350. A court must review the merits of a party's

22   substantive claim to the extent that they overlap with issues touching on class certification. *Ellis*

23   *v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citing *Dukes*, 564 U.S. at 350–51

24   and *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992)); *see also Blair v. The CBE*

25   *Grp., Inc.*, 309 F.R.D. 621, 625 (S.D. Cal. 2015). Only after it has conducted a "rigorous

26   analysis" of these facts and determined they show "actual, [and] not presumed, conformance"

27   with Rule 23(a) and (b), may a district court certify a class. *Ellis*, 657 F.3d at 981 (quoting *Gen.*

28   *Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 161, (1982)); *see also Comcast*, 569 U.S. at 33–34

                                                5

1    (extending the "rigorous analysis" requirement to Rule 23(b)); *Patel v. Nike Retail Servs., Inc.*,

2    Case No. 14-cv-4781-RS, 2016 WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous'

3    analysis applies both to Rule 23(a) and Rule 23(b)."). If a court does decide to certify a class, it

4    must define the class claims and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1), (g).

5        Individualized defenses may be relevant to a court's determination of whether to allow

6    certification of certain class claims. *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1184 (9th Cir.

7    2015); *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 531 (N.D. Ill. 2008) ("The existence of

8    affirmative defenses which require individual resolution can be considered as part of the court's

9    analysis to determine whether individual issues predominate under Rule 23(b)(3).") (footnote

10   omitted); *Mulford v. Altria Grp., Inc.*, 242 F.R.D. 615, 629–30 (D.N.M. 2007) ("While the

11   existence of affirmative defenses that may require individualized evidence does not compel a

12   finding that individual issues predominate over common ones, it does weigh against class

13   certification."). "When defendants opposing class certification raise a legal defense that may

14   defeat commonality, the district court cannot assume its validity but should make a threshold

15   determination on the legal merits." *Edwards*, 798 F.3d at 1184. While the court need not take

16   evidence on any of the defenses, if the defense is invalid as a matter of law, it will not defeat

17   certification. *Id.* Further, the need for individualized assessments of damages will not defeat

18   class certification. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013); *see also*

19   *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("[D]amage

20   calculations alone cannot defeat certification.").

21       "When appropriate, a class may be divided into subclasses that are each treated as a class

22   under this rule." Fed. R. Civ. P. 23(c)(5). If subclasses are required because of conflicts between

23   the various class members and the inability of either class counsel or class representatives to

24   adequately represent the subclass, "each subclass must independently meet the requirements of

25   Rule 23 for the maintenance of a class action." *Betts v. Reliable Collection Agency, Ltd.*, 659

26   F.2d 1000, 1005 (9th Cir. 1981). *See* 5 Newberg on Class Actions § 7.29 (differentiating between

27   compulsory subclasses and permissive subclasses for management purposes). *But see Am.*

28   *Timber & Trading Co. v. First Nat'l Bank of Oreg.*, 690 F.2d 781, 787 n.5 (9th Cir. 1982)

1    (concluding that because subclassing was permissive under Rule 23(d), it need not be evaluated

2    separately for commonality, numerosity, typicality, and adequacy).

3        Subclasses may be used to more efficiently resolve common issues during the proceeding

4    and at trial.  *See Rodriguez v. Hayes*, 591 F.3d 1105, 1123–24 (9th Cir. 2010) ("To the extent

5    there may be any concern that the differing statutes . . . will render class adjudication of class

6    members' claims impractical or undermine effective representation of the class, it may counsel

7    the formation of subclasses."); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997)

8    (subclasses allow courts to focus discovery, dismiss individual claims as necessary, and conduct

9    trial in a more orderly manner).  Absent conflicts of interest between subclasses, however, there is

10   no rule that separate subclasses are required for each of cause of action in order for plaintiffs to

11   satisfy their burden on class certification.  *See, e.g.*, *In re VMS Sec. Litig.*, 136 F.R.D. 466, 477–

12   78 (N.D. Ill. 1991) ("[T]he court will not require separate subclasses for the various federal

13   securities fraud claims."); *cf. Unicorn Field, Inc. v. Cannon Grp., Inc.*, 60 F.R.D. 217, 226–27

14   (S.D.N.Y. 1973) (requiring separate subclasses for different causes of action when they proceed

15   on distinct legal theories and requirements of proof).  *See also Norwood v. Raytheon Co.*, 237

16   F.R.D. 581, 589 n.14 (W.D. Tex. 2006) (where subclasses are based on causes of action involving

17   substantially similar claims, no separate analysis of subclasses is required).

18       **B.    Rule 23(a) Requirements**

19       In order for a class member to sue as a representative of all class members, the class

20   member must establish the following prerequisites:  (1) the class must be "so numerous that

21   joinder of all members is impracticable"; (2) there must be "questions of law or fact common to

22   the class"; (3) "the claims or defenses of the representative parties are typical of the claims or

23   defenses of the class"; and (4) "the representative parties will fairly and adequately protect the

24   interests of the class."  Fed. R. Civ. P. 23(a).  These prerequisites are typically referred to as

25   numerosity, commonality, typicality, and adequacy of representation.

26       1.    Numerosity

27       A proposed class must be "so numerous that joinder of all members is impracticable."

28   Fed. R. Civ. P. 23(a)(1).  Numerosity has no strict limit, but certainly class membership in the

7

1   hundreds is sufficient to meet it.  *See Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 449

2   (E.D. Cal. 2013) (numerosity met with approximately 3,500 class members); *Orvis v. Spokane*

3   *County*, 281 F.R.D. 469, 473 (E.D. Wash. 2012) (numerosity met with 260 class members);

4   *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 594 (E.D. Cal. 2008)

5   (approximately one thousand members satisfied numerosity).

6                              2.    Commonality

7        Rule 23 requires there be "questions of law or fact common to the class."  Fed. R. Civ. P.

8   23(a)(2).  To satisfy Rule 23(a)'s commonality requirement, a class claim "must depend upon a

9   common contention . . . of such a nature that it is capable of class[-]wide resolution—which

10  means that determination of its truth or falsity will resolve an issue that is central to the validity of

11  each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  As the Supreme Court further

12  explained, this frequently necessitates an inquiry that "overlap[s] with the merits of plaintiff's

13  underlying claim."  *Id.* at 351.

14                             3.    Typicality

15       "[T]he claims or defenses of the representative parties [must be] typical of the claims and

16  defenses of the class."  Fed. R. Civ. P. 23(a)(3).  They need not be clones; rather, all that is

17  required is that the claims or defenses be "reasonably co-extensive."  *Hanlon*, 150 F.3d at 1020

18  (noting that this standard is a "permissive" one and requires only that the claims of the class

19  representatives be "reasonably co-extensive with those of absent class members; they need not be

20  substantially identical").  Typicality is satisfied if the representative's claims arise from the same

21  course of conduct as the class claims and are based on the same legal theory.  *See, e.g., Kayes v.*

22  *Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (claims are typical where named plaintiffs

23  have the same claims as other members of the class and are not subject to unique defenses).  "The

24  test of typicality is whether other members have the same or similar injury, whether the action is

25  based on conduct which is not unique to the named plaintiffs, and whether other class members

26  have been injured by the same course of conduct."  *Hanon*, 976 F.2d at 508.

27  /////

28  /////

8

4.    Adequacy of Representation

Plaintiffs seeking class certification must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis*, 657 F.3d at 985 (quoting *Hanlon*, 150 F.3d at 1020)); s*ee also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015). "An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class." *Rodriguez v. W. Publ'g Co.*, 563 F.3d 948, 959 (9th Cir. 2009) (citing *Hanlon*, 150 F.3d at 1020). Accordingly, "[c]lass certification will be inappropriate if fundamental conflicts of interest are determined to exist among the proposed class members." *Allied Orthopedic v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007). Generally, the adequacy inquiry seeks to ensure that the class representative is "part of the class and [that he] possess[es] the same interest and injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).

**C.    Rule 23(b) Requirements**

Once the prerequisites of Rule 23(a) are met, the court must certify the class under one of the Rule 23(b) categories. Certification under Rule 23(b)(3) is permitted when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is [deemed to be] superior to other available methods for fairly and efficiently adjudicating the controversy." *Dukes*, 564 U.S. at 362 (quoting Fed. R. Civ. P. 23(b)(3)); *see also Tyson Foods, Inc. v. Bouaphakeo*, ___U.S. ___, ____, 136 S. Ct. 1036, 1045 (2016) ("An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'") (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)). "The Rule 23(b)(3) predominance inquiry tests whether proposed

1  classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at

2  622, whereas the superiority requirement demands courts "assess the relative advantages of

3  alternative procedures for handling the total controversy" in order to determine that "a class

4  action is the 'superior' method of resolution." Fed. R. Civ. P. 23(b)(3) advisory comm. note; *see*

5  *also Pointer v. Bank of Am. Nat'l Ass'n*, No. 2:14-cv-0525-KJM-CKD, 2016 WL 696582, at *8

6  (E.D. Cal. Feb. 22, 2016). While the predominance requirement is similar to the Rule 23(a)(2)

7  commonality requirement, the standard is much higher at this stage of the analysis. *Dukes*, 564

8  U.S. at 359; *Amchem*, 521 U.S. at 624–25; *Hanlon*, 150 F.3d at 1022. Ultimately, "[t]he

9  predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are

10  more prevalent or important than the non-common, aggregation-defeating, individual issues.'"

11  *Tyson Foods, Inc.*, 136 S. Ct. at 1045 (quoting Newberg, § 4:49, at 195–96).

12      Rule 23 provides that, aside from predominance, a court must find that a "class action is

13  superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.

14  R. Civ. P. 23(b)(3). The rule lists four metrics pertinent to superiority, including class members'

15  interests in individually controlling litigation, whether any litigation has already been filed by

16  putative class members, the desirability of concentrating the litigation in a class action, and the

17  "likely difficulties in managing a class action." *Id.* The Ninth Circuit has recognized a "well-

18  settled presumption that courts should not refuse to certify a class merely on the basis of

19  manageability concerns," but rather should look to "manageability as one component of the

20  superiority inquiry." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017)

21  (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015)).

22                                    **ANALYSIS**

23      A.     **Standing to Seek Injunctive Relief**

24      Based upon the parties' submissions, it is apparent that the named plaintiffs no longer

25  work for defendants. Plaintiff Aldapa left the company in May 2015, shortly after this lawsuit

26  was filed. (Doc. No. 145-6 at 94.) Plaintiff Avalos, left the defendants' employment in early

27  2014. (*Id.* at 106–07.) At the court's request, the parties provided supplemental briefing

28  concerning the named plaintiffs' standing to seek injunctive relief and their ability to seek

1    certification under Rule 23(b)(2).

2            Plaintiffs concede that an employee typically does not have standing to seek injunctive

3    relief against a former employer. *See Dukes*, 564 U.S. at 365 (noting that employees who left

4    employment after the filing of a complaint have "no more need for prospective relief than those

5    who left beforehand"); *Ellis*, 657 F.3d at 988; *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033,

6    1037 (9th Cir. 2006). Nevertheless, plaintiffs advance two arguments in support of their claim of

7    standing to seek injunctive relief here: (1) that at least one named plaintiff intends to seek

8    reinstatement, should the alleged violations of labor law cease; and (2) that the federal statute

9    under which plaintiff is suing—29 U.S.C. § 1854—has expanded the concept of standing in the

10   particular case of seasonal agricultural employees to allow injunctive relief to be afforded to prior

11   employees. The undersigned finds neither of these assertions to be persuasive.

12                       1.    Potential for Reinstatement

13           As plaintiffs note, there is an exception from the standard rule that former employees lack

14   standing to seek injunctive relief from their former employers. A former employee who is "in the

15   process of seeking reinstatement to their former positions, or seeking work from that employer"

16   may have standing to bring a claim for injunctive relief. *Walsh*, 471 F.3d at 1037 (citing *Freitag*

17   *v. Ayers*, 468 F.3d 528 (9th Cir. 2006) and *Nanty v. Barrows Co.*, 660 F.2d 1327 (9th Cir. 1981));

18   *see also Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 865 (9th Cir. 2017). However, upon

19   review none of these decisions support plaintiffs' standing to seek injunctive relief here. In

20   *Freitag*, the plaintiff was actively pursuing reinstatement. 468 F.3d at 547 (noting that, when the

21   injunction was issued, plaintiff "was still in the process of pursuing her state administrative

22   appeal [of a termination decision] in which she maintains that she is entitled to retain her position

23   as a correctional officer at Pelican Bay"). In *Nanty*, the court did state that "[w]hen a legitimate

24   candidate for a job has demonstrated that he has been the subject of unlawful discrimination in

25   the employment process, he is entitled to an injunction against future, or continued,

26   discrimination." 660 F.2d at 1333, *overruled on other grounds by O'Day v. McDonnell Douglas*

27   *Helicopter Co.*, 79 F.3d 756 (9th Cir. 1996). However, the Ninth Circuit has subsequently

28   explained that the injunction in *Nanty* was upheld "in part because the question whether the

1   plaintiff was entitled to the job he sought had not been finally resolved and, thus, he retained a

2   personal interest in ensuring that the company's discriminatory activity be enjoined." *Freitag*,

3   468 F.3d at 548.

4         Here, plaintiff Avalos declares that, while he left his position with defendants due to the

5   numerous employment law violations he observed, he would "consider seeking reinstatement

6   with the company" if those violations were appropriately addressed.  (Doc. No. 145-6 at 106–

7   07.)[3]  Nothing indicates plaintiff Avalos is actually seeking reinstatement by the defendants.  *See*

8   *Jadwin v. County of Kern*, No. 1:07-cv-00026-OWW-DLB, 2009 WL 2424565, at *8 (E.D. Cal.

9   Aug. 6, 2009) (injunctive relief was moot where plaintiff was not seeking reinstatement and there

10   was no "reasonable likelihood" he would resume employment).  Nor does this case relate to

11   plaintiff Avalos's unlawful discharge or a discriminatory failure to hire him.  Rather, he

12   affirmatively resigned from his employment with defendants.  Finally, even the statement Avalos

13   does make regarding resuming employment with defendants is equivocal:  he would merely

14   "consider" seeking reinstatement if a variety of allegedly unlawful payment practices are

15   remedied.  While it is unclear whether plaintiffs are required to seek reinstatement as a legal

16   remedy of the suit in order to seek injunctive relief, merely considering reinstatement if certain

17   remedial actions come to fruition is insufficient to fit within this exception.  Since plaintiff

18   Avalos has not demonstrated a cognizable legal interest in defendants' future employment

19   practices, he lacks standing to seek injunctive relief.

20            2.    Expanded Standing Under 29 U.S.C. § 1854

21         Plaintiffs also argue that "[p]articularly in the case of agricultural workers, there is a

22   presumption that former employees may establish a real and immediate threat of continuing or

23   future injury despite their fluctuation between employee and non-employee status during the

24   course of litigation."  (Doc. No. 178 at 10.)  According to plaintiffs, the Migrant and Seasonal

25   Agricultural Worker Protection Act ("AWPA") allows anyone "aggrieved" by the employer's

26   failure to discharge its lawful responsibilities to bring suit, even non-employees.  (*Id.*)  Therefore,

27

28   ---

[3]  Plaintiff Aldapa has not indicated she would consider returning to work for defendants.

1  they assert, as the named plaintiffs in this action they "are entitled to a presumption that as

2  seasonal, agricultural employees they and similarly-situated class members are likely to return to

3  work as employees of Defendants in the future."  (*Id.* at 11–12.)

4          The Supreme Court has held a plaintiff suffers an "injury-in-fact" for the purposes of

5  standing when Congress provides a statutory cause of action.  *See Massachusetts v. E.P.A.*, 549

6  U.S. 497, 521–23 (2007) (finding the State of Massachusetts had standing based on the Clean Air

7  Act); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–85

8  (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (finding injury in fact under the

9  Clean Water Act)); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21–25 (1998) (finding standing

10 when plaintiff was deprived of the statutory right to obtain information).  *But see Summers v.

11 Earth Island Inst.*, 555 U.S. 488, 496–97 (2009) ("[D]eprivation of a procedural right without

12 some concrete interest that is affected by the deprivation . . . is insufficient to create Article III

13 standing."); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 973 (9th Cir. 2015)

14 (noting Congress may enact statutes creating a private cause of action, absent which no injury

15 would exist, but may not "create injury in fact by legislative fiat").  However, a plaintiff must also

16 establish standing for each type of relief sought.  *Summers*, 555 U.S. at 493; *Friends of the Earth,

17 Inc.*, 528 U.S. at 185.

18         The AWPA permits "[a]ny person aggrieved by a violation of this chapter" to bring suit in

19 a district court.  29 U.S.C. § 1854(a).  Plaintiffs point to several court decisions in which

20 certification of a class seeking injunctive relief under Rule 23(b)(2) has been permitted, despite

21 the fact that violation was not presently occurring.  *See Siquic v. Star Forestry, LLC*, No.

22 3:13cv00043, 2016 WL 1117627, at *6 (W.D. Va. Mar. 17, 2016); *Roman v. Korson*, 152 F.R.D.

23 101, 109 (W.D. Mich. 1993) (allowing injunctive relief where evidence showed migrant workers

24 would return to the same housing in future years, because there was "a reasonable likelihood that

25 violations will occur in the future"); *Saintida v. Tyre*, 783 F. Supp. 1368, 1376 n.7 (S.D. Fla.

26 1992); *Fields v. Luther*, No. JH-84-1875, 1988 WL 59963, at *21–22 (D. Md. May 4, 1988).  Of

27 these decisions, only one—*Roman*—concerned a motion for class certification; the others that

28 were class actions involved cases in which a class had already been certified.  Moreover, because

1    it was decided in 1993, the court in *Roman* could not have considered more recent precedent

2    finding injunctive relief unavailable for classes of prior employees.  *See Dukes*, 564 U.S. at 365

3    (noting with approval the Ninth Circuit's recognition that "plaintiffs no longer employed by Wal–

4    Mart lack standing to seek injunctive or declaratory relief against its employment practices");

5    *Munoz v. Giumarra Vineyards Corp.*, No. 1:09-cv-00703-AWI-JLT, 2012 WL 2617553, at *35

6    (E.D. Cal. July 5, 2012), *findings and recommendations adopted*, 2013 WL 2421599 (declining

7    to certify a class under Rule 23(b)(2) where the class contained employees who no longer worked

8    for defendant).

9         This court is not unsympathetic to the unique and myriad difficulties facing seasonal

10   agricultural workers who attempt to vindicate their rights under applicable labor law.  However,

11   the named plaintiffs' absence from employment here is not apparently based on the seasonal ebb-

12   and-flow of the work which might warrant an expanded application of standing principles in this

13   case.  Instead, neither named plaintiff has worked for defendants in multiple years, nor do they

14   show any sign of returning to defendants' employment.  Nor is this a case where plaintiffs have

15   shown that some malfeasance or retaliatory interest on the part of their employer was what caused

16   their termination or prevented them from being rehired, or that they seek to be rehired as part of

17   the relief afforded by this lawsuit.  Rather, the named plaintiffs have not indicated they are

18   seeking reinstatement or are actively pursuing employment with the defendants.    In short,

19   plaintiffs have presented no persuasive argument that the AWPA expands standing sufficiently to

20   afford them the opportunity to seek injunctive relief here.  Since the plaintiffs lack standing to

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

14

1    pursue their claims for injunctive relief,[4] the court will deny plaintiffs' request to certify any of

2    the subclasses under Rule 23(b)(2) for the purposes of seeking injunctive relief.[5]

3           **B.    Adequacy of Class Representatives and Class Counsel**

4           As noted above, adequacy of the class representatives and class counsel must be

5    determined for each of the classes and subclasses to be certified.  Unlike factors such as

6    commonality, typicality, and predominance, however, adequacy of representation can be

7    addressed collectively, as the class representatives and class counsel remain the same for each

8    subclass.

9           Defendants have attacked, at length, the adequacy of one of the anticipated class counsel

10   and of both the named plaintiffs to represent the class.  (Doc. No. 147 at 24–32.)  Defendants'

11   arguments in this regard are addressed in turn below.

12          a.    <u>Plaintiff Avalos</u>

13          Both plaintiffs declare they wish to serve as a class representative in this action.  (Doc.

14   No. 145-6 at 93, 106.)  Both represent to the court that they have participated in numerous

15   meetings with their attorneys, have communicated with other workers about this action, and have

16   reviewed documents and policies with their attorneys.  (*Id.* at 93, 106.)  Plaintiffs Aldapa and

---

17   [4]  The same standing concerns do not impact the named plaintiffs' ability to seek damage for a

18   class period beyond the time in which they were employed by defendants.  A plaintiff must
     establish standing for each type of relief sought.  *Summers*, 555 U.S. at 493; *Friends of the Earth,*

19   *Inc.*, 528 U.S. at 185.  Plaintiffs clearly have standing to seek monetary redress.  *See Lujan v.*
     *Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (holding the "irreducible constitutional

20   minimum of standing" requires injury in fact, a causal connection to the conduct complained of,
     and the likelihood of redressability by a favorable decision).  Plaintiffs here have identified

21   various injuries they suffered due to labor law violations by the defendants, which are likely to be
     remedied by an award of damages.  The named plaintiffs need not be identically situated to bring

22   the claims of other class members, but need only have claims that are "reasonably co-extensive."
     *See Hanlon*, 150 F.3d at 1020; *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d

23   1171, 1175 (9th Cir. 1990).  Therefore, plaintiffs may represent a class seeking damages, even if

24   the class period extends beyond the period of their employment with defendants.

25   [5]  In the event the court rejected their arguments with respect to standing to seek injunctive relief,
     plaintiffs have requested leave to amend the complaint to add named plaintiffs that do have

26   standing to seek such injunctive relief.  (Doc. No. 178 at 12.)  Defendants indicate they would
     oppose any such request.  (Doc. No. 181 at 12–14.)  Motions for leave to amend the complaint

27   and any motion to amend this class certification order may be filed and noticed on the court's

28   calendar pursuant to Local Rule 230.

1   Avalos have already been deposed by defense counsel, and attended a mediation in San Francisco

2   concerning the case.  (*Id.*)  Additionally, both state that they are aware of no conflicts preventing

3   them from serving as class representatives, have neither business nor personal relationships with

4   class counsel, and intend to continue prosecuting this action until its resolution.  (*Id.*)

5           The court struggles to understand what genuine objections defendants have to plaintiff

6   Avalos serving as a class representative.  Defendants in large part[6] appear to argue that, because

7   Mr. Avalos made changes to his deposition transcript which were significant enough to warrant

8   the reopening of his deposition, this demonstrates "the lack of credibility of Mr. Avalos."  (Doc.

9   No. 147 at 29.)  According to defendants, "based on that fact [the reopening of the deposition]

10  alone, Mr. Avalos should not be allowed to serve as a class representative."  (*Id.*)

11          Defendants cite one case for the proposition that a court may find a plaintiff to be an

12  inadequate class representative if it finds his testimony lacks "credibility."  (Doc. No. 147 at 24–

13  25) (citing *CE Design Ltd. v. King Arch. Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011).  Even within

14  the decision in the cited case—which involved potential affirmative, systematic

15  misrepresentations being made by the sole named plaintiff, who had filed at least 150 class

16  actions under the same federal law—the Seventh Circuit cautioned against an over-reading of its

17  decision when it remanded the case for a further credibility evaluation:

18              We don't want to be misunderstood, however, as extending an
                invitation to defendants to try to derail legitimate class actions by
19              conjuring up trivial credibility problems or insubstantial defenses
                unique to the class representative.  Serious challenges to typicality
20              and adequacy must be distinguished from petty issues manufactured
                by defendants to distract the judge from his or her proper focus
21              under Rule 23(a)(3) and (4) on the interests of the class.

22  *Id.* at 728.

23  /////

24  _____

25  [6] Defendants also assert various facts about plaintiff Avalos—that he worked for Ag Force from
    2012 to March 22, 2014 under foreperson Elpidio Torres, that he pruned and thinned peach and
26  nectarine trees, that he picked mandarins, and that he did not harvest grapes or tree fruit—but
    present neither argument nor explanation as to why these allegations are relevant to this inquiry.
27  (Doc. No. 147 at 29–30.)  Because it is not apparent to the court why these facts should disqualify
    plaintiff Avalos from serving as a class representative, the court delves no further into defendants'
28  assertions.

1    Defendants point to various aspects of the deposition testimony given by plaintiff Avalos

2  in arguing that he lacks "standing"[7] to pursue class claims.  (Doc. No. 147 at 29–30.)  In this

3  regard, plaintiff Avalos testified at deposition that, while he was supposed to be paid on a piece-

4  rate basis for the mandarin harvesting, he was in fact paid hourly.  (Doc. No. 147-2 at 5–9.)  He

5  also testified that he believed the crew boss was "doing something illegal," but only testified

6  about the practices on his crew.  (*Id.*)  He later testified that his understanding of the way the

7  ghost workers affected him was that he had to perform more work in order to compensate for

8  these workers, as opposed to being deprived of wages.  (*Id.* at 11.)  According to plaintiff Avalos,

9  he was paid for all of the hours he worked.  (*Id.* at 11–13.)  Additionally, he testified he never

10  worked overtime, and "sometimes" got rest breaks, seemingly once a day.  (*Id.* at 13, 15.)  After

11  noting his testimony on these points defendants then baldly assert, without explanation, "[c]learly,

12  based on Plaintiff Avalos [sic] own testimony, he lacks standing."  (Doc. No. 147 at 30.)

13    This appears to be the type of manufactured trivial credibility issue which the Seventh

14  Circuit warned that courts should not be distracted by.  Most of the changes to plaintiff Avalos's

15  deposition testimony reflect his desire to correct his testimony about not being paid on a piece

16  rate basis to accurately reflect that he was not paid *properly* on a piece rate basis.  (Doc. No. 54-

17  1.)  Plaintiff Avalos explained that he misunderstood these questions when put to him at his

18  deposition and had assumed that because the crew bosses did not accurately account for his piece

19  rate wages, he was being paid on an hourly basis.  (*Id.*)  Defendants do not argue that these are

20  "sham corrections," *i.e.*, corrections designed to create a material dispute of fact where there

21  otherwise is none.  *See Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 901 (N.D. Cal.

22  2016).  Plaintiffs' counsel notes these corrections by Avalos to his deposition testimony were

23

24  ───────────────
    [7]  The invocation of standing in this context makes little sense.  Standing is an Article III concern
25  that exists in class actions similar to regular actions.  *See, e.g.*, *Westways World Travel, Inc. v.
    AMR Corp.*, 218 F.R.D. 223, 230–31 (C.D. Cal. 2003).  It is analyzed separately from the
26  adequacy of a named plaintiff to represent the class. *See id.* at 230–31, 235–36 (treating standing
    and adequacy as separate inquiries).  Plaintiff Avalos both alleged in the complaint and declares
27  in his affidavit that he was subject to numerous illegal employment practices.  He clearly has
    standing to pursue his claims against defendants.  Whether he is an adequate class representative
28  is a separate matter.

1  made necessary by "defense counsel's use of ambiguous, vague questions that contained legal

2  terminology or sought legal conclusions from Plaintiff [Avalos], a farmworker with no legal

3  training and little formal education." (Doc. No. 150 at 13, n.4.) Further, according to plaintiffs'

4  counsel, plaintiff Avalos does not speak English, "and the interpreter strained to translate defense

5  counsel's legal terms of art into Spanish." (*Id.*) It is not surprising that a layman in these

6  circumstances might have an imperfect understanding of the accurate answers to such questions.

7  These corrections to his deposition testimony do nothing to undermine plaintiff Avalos's

8  credibility as a class representative, which primarily requires that he not have a conflict of interest

9  and is willing to vigorously prosecute the action on behalf of the class. *Ellis*, 657 F.3d at 985.[8] If

10  anything, they bolster his credibility, since providing corrections to deposition testimony is the

11  appropriate course of action with respect to any misstatements. *See* Fed. R. Civ. P. 30(e)(1).

12  Plaintiff Avalos will be confirmed as a class representative for each of the subclasses certified

13  below.

14              b.    Plaintiff Aldapa

15          Defendants' arguments against plaintiff Aldapa's ability to serve as an adequate class

16  plaintiff are likewise unpersuasive. Defendants argue that plaintiff Aldapa too met with class

17  counsel and other potential class plaintiffs. As already stated herein, the court finds that the act of

18  meeting with one's attorney and co-plaintiffs is in no way salacious and does not impugn

19  Aldapa's credibility or call into question her adequacy as a class representative. As with respect

20  to plaintiff Avalos, the court is unclear what defendants intended to imply by listing numerous

21  facts about plaintiff Aldapa without explaining their relevance. (Doc. No. 147 at 30–31) (noting

22  plaintiff Aldapa only worked on one crew; that crew had at least three different forepersons; that

23  _____

24  [8] Defendants also attack plaintiff Avalos's credibility on two other grounds, which deserve only
   the briefest of mentions. First, according to defendants, Avalos should be barred from serving as
25  class representative because he provided different estimated prices for tools at his deposition than
   he did in his declaration supporting class certification. (Doc. No. 147 at 24–25.) This contention
26  is of no consequence here, and is summarily rejected. Second, defendants repeat their frequent
   refrain that Avalos's role is suspect because of his participation in group meetings with counsel at
27  the UFW facilities. (Doc. No. 147 at 30; *see also* Doc. Nos. 98, 116.) The act of meeting with
   other potential class action plaintiffs and the attorney who was seeking to serve as class counsel
28  in no way impugns Avalos's credibility.

1   the only time she knew of a foreperson using ghost workers was under Ramon Murillo; that

2   Aldapa was paid piece rate at times and hourly at other times; Aldapa "admitted" during her

3   deposition that she did not like the company-issued scissors and purchased her own, and knew her

4   foreman was charging for gloves without defendants' knowledge but did not report it).

5       Defendants present no salient reason why plaintiff Aldapa is unqualified to serve as a

6   class representative.[9]  Ms. Aldapa avers in her declaration that she has no conflicts of interest and

7   will vigorously prosecute the action.  (Doc. No. 145-6 at 93.)  These representations are sufficient

8   to meet the general criteria for serving as a class plaintiff.  *Ellis*, 657 F.3d at 985.  Therefore,

9   plaintiff Aldapa will be confirmed as a class representative for each of the subclasses certified

10  below, with the exception of the Vehicle Expense Subclass.

11              c.    Class Counsel

12      Plaintiffs seek appointment of both Martinez, Aguilasocho, & Lynch APLC ("MAL") and

13  Bush Gottlieb as class counsel, and provide detailed information concerning the qualifications of

14  various attorneys working for each law firm.  Mario Martinez, one of the putative class's

15  proposed attorneys, declares he graduated from the University of California at Berkeley's School

16  of Law and has been licensed to practice law since 1999.  (Doc. No. 145-1 at ¶ 7.)  He worked

17  with Camacho Law from 1998 to March 2015, at which point he formed the firm Martinez,

18  Aguilasocho, & Lynch APLC ("MAL").  (*Id.*)  Attorney Martinez is fluent in Spanish and grew

19  up working in the grape fields as a child, giving him a unique appreciation for the work

20  performed by his clients.  (*Id.*)  During his more than fifteen years of work at Camacho Law, he

21  represented farm workers and other low-income workers in complex class actions in both the

22  state and federal courts in California.  (*Id.* at ¶ 8.)  Camacho Law has represented low-income

23  agricultural workers who worked with many different crops in California, Florida, Washington,

24  Oregon, and other states, and primarily worked in labor and employment law to assist in

25  [9]  Defendants' argument that plaintiff Aldapa cannot be a representative for the Vehicle Expense

26  Subclass (Doc. No. 147 at 31) is superfluous.  It is true that a named plaintiff can only function as
    a representative for absent class members bringing claims she herself has standing to bring.

27  *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001).  However, plaintiffs
    acknowledged as much in their moving papers and never sought to have plaintiff Aldapa

28  represent that subclass.  (*See* Doc. No. 145 at 34, n. 41.)

1  enforcing the rights of Spanish-speaking farm workers, which is the same practice area upon

2  which MAL now focuses.  (*Id.* at ¶¶ 7–9.)  According to attorney Martinez, he is also the general

3  counsel for the United Farm Workers ("UFW").  (*Id.* at ¶ 8.)  Attorney Martinez has also

4  provided the qualifications for the other partners at his firm, Thomas Lynch and Edgar

5  Aguilasocho, as well as an associate who is working on the case, Margaret Serrano.  (*Id.* at ¶¶ 10–

6  11.)  Attorney Martinez lists thirteen class actions which the attorneys for his firm have worked

7  on.  (*Id.* at ¶ 12.)

8       Attorney Ira Gottlieb declares he has been licensed in California since 1982, and in New

9  York since 1981, having received a J.D. in 1980 from Rutgers University.  (Doc. No. 145-2 at ¶

10  2.)  He has worked as a labor attorney for more than 35 years, and previously served as counsel to

11  the UFW.  (*Id.* at ¶ 3.)  Attorney Gottlieb notes he has worked on numerous labor law class

12  actions as lead counsel, and lists many of them.  (*Id.* at ¶¶ 4–6.)  He also notes the qualifications

13  of the other attorneys from Bush Gottlieb working on this case, Erica Deutsch and Dexter

14  Rappleye.  (*Id.* at ¶¶ 7–8.)

15       Defendants' sole argument about the adequacy of class counsel consists of contesting

16  attorney Mario Martinez's ability to serve in that role.  No other arguments are raised concerning

17  other attorneys from MAL or Bush Gottlieb.  Defendants assert attorney Martinez and MAL are

18  prohibited from representing the class because of the "apparent conflict of interest" between

19  Martinez's role in this case and as general counsel for the UFW.  (Doc. No. 147 at 25.)

20  Defendants state that they "are informed and believe the UFW threatened to oppose AB 1513 [the

21  safe harbor bill] because Mr. Martinez stands to earn substantial attorneys' fees should this case

22  be certified as a class action and the class plaintiffs ultimately prevail."  (*Id.*)  According to

23  defendants, requiring the putative class to "recover those wages they believe to be due and owing

24  through litigation—rather than the AB 1513 safe harbor—was profoundly not in the class

25  members' best interest."  (*Id.* at 25–26.)  Allegedly, this "jeopardized the ability of employees to

26  recover at all," "significantly delayed" recovery, and allowed any ultimate recovery to be reduced

27  by class counsel's attorneys' fees.  (*Id.*)  Defendants allege that these circumstances establish that

28  attorney Martinez and the UFW "put their own monetary interests ahead of the same class

1    members they now seek to represent." (*Id.* at 26.)

2         The undersigned finds defendants' arguments in this regard to be unpersuasive. Plaintiffs

3    note they agreed to a protective order barring them from sharing confidential information with the

4    UFW. (Doc. No. 150 at 15.) Defendants have presented no evidence in connection with the

5    pending motion that shows the interests of the UFW, attorney Martinez, and the class members

6    are at odds. This court has already rejected the same argument made by defense counsel here

7    against attorney Martinez in another case. *See Amaro v. Gerawan Farming, Inc.*, No. 1:14-cv-

8    00147-DAD-SAB, 2016 WL 3924400, at *17 (E.D. Cal. May 20, 2016). Additionally, the court

9    remains unconvinced that, even if there was evidence that attorney Martinez was involved in the

10   defendants' exclusion from AB 1513's safe harbor provisions, it would be evidence of an interest

11   on his part that conflicts with the class. The safe harbor provision at issue allowed offending

12   companies to pay only for the actual rest period time owed and to avoid paying a premium

13   penalty. *See* Labor Code § 226.2(b) (providing an affirmative defense in certain situations to

14   statutory penalties and damage claims where employers paid the amount due by December 15,

15   2016). Plaintiffs do not concede that attorney Martinez was involved in having defendants

16   excluded from the safe harbor provision. However, they do point out that the safe harbor would

17   have allowed defendants to escape paying significant amounts in damages, thereby reducing class

18   recovery in this case by millions of dollars. (Doc. No. 150 at 15, n.7.) Actions by counsel that

19   might well serve to increase a recovery by the class would not appear to pose any obvious conflict

20   with class counsel's general duties to the class. In any event, the court concludes that no conflict

21   of interest on the part of attorney Martinez has been established by defendants.[10]

22        Absent any demonstrated conflicts of interest, and given the qualifications of class

23   counsel, the court is satisfied they will vigorously and adequately pursue representation of the

24   class. *Ellis*, 657 F.3d at 985. The court will therefore deem Martinez Aguilasocho & Lynch

25   _____

26   [10] Defendants also believe there is a conflict of interest because the UFW unsuccessfully
     attempted to unionize defendants' employees after the filing of the class action. (Doc. No. 147 at

27   26.) Defendants contend in summary fashion that attorney Martinez's dual role as general
     counsel for the UFW and class counsel in this case "creates an obvious and unresolvable conflict

28   of interest." (*Id.*) Absent any explanation for this contention, no conflict is apparent to the court.

1    APLC and Bush Gottlieb to be appropriate class counsel.

2    **C.    Numerosity and Typicality**

3    Defendants do not dispute that numerosity and typicality are met for each of the

4    subclasses.  Plaintiffs indicate that even the smallest potential subclass—the Ghost Worker

5    Subclass—contains hundreds of employees.  (Doc. No. 145 at 31, n.39.)  Most of the other

6    subclasses are made up of at least 14,000 employees, and potentially more.  (*Id.*)  This is well

7    beyond the size needed to satisfy numerosity requirements.  *See, e.g.*, *Orvis*, 281 F.R.D. at 473

8    (numerosity met with 260 class members); *Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294,

9    300 (E.D. Cal. 2011) ("Courts have routinely found the numerosity requirement satisfied when

10   the class comprises 40 or more members.").

11   Further, plaintiffs' claims mirror those of each of the subclasses that they intend to

12   represent.  Plaintiffs have provided declarations indicating they would fit within the subclass

13   definitions below and are bringing the same substantive legal claims.  (*See* Doc. No. 145-6 at 91–

14   113.)  Plaintiffs Aldapa and Avalos's claims are "reasonably co-extensive with those of absent

15   class members."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  The court finds

16   plaintiffs' claims to be typical here.  Therefore, the numerosity and typicality requirements of

17   Rule 23(a) will be deemed to have been satisfied for each of the subclasses discussed below.

18   **D.    Certification of the Subclasses**

19   The court will now examine the propriety of certifying each subclass, and will address

20   both the remaining Rule 23(a) and 23(b)(3) factors for each.

21   **1.    Piece Rate Rest Period Subclass**

22   Plaintiffs seek to establish a subclass for violations of Labor Code § 226.7 and Wage

23   Order No. 14-2001.  (Doc. No. 145 at 43–47.)  As with a number of the subclasses below,

24   defendants contest commonality, predominance, and superiority in various respects.

25   **a.    *Commonality***

26   As mentioned above, an appropriately certified class requires "a common contention . . .

27   of such a nature that it is capable of class[-]wide resolution—which means that determination of

28   its truth or falsity will resolve an issue that is central to the validity of each one of the claims in

1    one stroke." *Dukes*, 564 U.S. at 350.

2         Labor Code § 226.7 and IWC Wage Order No. 14-2001 (codified at 8 Cal. Code Regs.

3    § 11140) work together to control the provision of rest breaks by employers to non-exempt

4    agricultural employees, whether paid on a piece rate or hourly basis.  Labor Code § 226.7 serves

5    as an enabling statute, mandating that employers provide breaks in a manner consistent with the

6    wage orders, as well as other authorities.  The wage order states the specific requirements to

7    which an employer of agricultural workers must adhere:

8              Every employer shall authorize and permit all employees to take
9              rest periods, which insofar as practicable shall be in the middle of
               each work period.  The authorized rest period time shall be based
10             on the total hours worked daily at the rate of ten (10) minutes net
               rest time per four (4) hours or major fraction thereof.  However, a
11             rest period need not be authorized for employees whose total daily
               work time is less than three and one-half (3 1/2) hours.  Authorized
12             rest period time shall be counted as hours worked for which there
               shall be no deduction from wages.

13   8 Cal. Code Regs. § 11140(12).  California courts have held that this provision means that one

14   10-minute rest period is required for shifts between three and one-half and six hours in length,

15   two 10-minute rest periods are required for shifts between six and ten hours, and three 10-minute

16   rest periods for shifts between ten and fourteen hours.  *See Alberts v. Aurora Behavioral Health*

17   *Care*, 241 Cal. App. 4th 388, 400 (2015) (citing *Brinker Rest. Corp. v. San Diego Cty. Superior*

18   *Court*, 53 Cal. 4th 1004 (2012)).  Labor Code § 226.7 reiterates that rest breaks are to be counted

19   as hours worked, and that rest breaks cannot result in a deduction of wages.

20        California law also requires piece-rate employees to be separately compensated for rest-

21   break periods at an amount not less than the minimum wage.  Lab. Code § 226.2; *Gonzalez v.*

22   *Downtown LA Motors, LP*, 215 Cal. App. 4th 36, 44–45 (2013); *Bluford v. Safeway Stores, Inc.*,

23   216 Cal. App. 4th 864, 872 (2013).  "[C]ompliance [with this requirement] cannot be determined

24   by averaging hourly compensation."  *Bluford*, 216 Cal. App. 4th at 872.  Rather, "employees

25   [must] be compensated at the minimum wage for each hour worked."  *Gonzalez*, 215 Cal. App.

26   /////

27   /////

28   /////

1   4th at 45 (citing *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 323 (2005)).[11]  While the law

2   compels employers to "authorize and permit" rest breaks, it does not mandate that employees take

3   these breaks.  8 Cal. Code Regs. § 11140(12); Cal. Dep't of Indus. Rel., Division of Lab.

4   Standards Enforcement, Opinion Letter (Jan. 28, 2002).  In addition, employers are not required

5   to track rest periods.  8 Cal. Code Regs. § 11140(7)(A)(3); *see also Munoz v. Giumarra Vineyard*

6   *Corp.*, No. 1:09-CV-0703 AWI JLT, 2015 WL 5350563, at *6 (E.D. Cal. Sept. 11, 2015); *In re*

7   *Taco Bell Wage &Hour Actions*, No. 1:07-cv-1314 LJO DLB, 2012 WL 5932833, at *11 (E.D.

8   Cal. Nov. 27, 2012) ("While meal beaks are required to be recorded on time cards and therefore

9   provide a reliable record, California law does not require employers to record rest periods.").

10          Plaintiffs argue that here the Piece Rate Rest Period Subclass should be certified because

11   defendants maintained a universal rest period policy, and piece rate workers took rest breaks

12   during their shifts.  (Doc. No. 145 at 45.)  Similarly, plaintiffs contend that defendants utilized a

13   universal compensation system, which compensated all field workers on either an hourly or a

14   piece-rate basis.  (*Id.*)  Because of this, plaintiffs assert, the payroll records reflect whether

15   defendants provided separate hourly compensation for the rest periods of their piece rate

16   employees.  (*Id.* at 46.)  Plaintiffs maintain that from March 17, 2011 (the beginning of the

17   proposed class period) until at least October 2013, defendants provided no separate compensation

18   for rest periods, and that, between November 2013 and February/March 2014, defendants

19   provided separate compensation for rest periods for less than the minimum amount of time

20   required by law.  (*Id.*)  Finally, plaintiffs claim that following March 2014, while some rest

21   breaks were provided to piece rate employees, not all of defendants' workers received them.  (*Id.*

22   at 46–47.)

23          Plaintiffs have presented evidence of the following.  It was defendants' company policy to

24   provide rest periods for all field workers, regardless of whether they work on an hourly or piece-

25   _____

26   [11]  Hours paid as a result of Labor Code § 226.7 are treated as wages under California law.
    *Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1114 (2007).  Further, the employee is

27   entitled to payment "immediately upon being forced to miss a rest or meal period."  *Id.* at 1108.
    Thus failure to compensate appropriately for rest breaks would also violate 29 U.S.C. § 1832(a)

28   (requiring payment of "wages owed to [seasonal agricultural] worker[s] when due").

1    rate basis, consisting of one 10-minute break for three hours or more of work, and a second break

2    for seven[12] or more hours of work.  (Doc. No. 145-1 at 130) (Deposition of Christopher

3    Rodriquez, defendants' Person Most Knowledgeable ("PMK")).  This policy was eventually

4    reduced to writing.  (Doc. No. 145-1 at 500 (Notice of Rest and Meal Period Policy).)  Similarly,

5    defendants have universal pay policies for certain types of employees:  all pruning work is

6    compensated hourly at the minimum wage, while harvesting of mandarins and grapes was paid on

7    a piece rate basis (though the piece rate could either be a group piece rate or an individual piece

8    rate).  (Doc. No. 145-1 at 108–12 (PMK Deposition).)

9            It is also clear that whether an employee was separately compensated for rest periods can

10    be readily determined by reviewing payroll records for that employee.  (*See id.* at 185–91.)

11    Plaintiffs' retained statistical expert, Jeffrey Petersen, declares that he received and analyzed

12    payroll data[13] from defendants.  (Doc. No. 145-3) (Declaration of Jeffrey Petersen).  According to

13    Dr. Petersen, there were a total of 9,427 subclass members who worked 620,348 individual work

14    days during the class period.  (*Id.* at ¶ 10.)  He concluded a rest break was not paid on a piece rate

15    employee workday if either (a) a shift was between 3.5 and 6.0 hours, and there was no record of

16    a payment for at least 0.1667 hours in the "regular pay" column[14]; or (b) there was a recorded

---

17    [12]  As stated above, California law requires a second rest break at six hours of work, not seven.

18    *See Alberts*, 241 Cal. App. 4th at 400.  Defendants' Person Most Knowledgeable ("PMK")
       testified in the same deposition that documents which suggested a second rest period was

19    available at seven hours of work reflected a "misprint," and that they should reflect a second rest
       period at six, not seven, hours of work.  (Doc. No. 145-1 at 138.)  While there is a factual dispute

20    about what defendants' rest policy actually was, plaintiffs maintain this is immaterial because
       defendants failed to provide legally sufficient rest breaks regardless.  (Doc. No. 145 at 45 n.58.)

21

22    [13]  It is unclear whether Dr. Petersen has analyzed all of defendants' payroll data.  Plaintiffs' brief
       notes that defendants may only have disclosed payroll records for 25 percent of the total class,

23    pursuant to an earlier discovery dispute.  (Doc. No. 145 at 22.)

24    [14]  Dr. Petersen states that, when defendants made rest period payments for piece rate employees,
       they were categorized as non-productive time and paid as "regular pay," thus appearing distinctly

25    in the payroll record.  (Doc. No. 145-3 at ¶ 11, n.5.)  The figure found significant for rest period
       purposes corresponds to a ten minute period of work time, as ten minutes is 0.1667 hours.  (*Id.*)

26    Each was purportedly paid at the minimum wage.  Some entries reflected a 0.16 hour payment,
       which Dr. Petersen counted as no rest period payment being received, because 0.16 hours equates

27    to only 9.6 minutes.  (*Id.*)  Because each of these rest periods was paid at the minimum wage, a
       payment for 9.6 minutes reflects a payment below the state minimum wage.  (*Id.*)

28

1    shift of more than 6.0 hours, but no payment for at least 0.3333 recorded.  (*Id.* at ¶ 11.)

2            This subclass is premised on the central claim that defendants failed to make legally

3    sufficient payments to their workers for all rest periods.  Defendants' rest period policy changed

4    throughout the proposed class period.  It is undisputed rest periods for piece rate employees were

5    not separately compensated at an hourly rate—allegedly in violation of California labor law—

6    between March 2011 and November 2013.  (*See* Doc. No. 145 at 46; Doc. No. 147 at 40.)  From

7    November 2013 to March 2014, plaintiffs contend that while rest breaks were separately

8    compensated, the compensation was legally insufficient, because they were compensated at the

9    minimum wage for only 9.6 minutes, rather than 10 minutes.  (*See* Doc. No. 145-1 at 187–88

10   (PMK Depo.)) (noting that, in March 2014, defendants began separately compensating for 0.17

11   hours of rest break time per rest break, rather than 0.16 hours).  Finally, while the policy

12   following March 2014 was facially valid, defendants in fact failed to compensate all subclass

13   members separately for each rest period.   (Doc. No. 145-1 at 188–91 (PMK Depo.).)  Despite the

14   fact that defendants' rest period policy changed throughout the period in question, it is apparent

15   that whether a rest period was separately compensated and the amount of compensation provided

16   for rest breaks are determinable simply from reviewing defendants' payroll records.  (*See, e.g.*, *id.*

17   at 185–91.)  The common issue of whether defendants maintained a lawful rest period policy and

18   appropriately made rest period payments under California law is common to this subclass.

19   Commonality is therefore satisfied here.

20                        b.      *Predominance*

21            Common issues also predominate over individual ones within this subclass.  As explained

22   above, defendants maintained universal payroll policies concerning compensation for rest periods

23   applicable to all piece rate employees.  Furthermore, plaintiffs' claims will succeed or fail based

24   on the ultimate determination of whether defendants' policies were lawful under California law

25   and whether class members were actually paid in accordance with those policies.  Both issues are

26   capable of determination on a subclass-wide basis:  whether defendants' policies were lawful

27   affects all similarly situated employees, while whether class members were paid in accordance

28   with those policies can be determined by looking to a single body of evidence—defendants'

1    payroll records.

2          Defendants argue that they anticipate raising as a defense that their piece rate workers

3    regularly skipped rest breaks, and that this defense will result in individual issues predominating

4    over common ones.  (Doc. No. 147 at 41–46.)  In support of this position, defendants do offer at

5    least some evidence that their workers occasionally skipped rest breaks.  (*See, e.g.*, Doc. No. 147-

6    8 at 15 (Amador) ("Sometimes I prefer to work through my break in order to catch up if I am

7    running behind of the crew.  I estimate this happens very few times and when it does, I only do it

8    for about five (5) minutes of my break."); Doc. No. 147-8 at 108 (Diaz) ("Although extremely

9    rare, Saturday's [sic] the crew would work through our morning break and instead would

10   combine it with our lunch in order to take a forty (40) minute lunch."); Doc. No. 147-10 at 95–96

11   (Mendoza) ("From the time I started with the company until about 2014, our crew would agree

12   and get permission from our foreman to skip over our rest break and lunch break on Saturdays

13   when we worked shorter days, in order to get out earlier.").)  Nonetheless, defendants' argument

14   in this regard does not defeat predominance.

15         For the period from March 2011 to November 2013, any individualized defenses on the

16   grounds identified by defendants would appear to be irrelevant to consideration of this aspect of

17   plaintiffs' motion for class certification.  Plaintiffs' claim is based on Labor Code § 226.7 which

18   states that "[i]f an employer fails to provide . . . [a] rest or recovery period in accordance with a

19   state law, . . . the employer shall pay the employee one additional hour of pay at the employee's

20   regular rate of compensation for each workday that . . . [the] rest or recovery period is not

21   provided."  As set forth above in addressing the issue of commonality with respect to this

22   subclass, plaintiffs' claim here is that state law required the class members to be separately

23   compensated for rest breaks during this period.  Thus, this claim is focused on the manner in

24   which the rest breaks were compensated by defendants, not whether the rest breaks were in fact

25   taken by their workers.[15]  It appears to be undisputed that none of the rest breaks for defendants'

26   _____

27   [15]  Specifically, plaintiffs' contend that defendants' piece rate employees were not being
     separately compensated on an hourly basis for rest breaks as required by state law.   Whether
28   plaintiffs' claim in this regard is supported by state law is a question going to the merits of their
     claim rather than to whether class certification as to it is appropriate.

1    piece rate employees during the specified period of time were compensated separately on an

2    hourly basis.  Therefore, if plaintiffs are correct in contending that defendants' policy in this

3    regard was in violation of the requirements of California law, it would also be undisputed that

4    defendants failed to provide *any* "rest or recovery period[s] in accordance with a state law" from

5    March 2011 to November 2013, because class members were unable to take a separately

6    compensated rest period even if they sought to do so.  *Brinker*, 53 Cal. 4th at 1033 ("No issue of

7    waiver ever arises for a rest break that was required by law but never authorized; if a [legally-

8    compliant] break is not authorized, an employee has no opportunity to decline to take it."); Labor

9    Code § 226.7.  Therefore, the court concludes that the common issues here "are more prevalent or

10   important than" the individual issues.  *See Tyson Foods, Inc.*, 136 S. Ct. at 1045 (quoting

11   Newberg on Class Actions § 4:50, pp. 196–97).

12        Defendants also indicate that, for the period from November 2013 to March 2014, they

13   will raise both a *de minimis* defense as well as a merits defense, because the alleged violation is

14   that rest periods were undercompensated, not uncompensated.  (*See* Doc. No. 147 at 46) ("[E]ven

15   if the court agrees with Plaintiffs' argument that compensation for such rest periods in the amount

16   of 0.16 of an hour, or 9.6 minutes, constitutes an unpaid rest period as opposed to *de minimis*

17   violation . . .").  Defendants cite no authority establishing that a *de minimis* defense is cognizable

18   under state law, although the Ninth Circuit has held such a defense exists to unpaid overtime

19   claims under the Fair Labor Standards Act ("FLSA").  *See Lindow v. United States*, 738 F.2d

20   1057, 1062–63 (9th Cir. 1984) (noting courts should look to factors such as practical

21   administrative difficulty of reflecting the time, the aggregate size of the claim, and the regularity

22   of the excess work in the context of that case).[16]  Moreover, district courts have held that this

23   defense does not preclude class certification in other circumstances.  *See Moore v. Ulta Salon,*

24   *Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 618 (C.D. Cal. 2015).  In any event, the court

25   concludes that here both *de minimis* and merits-based defenses tend to support, rather than

26   _____

27   [16]  A question of a similar nature—whether California recognizes a *de minimis* defense to claims
     for unpaid wages under Labor Code §§ 510, 1194, and 1197—has been certified to the California
     Supreme Court.  *See Troester v. Starbucks Corp.*, 680 Fed. App'x 511, 2016 WL 8347245 (9th

28   Cir. June 2, 2016).  It appears that the question remains pending before that court.

1    undermine, class certification, as they too will be issues suitable for resolution across the entire

2    subclass. Defendants have not explained how the assertion of these defenses must be applied

3    individually.

4        Finally, from March 2014 onward, plaintiffs concede that defendants' policies were

5    lawful. Rather, plaintiffs maintain that class members were not always paid in accordance with

6    those policies. Defendants argue that their payroll records will not provide a common method of

7    proof with respect to this claim because they will only show whether an individual was

8    compensated for a rest period, but cannot show whether an employee freely chose to waive any

9    given rest period.

10       Regardless of whether a waiver defense to these claims is cognizable,[17] defendants have

11   failed to establish that assertion of such a defense would cause individual issues to overwhelm

12   class questions. Defendants bear the burden of pleading and proving any affirmative defenses

13   they seek to raise. *See Brinker*, 53 Cal. 4th at 1053 (noting that waiver "is an affirmative defense,

14   and thus the burden is on the employer, as the party asserting waiver, to plead and prove it"); *see*

15   *also Sliger v. Prospect Mortg., LLC*, 89 F. Supp. 2d 1212, 1217 (E.D. Cal. 2011). Of the 100

16   employee declarations provided by defendants, only in seven do employees recall ever skipping a

17   rest break; of those seven, the declarations state that this practice was very infrequent. (Doc. No.

18   147-8 at 15 (Amador) (estimating she skipped a rest break "very few times"); *id.* at 108 (Diaz)

19   (describing skipping a rest break as "extremely rare"); Doc. No. 147-10 at 95–96 (Mendoza)

20   (describing skipping rest breaks on Saturdays only); Doc. No. 147-11 at 58 (Perez) (describing

21   skipping rest breaks "occasionally" on Saturdays, and noting this stopped occurring when the

22   individual piece rate system was put in place); *id.* at 78–79 (Ramos) (stating that skipping rest

23

---

24   [17] It is unclear whether employees may waive rest periods under California law. *Compare* Cal.
     Dep't of Indus. Rel., Division of Lab. Standards Enforcement ("DLSE"), Opinion Letter (Jan. 28,
25   2002) (noting that no rest break is required for any employee who "freely chooses without any
     coercion or encouragement to forego or waive a rest period") *with Bufil v. Dollar Fin. Grp., Inc.*,
26   162 Cal. App. 4th 1193, 1205 (2008) (citing 8 Cal. Code Regs. § 11040(11)(A), (12)(A)) ("[T]he
     purported meal period waivers had nothing to do with the rest period claims because an employee
27   cannot waive such claims. The permitted waiver of the meal requirement applies only to meal
     periods, not to rest breaks.").
28

1  breaks had "occurred less than about ten (10) times"); Doc. No. 147-12 at 48 (Toledo) (noting

2  that, some years ago, his crew would skip rest breaks on Saturdays if everyone, including the

3  foreman, agreed); *id.* at 85 (Vargas) (noting that sometimes his crews would skip rest breaks on

4  Saturdays but it "didn't happen all the time back then and it does not happen at all anymore").

5  None of the employees suggested they skipped all, most, or even a sizable number of their rest

6  breaks.  Defendants have presented no evidence suggesting any waiver defense permeates this

7  subclass to the point a liability determination would require individualized attention.  Moreover,

8  the Ninth Circuit has approved of the use of statistical sampling and representative testimony as a

9  method to determine liability in wage-and-hour class actions.  *See Jimenez v. Allstate Ins. Co.*,

10  765 F.3d 1161, 1167 (9th Cir. 2014) ("Since *Dukes* and *Comcast* were issued, circuit courts

11  including this one have consistently held that statistical sampling and representative testimony are

12  acceptable ways to determine liability.").  To the extent defendants wish to prove that individual

13  class members waived rest breaks, they may do so at the damages phase of the case.  *See id.* at

14  1168 (noting with approval the district court's decision to preserve defendant's "opportunity to

15  raise any individualized defense it might have at the damages phase of the proceedings"); *Leyva

16  v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013) ("[T]he presence of individualized

17  damages cannot, by itself, defeat class certification under Rule 23(b)(3).").

18      In short, defendants' liability under this subclass can be determined based on legal

19  disputes common to all subclass members, including whether defendants' varying rest period

20  policies were lawful and whether they are subject to a *de minimis* defense.  These issues will

21  predominately be resolved based on one body of evidence—defendants' payroll records—also

22  supporting subclass-wide resolution.  Finally, defendants have presented very little evidence

23  supporting an affirmative waiver defense.  To the extent they have shown that any waiver

24  occurred, it appears to the court that such evidence is more properly categorized as relevant only

25  to the damages inquiry, rather than one pertaining to plaintiffs' central theory of liability.

26  Therefore, the court concludes that subclass-wide issues predominate with respect to this

27  subclass.

28  /////

1                            c.      *Superiority*

2           For many of the same reasons that this court concludes subclass-wide issues predominate,

3    it likewise concludes that class treatment of the piece rate rest period subclass claims is superior

4    to individual treatment.  In determining superiority, the court is to look to issues such as class

5    members' interests in individual control of the litigation, the extent of any litigation already

6    begun by class members, the desirability of concentrating the litigation in a particular forum, and

7    the likely difficulties in managing a class action.  *See* Fed. R. Civ. P. 23(b)(3)(A)–(D).  There has

8    been no showing here that any of the class members have a separate interest in individual control

9    of the litigation, or that suits by class members are already pending on these same issues.

10   Moreover, the types of claims at issue here likely involve smaller amounts of damages, for which

11   the only practical means of seeking redress is class treatment.  *See Zinser v. Accufix Research*

12   *Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) ("Where damages suffered by each putative class

13   member are not large, this factor weighs in favor of certifying a class action.").

14          Finally, while defendants do raise some issues that they believe will result in difficulties

15   managing the class action at a later stage in this litigation, this does not defeat class certification.

16   The Ninth Circuit has emphasized that administrative feasibility is not a stand-alone prerequisite

17   to class certification, and that there is a "well-settled presumption that courts should not refuse to

18   certify a class merely on the basis of manageability concerns."  *Briseno v. ConAgra Foods, Inc.*,

19   844 F.3d 1121, 1128 (9th Cir. 2017).  Indeed, here, the only real manageability concern

20   defendants have presented is their potential waiver defense and, as noted above, there is scant

21   evidence suggesting that this will be a genuine issue running throughout the subclass.

22          For all of these reasons, the court concludes a class action is superior to individual

23   resolution of these claims against defendants, and therefore will certify the Piece Rate Rest Period

24   Subclass as follows:

25   /////

26   /////

27   /////

28   /////

31

1              Piece Rate Rest Period Subclass

2        All individuals who were employed by Defendants as a non-exempt
      "field worker" or agricultural worker from March 17, 2011 to
3        present, and were compensated on a piece rate basis.[18]

4              2.    Unpaid Travel Time Subclass

5        Plaintiffs seek certification of a subclass to litigate the issue of whether defendants were

6  required to compensate them for unpaid travel time between various work sites.

7                    a.    *Commonality*

8        Plaintiffs assert, and defendants do not dispute, that class members were required to be

9  compensated for any time spent traveling between different fields during their shifts.  (Doc. No.

10  145 at 47; Doc. No. 147 at 50.)  Indeed, any compulsory travel time is generally compensable as

11  "hours worked" for agricultural employees in California.  *See Morillion v. Royal Packing Co.*, 22

12  Cal. 4th 575, 595 (2000).[19]

13        Supporting commonality are twenty-five declarations from putative class members

14  generally recalling that they were required to travel between thirty minutes and one hour between

15  fields during mandarin harvest season numerous times per week.  (*See* Doc. No. 145-4 at 5

16  (Magdaleno); *id.* at 12 (Hinojosa); *id.* at 17–18 (Torres); *id.* at 26 (Estrella); *id.* at 40–41 (Vega);

17  *id.* at 47 (Gonzalez); *id.* at 55–56 (Vargas); *id.* at 65 (de Estrella); *id.* at 72 (Rojas); *id.* at 80

18  (Hinojosa); *id.* at 86 (Carranza); *id.* at 96 (Orozco); Doc. No. 145-5 at 6 (Reyna); *id.* at 31

19  ───────────────────

20  [18]  This subclass definition differs somewhat from that originally proposed by plaintiffs.  The
    court has reformulated this and other subclasses below to address concerns attached to so-called
21  "fail-safe" classes.  *See, e.g.*, *Ruiz v. Citibank, N.A.*, Nos. 10 Civ. 5950 (KPF)(RLE), 10 Civ. 7304
    (KPF)(RLE), 2015 WL 4629444, at *7 (S.D.N.Y. Aug. 4, 2015) ("Such 'fail-safe classes' present
22  myriad problems, including the risk that plaintiffs might effectively litigate their claims without
    the risk of an adverse judgment:  either they 'win' and are in the class, which by definition cannot
23  lose its claim, or they 'lose' and are outside the class, and thus are not bound by an adverse
    decision."); *see also Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 n.7 (9th Cir. 2016)
24  (noting the Ninth Circuit requires only a "reasonably close fit between the class definition and the
    chosen theory of liability" so as to avoid the problems of fail-safe classes); *Santillan v. Gonzales*,
25  388 F. Supp. 2d 1065, 1072 (N.D. Cal. 2005) ("A court may divide a class into subclasses on
    motion of either party, or *sua sponte*.") (citing *Burka v. N.Y.C. Transit Auth.*, 110 F.R.D. 595,
26  603–04 (S.D.N.Y. 1986)).

27  [19]  Again, since this time is compensable as hours worked, it counts as wages that must be paid
28  under 29 U.S.C. § 1832(a).

                                32

1    (Patron); *id.* at 39 (Carrera); *id.* at 50 (Melendres); *id.* at 58 (De Leon); *id.* at 64 (Alvarez); *id.* at

2    70 (Gutierrez); *id.* at 77–78 (Esquivel); *id.* at 86–87 (Reyes); Doc. No. 145-6 at 4 (Sanchez); *id.* at

3    74–75 (Cabrales); *id.* at 81 (Hernandez); *id.* at 85 (Monzon).)  All of these declarations state that

4    the employees were not compensated for this travel time.  Defendants' PMK testified at his

5    deposition that, in the early part of the class period, workers would travel between fields in their

6    own vehicles during mandarin season, alternately doing pruning and harvesting work.  (Doc. No.

7    145-1 at 119–20.)  Further, the PMK testified that defendants' payroll records did not reflect any

8    separate travel time compensation for those employees.  (*Id.* at 163, 171–72, 174–77, 180, 184.)

9    It is clear there are common questions of fact and law that run throughout the proposed subclass,

10   and that there is a common method of proof—defendants' payroll records—which will further

11   facilitate subclass-wide resolution.  Commonality is therefore satisfied with respect to this

12   subclass.

13              b.      *Predominance*

14         Defendants do not contest predominance as such here.  Rather, defendants complain the

15   class is not ascertainable.  (Doc. No. 137 at 48–51.)  As noted above, there is not a stand-alone

16   prerequisite of administrative feasibility which the plaintiffs must meet in order to certify a class;

17   rather, administrative concerns are simply a part of the analysis of whether a class action is a

18   superior method of resolving a dispute.  *See Briseno*, 844 F.3d at 1128.  Defendants' arguments in

19   this regard will therefore be addressed in connection with the consideration of superiority, below.

20         Meanwhile, the central issue concerning this subclass is whether defendants were required

21   to compensate their employees for travel time between job sites, and whether they did so.  This

22   subclass is readily subject to not only common legal issues, but common proof.  Defendants'

23   PMK acknowledged at his deposition that defendants' payroll records reflect unique codes

24   identifying what specific fields various workers were working in on a particular day, along with

25   identifying information about that grower, allowing a determination as to when workers travelled

26   to two different fields in one day.  (Doc. No. 145-1 at 150–55.)  Plaintiffs also supplied a ranch

27   map index and list of growers which they purport allow for the determination of the driving time

28   between any two fields reflected in the payroll records.  (*See* Doc. No. 145 at 48; Doc. No. 184.)

1    Plaintiffs' expert Dr. Petersen explains how he will calculate the unpaid travel time in his

2    declaration.  First, he notes that, within the data he received, 14.3 percent of the workdays during

3    the class period reflect work performed at more than one location.  (Doc. No. 145-3 at ¶ 18.)  To

4    calculate the payments due, he would "randomly draw a number of days when class members

5    traveled that is representative of the entire class."  (*Id.* at ¶ 19.)  Dr. Petersen states he understands

6    the coded job sites depicted in the payroll records are attached to addresses, which he would then

7    input into Google Maps to determine the length of time it would take to drive between job sites.

8    (*Id.*)  He notes that, if there are not addresses readily available, plaintiffs would need to seek

9    further data production from defendants to confirm the location of the job sites in question.  (*Id.*)

10   According to Dr. Petersen, the data from each of the sample drive times selected will be

11   aggregated to determine the average travel time per work days, within an acceptable margin of

12   error.  (*Id.*)  This average number will then be combined with the number of days where travel

13   time payments were due and the associated hourly wage rate to determine the damages for the

14   class for unpaid travel time.  (*Id.*)

15          Defendants concede that the claims raised by this subclass are susceptible of common

16   proof.  Defendants argue that either no travel time was incurred or all payments were

17   appropriately made, because their payroll records reflect some travel periods were separately

18   compensated and recorded.  (*See* Doc. No. 147-5 at ¶ 15) (giving an example of 0.41 hours of

19   travel time paid separately to plaintiff Avalos on November 27, 2013).)  The evidence referred to

20   by defendants may be relied upon to support a merits-phase argument and is not appropriately

21   addressed at this stage of the proceeding.  However, the court notes that defendants' PMK

22   declares he was able to determine that there was separate compensation provided for travel time

23   by examining payroll records, the grower list, and the ranch map index.  (*Id.*)  This statement

24   makes clear that defendants can discern from the payroll records whether an employee was

25   appropriately compensated for travel time.  This, in turn, demonstrates the viability of this claim

26   being addressed on a subclass-wide basis:  both parties can determine solely from defendants'

27   /////

28   /////

1    records whether the employees were separately compensated for travel time.[20]

2         Because this claim is susceptible of common proof and will involve common legal

3    questions that clearly outweigh any individual issues, predominance is satisfied.

4                         c.    *Superiority*

5         The court also concludes that class treatment of this claim is superior to individual

6    treatment.  No showing has been made that any other individual litigation of the putative subclass

7    members has begun, or that any individual subclass members are interested in seeking separate

8    recourse.  The cumbersome nature of attempting to pursue many small-value claims individually

9    further supports concentrating all of them within one forum.

10        Defendants challenge the ascertainability of this subclass, which the court again takes to

11   be a challenge to the administrative feasibility or manageability of the subclass.  *See Briseno*, 844

12   F.3d at 1124, n.3 (refraining from using the term "ascertainability" because of the varied

13   meanings given to it by courts).  Defendants assert numerous individual determinations that

14   would have to be made in order to identify the members of the class.  (Doc. No. 147 at 50–51.)

15   However, the class definition need not be so exact as to only cover individuals who in fact

16   suffered the injury alleged.  *See Torres*, 835 F.3d at 1138, n.7 (noting the Ninth Circuit requires

17   only a "reasonably close fit between the class definition and the chosen theory of liability,"

18   because requiring a class definition that is too precise leads to problems associated with fail-safe

19   classes).  All that is required for class definition is that it set forth "common characteristics

20   sufficient to allow a member of that group to identify himself or herself as having a [potential]

21   right to recover based on the description."  *Krueger v. Wyeth, Inc.*, No. 03CV2496 JAH(AJB),

---

22   [20]  Defendants also argue that, if the two fields at which a given class member worked are

23   contiguous, there would be no compensable travel time between them and therefore no violation
     of the law.  This argument is not well taken.  Even to the extent this could theoretically be true,

24   defendants make no showing that any of their fields are in such close proximity to one another
     that there would be no travel time between them, let alone that any putative class members

25   actually worked at two such contiguous fields on the same day during any part of the class period.
     Indeed, the evidence before the court suggests that the fields in question range over a wide area.

26   (*See* Doc. No. 145-1 at 85–87) (noting that, according to the PMK, the fields on which the
     putative class members work range as far north as Madera and as far south as Goshen

27   (approximately 65 miles apart) and as far east as Sanger and as far west as Kerman
     (approximately 35 miles apart)).

28

1   2011 WL 8984448, at *1 (S.D. Cal. July 13, 2011).

2           As such, having found all the criteria met for certification, the court certifies the following

3   subclass, which will allow potential class members to know whether they are a member of that

4   group and have a potential right to recover:

5                       Unpaid Travel Time Subclass

6                       All individuals who were employed by Defendants as a non-exempt
                        "field worker" or agricultural worker from March 17, 2011 to
7                       present, and worked at two or more fields in one day.

8                   3.      Vehicle Expense Subclass

9           Plaintiffs seek to certify a subclass for unreimbursed vehicle expenses incurred by class

10  members when they drove their cars between various worksites.  Defendants essentially renew

11  their objections to certification under the unpaid travel time subclass in opposition to certification

12  of this subclass.  (Doc. No. 147 at 54–55.)

13                      a.      *Commonality*

14          Under California law, an employer "shall indemnify his or her employee for all necessary

15  expenditures or losses incurred by the employee in direct consequence of the discharge of his or

16  her duties."  Cal. Labor Code § 2802(a).  This is generally understood to include vehicle

17  expenses.  *See Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 567–68 (2007) (noting the

18  parties agreed § 2802 required "an employer to indemnify its employees for expenses they

19  necessarily incur in the discharge of their duties," and finding employer could do so by enhancing

20  the base salary under certain circumstances).  Defendants' PMK testified at his deposition that

21  defendants' employees are not compensated for mileage reimbursements for driving their own

22  cars between worksites.  (Doc. No. 145-1 at 249.)  It is clear that this subclass contains common

23  legal issues and company policies.

24                      b.      *Predominance*

25          Plaintiffs submit that, for many of the same reasons that the Unpaid Travel Time Subclass

26  is appropriate for certification, so is this subclass.  In addition to the facts stated above showing

27  that travel between different worksites can be determined by defendants' own records,

28  defendants' PMK testified that employees are never provided mileage reimbursements or

                                            36

1    automobile allowances for their vehicle expenses when traveling between fields because "they're

2    paid for that time." (Doc. No. 145-1 at 249.) Plaintiffs have come forward with declarations

3    from individual class members reflecting that they drove their own car between fields and were

4    not reimbursed for it. (Doc. No. 145-4 at 26 (Estrella); *id.* at 48 (Gonzalez); *id.* at 57 (Vargas); *id.*

5    at 65 (de Estrella); *id.* at 80 (Hinojosa); Doc. No. 145-5 at 7 (Reyna); *id.* at 32 (Patron); *id.* at 39

6    (Carrera); *id.* at 64 (Alvarez); *id.* at 70 (Gutierrez); *id.* at 78 (Esquivel); *id.* at 87 (Reyes); *id.* at 96

7    (Machuca); Doc. No. 145-6 at 4–5 (Sanchez); *id.* at 56 (Gonzalez); *id.* at 75 (Cabrales); *id.* at 81

8    (Hernandez); *id.* at 85–86 (Monzon).)

9         Defendants believe predominance is not met here because the identity of the individuals

10   who drove vehicles between worksites cannot be determined solely from defendants' payroll

11   records, which is undisputed. Indeed, there is evidence that some employees carpooled to work

12   and presumably between job sites while at work. (*See* Doc. No. 147-5 at 4 (PMK Depo.)

13   ("[O]ver the class period, while performing my duties as Director of Human Resources for Ag

14   Force and FPC, I have observed that it is more common than not for agricultural employees to

15   carpool to work."); Doc. No. 147-8 at 37 (Ayala) ("I arrive this early because the ladies I carpool

16   with pick me up early."); *id.* at 92 (Cruz) (carpool driver); *id.* at 96 (Cruz) (carpool driver); *id.* at

17   101 (de Jesus) (sometimes carpools); Doc. No. 147-9 at 13 (Dung); *id.* at 6 (Garcia); Doc. No.

18   147-12 at 9 (Sanchez); *id.* at 68 (Valencia).) However, the number of individual employees

19   whom actually drove vehicles between fields goes to the question of damages with respect to this

20   subclass, not to liability with respect to the claim. The liability question will be resolved by

21   looking to whether defendants were required to compensate employees for mileage for driving

22   their own vehicles between job sites, and whether they did so. Once again the court notes,

23   individualized damages inquiries do not defeat class certification. *Leyva*, 716 F.3d at 513–14;

24   *Yokoyama*, 594 F.3d at 1094.

25        Here, the parties do not contest that the question of liability with respect to this claim is

26   readily determinable across the subclass. Accordingly, the court finds that common issues

27   predominate over individual ones.

28   /////

37

1

      c.     *Superiority*

2        Defendants' main objection to this subclass is, as with the Unpaid Travel Time Subclass,

3  based upon defendants' contention that it is not manageable.  (Doc. No. 147 at 54–55.)  At its

4  core, this is a challenge to the superiority of pursuing this cause of action on a subclass-wide

5  basis.  According to defendants, because it is not apparent from their records whether an

6  employee drove a car from one worksite to another, thereby incurring reimbursable expenses, this

7  will necessitate a series of individual inquiries as to damages.  (*Id.*)  However, plaintiffs' expert

8  Dr. Petersen suggests a damages determination for this subclass would be reached by combining

9  his analysis of the damages attributable to the unpaid travel time subclass with an aggregated

10  average travel distance, multiplied by the IRS mileage reimbursement rate.  (Doc. No. 145-3 at

11  ¶ 20.)  In a footnote in his declaration, Dr. Petersen represents that he will determine how many

12  individuals drove their own vehicles between worksites by employing surveying techniques,

13  essentially asking class members whether they did so and how many co-workers typically rode

14  with them.  (*Id.* at ¶ 20, n.9.)  This information would then "be used in the projection of class

15  wide damages."  (*Id.*)  Alternately, plaintiff indicates that the number of individuals who drove

16  their vehicles and are entitled to reimbursement can be identified through "self-certification," i.e.

17  the submission of affidavits at the claims administration stage.  (Doc. No. 150 at 25–26.)  Other

18  district courts in California have permitted just this type of procedure.  *See Melgar v. CSk Auto,*

19  *Inc.*, No. 13-cv-03769-EMC, 2015 WL 9303977, at *8 (N.D. Cal. Dec. 22, 2015); *Krueger v.*

20  *Wyeth, Inc.*, 310 F.R.D. 468, 475–76 (S.D. Cal. 2015) (noting approval of classes "even when the

21  only way to determine class membership is with self-identification through affidavits").

22        The court understands and appreciates defendants' concerns regarding the proposed

23  statistical analysis.  However, the court is likewise mindful that under binding Ninth Circuit

24  precedent individualized damage assessments, standing alone, cannot serve to defeat class

25  certification.  *Leyva*, 716 F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094.  Further, it is clear here

26  that plaintiffs' anticipated damages models are not inconsistent with their alleged liability case.

27  *See Comcast*, 569 U.S. at 34–35.  Whatever method of determining damages may ultimately be

28  employed here, the fact that plaintiffs have proposed statistical modeling at this stage does not

1  defeat class certification. *See Jimenez v. Allstate Ins. Co.*, No. LA CV10-08486 JAK (FFMx),

2  2012 WL 1366052, at *15 (C.D. Cal. Apr. 18, 2012) (noting that although plaintiff had not met

3  its burden of demonstrating that statistical sampling was proper for calculating damages, "this

4  shortcoming is not sufficient to preclude class certification"); *In re Estate of Marcos Human*

5  *Rights Litig.*, 910 F. Supp. 1460, 1464 (D. Haw. 1995) ("The use of aggregate procedures, with

6  the help of an expert in the field of inferential statistics, for the purpose of determining class

7  compensatory damages is proper."). There are no issues with class manageability that render this

8  subclass unsuitable for class treatment at this time. Therefore, the following subclass is certified

9  by the court:

10  <u>Vehicle Expense Subclass</u>

11  All individuals who were employed by Defendants as a non-exempt
    "field worker" or agricultural worker from March 17, 2011 to
12  present, worked at two or more fields in one day, and drove their
    own cars between fields.
13

14  4.  <u>Meal Period Subclass</u>

15  Plaintiffs wish to certify a subclass of employees who were denied required meal periods

16  or whose required meal periods were not recorded. (Doc. No. 145 at 50–52.) Defendants again

17  argue that individual issues predominate as to this subclass, thereby making class certification

18  inappropriate. (Doc. No. 147 at 55–56.)

19  a.  *Commonality*

20  Defendants do not directly contest commonality with respect to this subclass. California

21  law requires employers to "authorize and permit all employees after a work period of not more

22  than five (5) hours to take a meal period of not less than thirty (30) minutes." 8 Cal. Code Regs.

23  § 11140(11). If an employee is working no more than six hours during a day, they may validly

24  waive a meal period by mutual consent of both employee and employer. *Id.* During the meal

25  period, the employee shall not be required to work, unless the parties have executed a written

26  agreement to an "on duty" meal period, which is required by the nature of the work. *See* Cal.

27  Labor Code § 226.7; 8 Cal. Code Regs. § 11140(11). Generally, the employer's duty to provide a

28  meal period to an employee is discharged "if it relieves its employees of all duty, relinquishes

1    control over their activities and permits them a reasonable opportunity to take an uninterrupted

2    30-minute break, and does not impede or discourage them from doing so." *Brinker*, 53 Cal. 4th at

3    1004. Further, employers are required by law to record meal periods. *See* Cal. Code Regs.

4    § 11140(7)(A)(3) ("Meal periods, split shift intervals and total daily hours worked shall also be

5    recorded.").

6        Additionally, defendants apparently maintained a practice requiring forepersons to ensure

7    each crew took a lunch break and took it at the same time, and that each lunch period was

8    recorded. (Policies and Procedures for Crew Foreman – Lodged Doc.) Defendants' PMK

9    testified at deposition that company policy requires the forepersons to record the start and stop

10   time of the lunch break. (Doc. No. 145-1 at 137–38.) Nevertheless, there are numerous instances

11   in defendants' records, confirmed by the PMK, where no lunch break was recorded for work

12   periods of longer than five hours. (*See* Doc. No. 145-1 at 167–68; *id.* at 175–76; *id.* at 180; *id.* at

13   211–14.) The PMK testified he did not know why the company forepersons were not recording

14   meal periods. (*Id.* at 214.)

15       Plaintiffs have submitted declarations from numerous class members in which those

16   employees state that lunch breaks were frequently not given, and hence were not recorded. Those

17   declarants have recounted that either they were told they would not get a lunch break because the

18   crew had to change job sites during the day and the travel time was their lunch break, or simply

19   because the foreperson failed to call for a lunch break. (Doc. No. 145-4 at 5 (Magdaleno) ("Only

20   the foreman can tell the crew to take a lunch. If the foreman doesn't call lunch, we don't take

21   it."); *id.* at 18 (Torres); *id.* at 26 (Estrella); *id.* at 48 (Gonzalez); *id.* at 57 (Vargas); *id.* at 65 (de

22   Estrella); *id.* at 81 (Hinojosa); Doc. No. 145-5 at 7 (Reyna); *id.* at 12 (Hernandez); *id.* at 34

23   (Patron); *id.* at 39–40 (Carrera); *id.* at 50 (Melendres); *id.* at 58 (De Leon); *id.* at 64 (Alvarez); *id.*

24   at 69–70 (Gutierrez); *id.* at 78 (Esquivel); *id.* at 87 (Reyes); Doc. No. 145-6 at 5 (Sanchez); *id.* at

25   66–67 (Garcia); *id.* at 75 (Cabrales); *id.* at 81 (Hernandez).)

26       Additionally, Dr. Petersen has declared that he received 24,271 pages of records

27   consisting predominantly of daily time sheets compiled by crew forepersons from January 2011

28   to December 2015. (Doc. No. 145-3 at ¶ 13.) These time sheets, which are filled out by the crew

1    forepersons each day, have a specific section denoting start and stop times for a meal break.  (*See,*

2    *e.g.*, Doc. No. 145-1 at 362, 374, 379.)  Dr. Petersen noted that, while examining these forms, if a

3    half hour period was recorded, he assumed the crew had received a meal period, whereas if it was

4    empty, he assumed no meal period was received.  (Doc. No. 145-3 at ¶ 13.)  Indeed, at deposition

5    defendants' own PMK confirmed that crew forepersons record the meal period taken on these

6    sheets.  (Doc. No. 145-1 at 126–27.)   The crew sheet records obtained by plaintiffs thus far

7    depict approximately 12,135 crew work days (measured per crew, rather than per employee).

8    (Doc. No. 145-3 at ¶ 14.)  Dr. Petersen randomly selected 275 crew sheets to estimate a

9    percentage of work days when class members did not receive the required meal break, which

10   yielded 6,469 individual employee records for that sample.  (*Id.* at ¶ 15.)  He determined that

11   there were 981 instances of individual employees not being provided meal breaks out of the

12   sample, suggesting there was approximately a 15.2 percent rate of employees not being provided

13   meal breaks.  (*Id.*)  Dr. Petersen clarified in a supplemental declaration that putative class

14   members were not provided with a meal period on 15.2 percent of the days worked, not that 15.2

15   percent of the employees had suffered this injury at some point.  (Doc. No. 178-1 at ¶ 3.)

16        As demonstrated by the above discussion, there are common legal questions that pervade

17   defendants' liability to this subclass, and common proof—defendants' records and the parties'

18   respective expert opinions concerning their interpretation—which will be used in determining

19   liability.  Commonality is therefore satisfied as to this subclass.

20                    b.    *Predominance*

21        Defendants present three separate arguments concerning why common issues do not

22   predominate over individual issues with respect to this subclass.  First, they argue that the 15.2

23   percent rate of missed meal payments calculated by Dr. Petersen is "exceptionally low under the

24   assumption that Defendants made it a practice to deny workers a meal period."  (Doc. No. 147 at

25   55.)  Defendants represent that "a determination of liability and calculation of damages based on

26   a rate this low will not achieve a reasonable method for allocating liability or damages across the

27   class as the Compliance Rate varies from person to person, crew to crew, and crop to crop."  (*Id.*

28   at 55–56.)  However, defendants do not explain why a low violation rate would affect the liability

1    determination here.  Nor do defendants provide any authority for the proposition that an employer

2    must commit labor law violations at a particular rate to make those violations subject to class

3    wide determination.  To the extent defendants' argument in this regard relates to how damages

4    will ultimately be demonstrated and determined, the court notes defendants' concerns.  However,

5    as explained above, such concerns are premature and cannot defeat class certification.  *Leyva*, 716

6    F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094; *Jimenez*, 2012 WL 1366052, at *15; *Ellis v. Costco

7    Wholesale Corp.*, 285 F.R.D. 492, 539 (N.D. Cal. 2012) ("[T]he need for individualized hearings

8    does not, on its own, defeat class certification."); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D.

9    666, 680 (N.D. Cal. 2011) ("[I]ndividual damages issues typically do not bar class certification

10    where common questions predominate over individual questions as to liability.").

11        Defendants next argue that there are numerous potential reasons why their payroll records

12    would have omitted a meal period, "including clerical errors, meal periods taken between

13    assignments, errors in a crew boss's understanding of the law, or unforeseen circumstances which

14    keep the crew working past five hours."  (Doc. No. 147 at 56.)  Defendants provide neither

15    authority nor evidence to support either:  (1) that evidence exists supporting these possible

16    explanations; or (2) that even if such evidence exists, it would support a legal defense from

17    liability.  Without such support, defendants' argument that their suggested defenses are genuine

18    and cognizable and therefore require individualized liability treatment is unpersuasive .  *Edwards*,

19    798 F.3d at 1184 ("When defendants opposing class certification raise a legal defense that may

20    defeat commonality, the district court cannot assume its validity . . ."); *Anda v. Roosen Varchetti

21    & Olivier, PLLC*, No. 1:14-CV-295, 2016 WL 7157414, at *4 n.1 (W.D. Mich. Oct. 31, 2016)

22    ("[T]he mere possibility that Defendants could raise individualized defenses against Plaintiffs'

23    claims is insufficient reason for this Court to depart from the well-settled rule that potential

24    individualized defenses do not preclude class certification.").

25        Finally, defendants argue:

26        The primary shortcoming of the use of sampling methodologies in
        class litigation is that a statistical (or any other) methodology does

27        not exist that allows for the assignment of a proportional result to
        the non-sampled population.

28

42

1    (Doc. No. 147 at 56.)  In this vein, defendants present the declaration of their expert, Dr. Joseph

2    Krock, who opines that the sample on which plaintiffs' expert relied "identified 981 days out of

3    6,469 days on which workers purportedly did not receive a meal period.  According to the

4    proposed methodology, at least 269,188 days are going to be assigned as missed meal period days

5    without actually determining whether a missed meal period exists."  (Doc. No. 147-7 at ¶¶ 39–

6    41.)  As mentioned at oral argument on the pending motion, the court has struggled to understand

7    this argument advanced by defendants.  To the extent this argument suggests that statistical

8    conclusions are inherently flawed or invalid, the court cannot adopt that proposition.  *See, e.g.*,

9    *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, No. CV 13-2747-DMG (AGRx), 2014 WL

10   5797541, at \*3–4 (C.D. Cal. Oct. 7, 2014) (allowing introduction of statistical expert); *Butler v.*

11   *Home Depot, Inc.*, 984 F. Supp. 1257, 1266 (N.D. Cal. 1997) (same).  Defendants may be

12   suggesting that a foreperson's failure to note whether a meal break was taken on crew sheets does

13   not mean the crew actually missed a meal break.  However, they have provided no evidence that

14   this is the case, nor have they provided any authority suggesting it would be a defense to liability

15   even if such evidence were to exist.

16          Again, the court understands defendants' concerns about the methodology to be employed

17   in any ultimate calculation of damages with respect to this claim.  Nevertheless, such concerns do

18   not bar class certification here.  *Leyva*, 716 F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094;

19   *Jimenez*, 2012 WL 1366052, at \*15; *Ellis*, 285 F.R.D. at 539; *Herrera*, 274 F.R.D. at 680.

20   Instead, it is largely undisputed that liability can be determined on a subclass-wide basis by

21   determining whether defendants were required to and did compensate the class members for the

22   meal periods, along with whether they recorded the meal periods, as required by California law.

23   Therefore, predominance is satisfied as to this subclass

24                              c.    *Superiority*

25          Similar to the above subclasses, there is no indication that members of this subclass wish

26   to pursue these claims individually or have filed suits to that end.  To the extent defendants recast

27   their qualms with this class under the guise of administrative feasibility or manageability, those

28   arguments are rejected since they do not overcome the "well-settled presumption that courts

43

1    should not refuse to certify a class merely on the basis of manageability concerns." *Briseno*, 844

2    F.3d at 1128.  For these reasons the following subclass is certified by the court:

3                         Meal Period Subclass

4                         All individuals who were employed by Defendants as a non-exempt
                           "field worker" or agricultural worker from March 17, 2011 to
5                         present, for whom no meal period was recorded on at least one day
                           in which the employee worked more than five hours.
6

7                         5.    Ghost Worker Crew Subclass

8            Plaintiffs seek certification for a subclass of individuals subjected to the practice of using

9    so-called "ghost workers" or "muertitos."  (Doc. No. 145 at 53–56.)  Between the 2011 and 2014

10   mandarin harvest seasons, defendants compensated their employees who picked mandarins on a

11   group piece rate basis:  their compensation was based on a per-bin rate for all of the bins

12   harvested by a given crew, divided in equal shares among the crew members.  (*Id.* at 53.)

13   Plaintiffs allege that various forepersons put fictitious employees—the ghost workers or

14   muertitos—on their crew list, allowing the foreperson to claim the pay for these fictitious

15   employees for themselves while also depriving each of the rest of the crew members of some

16   portion of their wages.  (*Id.* at 54.)  As of the 2015 mandarin harvest season, defendants began

17   paying their employees on an individual piece rate basis, eliminating the incentive and potential

18   for this practice to continue.

19           At the court's request, plaintiffs provided supplemental briefing detailing their theories of

20   the defendants' liability based on their forepersons' use of ghost workers.  According to plaintiffs,

21   there are six separate theories of liability with respect to this claim:  (1) the basic nature of the

22   employment relationship; (2) Labor Code § 221 and the AWPA; (3) California Business and

23   Professions Code § 17200; (4) apparent authority liability for the torts of defendants' agents; (5)

24   ratification of the tortious actions of its employees; and (6) negligent hiring of forepersons.  (Doc.

25   /////

26   /////

27   /////

28   /////

1   No. 178 at 17–23.)  Several of these—namely, the last four—are summarily rejected by the

2   court.[21]

3          Concerning their other two theories of liability, plaintiffs maintain defendants are liable

4   pursuant to Labor Code §§ 221 and 1194, as well as the AWPA.  It remains unclear to the court in

5   what way Labor Code § 221 could be applicable here.  California law prohibits "any employer"

6   from "collect[ing] or receiv[ing] from an employee any part of wages theretofore paid by said

7   employer to said employee."  Labor Code § 221.  Generally speaking, § 221 "was enacted in

8   order to prevent employers from utilizing secret deductions or kickbacks to pay employees less

9   than their stated wages."  *Finnegan v. Schrader*, 91 Cal. App. 4th 572, 584 (2001).  Plaintiff has

10  not alleged that the defendant employers here collected or received any of the wages which

11  should have gone to class members.

12         One California court has held that an underpayment of wages may, in certain

13  circumstances, be considered a violation of § 221.  *Gonzalez*, 215 Cal. App. 4th at 50.  However,

14  the California Court of Appeals' holding in *Gonzalez* was premised on a violation of Labor Code

15  § 223, which prohibits "secretly pay[ing] a lower wage while purporting to pay the wage

16  designated by statute or by contract."  *See Gonzalez*, 215 Cal. App. 4th at 50.  The employer in

17  *Gonzalez* had utilized a payment system under which automotive service technicians were

18  compensated at a flat, per-hour rate.  215 Cal. App. 4th at 41.  However, the hours were based on

19  "flag hours," rather than actual hours worked.  *Id.*  The employer assigned each specific repair

20  task a certain number of "flag hours," approximating the amount of time it believed a repair

21  _____

22  [21]  To the extent plaintiffs now suggest their ghost worker claims against defendants rely on tort
    causes of action—whether established directly through negligent hiring, or through an agency

23  theory such as apparent authority or ratification—their contention must be rejected. (Doc. No.
    178 at 21–23.)  The operative pleading in this case set forth only causes of action based in

24  statutory labor law. (*See* Doc. No. 129.)  No tort causes of action have been alleged in the
    operative complaint, and plaintiffs cannot hope to certify a subclass on the basis of claims they

25  have not alleged.  Further, Business and Professions Code § 17200 cannot provide an independent
    basis to warrant certification of this subclass, since this provision merely "'borrows' violations of

26  other laws and treats these violations, when committed pursuant to business activity, as unlawful
    practices independently actionable under section 17200 *et seq.* and subject to the distinct

27  remedies provided thereunder."  *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383

28  (1992).

1    should take.  *Id*.  A technician who completed a repair earned the amount of "flag hours"

2    attributed to it, regardless of how long the repair actually took to complete.  *Id*.  No compensation

3    was provided for down time, except that at the end of a pay period, the amount of compensation

4    for "flag hours" was averaged across the total scheduled time for that pay period.  *Id*.  If the rate

5    fell below the minimum wage, the employer would supplement the employees' pay accordingly.

6    *Id*.  In holding that this averaging was unlawful, the court in *Gonzalez* explained that such a

7    scheme could be a violation of § 221, employing the following example:

8        [A] technician who works four piece-rate hours in a day at a rate of
         $20 per hour and who leaves the job site when that work is finished
9        has earned $80 for four hours of work.  A second technician who
         works the same piece-rate hours at the same rate but who remains at
10       the job site for an additional four hours waiting for customers also
         earns $80 for the day; however, averaging his piece-rate wages over
11       the eight-hour work day results in an average pay rate of $10 per
         hour, a 50 percent discount from his promised $20 per hour piece-
12       rate.   The second technician forfeits to the employer the pay
         promised "by statute" under Labor section 223 because if his piece-
13       rate pay is allocated only to piece-rate hours, he is not paid at all for
         his nonproductive hours.

14

15   *Id*. at 50.  In *Gonzalez*, therefore, the state appellate court reasoned that Labor Code §§ 221 and

16   223 were violated because the employees forfeited this amount *directly* to the employer by virtue

17   of the employer not paying them in accordance with statutory labor law.  In contrast, the

18   plaintiffs' allegation here is that the money was essentially stolen by their forepersons, who

19   presumably kept it and did not return it to the employer, the defendants in this action.

20   Accordingly, the court concludes that plaintiffs' argument that this claim could be premised on an

21   alleged violation of Labor Code § 223 is simply not persuasive.

22       More importantly, however, all of these alleged violations of the law appear to require the

23   employer to have knowledge of the unlawful payment scheme at issue.  The AWPA requires that

24   employers of seasonal agricultural workers provide employees written information concerning,

25   among other things, the wages to be paid.  29 U.S.C. § 1821(a).  Further, employers are

26   prohibited from "*knowingly* provid[ing] false or misleading information" to the same employees.

27   *Id.* § 1821(f) (emphasis added).  Meanwhile, Labor Code § 1194 authorizes private civil suits by

28   employees receiving less than the legal minimum wage or overtime compensation.  As the

1  California Supreme Court has noted, "[a] proprietor who *knows* that persons are working in his or

2  her business without having been formally hired, or while being paid less than the minimum

3  wage, clearly suffers or permits that work by failing to prevent it, while having the power to do

4  so." *Martinez v. Combs*, 49 Cal. 4th 35, 69–70 (2010) (emphasis added).

5      Plaintiffs have come forward with no evidence indicating that defendants here had a

6  company policy permitting, allowing, or encouraging the use of ghost workers by forepersons.

7  Nor have they provided evidence that the majority of forepersons were engaged in this practice,

8  from which it could perhaps be inferred the defendants had at least constructive knowledge of the

9  activities of their forepersons.  At most, plaintiffs have provided evidence that this practice

10  occurred on the crews of thirteen different forepersons:  Ramon Murillo, Eloy Molina, Elpidio

11  Torres, Vicky Vargas, Porfidio Vargas, "La Chata," Guadalupe Cruz, Jilberto (LNU), "El Sapo,"

12  Juan Miramontes, Bartolo (LNU), Alejandro LNU, and Joaquin Murillo.[22]  (Doc. No. 151 at

13  ¶ 19(a).)[23]  The parties do not dispute that defendants employed at least 109 different crews

14  during the proposed class period which utilized this group piece rate system, suggesting there

15  were at least 109 different forepersons active during the class period.  Based on this, the court

16  finds that there the evidence before it is insufficient to show that the alleged behavior affected

17

---

18  [22]  Plaintiffs' evidence does not support a finding that this practice occurred on the crews of
forepersons Enrique Garcia, Baltazar Ramirez, Bertha (LNU), or Reyna Ibanez.  Gerardo Reyna

19  declared that he worked for foreperson Garcia, but implicates only foreperson Vicky Vargas in
any wrongdoing.  (Doc. No. 145-5 at 6–7.)  The same is true of the declaration of Ines Garcia in

20  regards to foreperson Ibanez.  (Doc. No. 145-6 at 65.)  Similarly, the declarations provided by
plaintiffs recount only that class members began working for forepersons Ramirez and Bertha

21  (LNU) in 2015 and 2016.  (Doc. No. 145-4 at 102; Doc. No. 145-6 at 65.)  Plaintiffs have alleged
that the payment structure for these crews changed from a group to an individual piece rate

22  system starting in 2015, thereby preventing forepersons from using ghost workers.

23

24  [23]  Plaintiffs note that while they do not believe every foreperson committed wage theft in this
manner, they are unwilling to stipulate to a specific number of forepersons who committed such

25  wage theft, because they have been provided with only limited contact information for class
members.  (Doc. No. 178 at 23–24.)  The assigned magistrate judge in this action previously

26  limited discovery relevant to these claims to 25 percent of the putative class members, unless
plaintiffs uncovered from that sampling "evidence of company-wide violations."  (Doc. No. 33 at

27  7.)  Plaintiffs have not sought further discovery on this issue or brought a motion to compel for
hearing by the magistrate judge, despite the prior order limiting discovery stating that this issue

28  could be revisited if further evidence of class-wide violations was developed.  (*Id.*)

1   most or even a substantial portion of defendants' crews.  Absent that showing, the court is not

2   persuaded that an inference can be drawn that defendants should have been aware that the ghost

3   worker practice was widespread or occurring across all of its forepersons.

4        Given the above, any question of defendants' liability here would first require proof that

5   each foreperson was engaged in the practice.  Defendants do not agree that the above thirteen

6   forepersons were engaged in this practice of wage theft via ghost workers, and instead assert only

7   one foreperson—Ramon Murillo—ever engaged in it.  (Doc. No. 181 at 20.)  Indeed, defendants

8   have provided declarations from crew members specifically stating that forepersons Bartolo

9   (LNU), Vicky Vargas, Porfidio Vargas, and Eloy Molina did not engage in the use of ghost

10   workers.  (*See* Doc. No. 147-8 at 25–26 (Foreperson Bartolo (LNU); never saw or suspected

11   ghost workers and believed she was paid correctly); *id.* at 107 (Foreperson Vicky Vargas); Doc.

12   No. 147-9 at 25 (Fernandez) (Foreperson Porfidio Vargas); Doc. No. 147-11 at 70, 72–73

13   (Foreperson Eloy Molina).)  These are factual disputes that would need to be resolved on a

14   foreperson-by-foreperson basis.

15        Second, as suggested above plaintiffs would be required to prove that defendants knew

16   their forepersons were engaged in this practice in order for defendants to be held liable.  *See* 29

17   U.S.C. § 1821(f); *Martinez*, 49 Cal. 4th at 69–70.  Some of plaintiffs' declarants indicate that

18   putative class members generally complained about the ghost worker practices.  (*See, e.g.*, Doc.

19   No. 145-4 at 26 ("We began to complain to the company supervisors, but no one listened to us.");

20   *id.* at 34.)  Others do not.  (*See, e.g.*, Doc. No. 145-6 at 5, 19–20, 58–59.)  None of the

21   declarations presented indicate how frequently, when, or the type of worker complaints that were

22   lodged, nor who within the defendants' organizations they were lodged with.  There is simply not

23   sufficient evidence before the court to establish that these complaints were of such a nature that

24   the defendants should have been on notice that *all* of its forepersons were potentially engaged in

25   the practice of using ghost workers thereby causing actual employees to suffer injury.

26        Plaintiffs have also failed to identify any method of common proof that could be used to

27   demonstrate the liability of the defendants across this subclass.  Defendants are only potentially

28   liable under the theories plaintiffs have alleged if their forepersons actually engaged in this

48

1   practice and if the company knew it.  Plaintiffs have not demonstrated to the court's satisfaction

2   that this can be accomplished in any way other than taking individualized testimony and engaging

3   in a foreperson-by-foreperson determination of that supervisor's practices and defendants'

4   knowledge of those practices.  This would, in essence, require up to 109 separate proceedings to

5   establish defendants' liability, if any, with respect to each of their forepersons.  Common issues

6   therefore do not predominate over individual ones here.  Thus, certification is not warranted for

7   this subclass.  *See Zinser*, 253 F.3d at 1189 (upholding denial of certification where it was

8   "inescapable that many triable individualized issues may be presented"); *Pena v. Taylor Farms*

9   *Pac., Inc.*, 305 F.R.D. 197, 219–20 (E.D. Cal. 2015) (finding common issues predominate where

10  factual issues are "individualized, but subject to common determination by resort to the

11  timekeeping records"); *Kurihara v. Best Buy Co., Inc.*, No. C 06-01884 MHP, 2007 WL 2501698,

12  at *9 (N.D. Cal. Aug. 30, 2007) (noting that courts are frequently unwilling "to certify classes

13  where individualized inquiries are necessary to determine liability," and collecting cases).

14                  6.      Tools Subclass

15      Plaintiffs seek certification of a subclass to correspond with their claim that defendants

16  failed to provide all necessary tools for their employees to perform their jobs.  (Doc. No. 145 at

17  56–60.)  Defendants respond that they complied with the law in this respect because most of the

18  tools plaintiffs identify are not necessary for the work to be performed and that commonality is

19  lacking because of variances in tool practices among different work crews.  (Doc. No. 147 at 57–

20  59.)

21                  a.      Commonality

22      Defendants phrase their objection to this subclass in terms of commonality, but in the

23  court's view defendants' argument is better understood as an objection to predominance.

24  Defendants do not dispute that there are common questions amongst this subclass, but rather

25  argue that individual variances overwhelm them.  (*See id.* at 59) ("Membership in this proposed

26  subclass may only be ascertained after making the following individualized determinations . . .").

27  Therefore, the court will treat commonality as uncontested here.  *See Dukes*, 564 U.S. at 359

28  (noting that "for purposes of Rule 23(a)(2) even a single common question will do") (internal

1    quotations and brackets omitted); *Hanlon*, 150 F.3d at 1022 (noting "commonality alone is not

2    sufficient to fulfill" the predominance requirement, which requires that "common questions

3    present a significant aspect of the case[,which] can be resolved for all members of the class in a

4    single adjudication").

5                              *b.    Predominance*

6          Under California law, "[a]n employer shall indemnify his or her employee for all

7    necessary expenditures or losses incurred by the employee in direct consequence of the discharge

8    of his or her duties."  Cal. Labor Code § 2802(a).  Moreover, "[w]hen tools or equipment . . . are

9    necessary to the performance of a job, such tools and equipment shall be provided and maintained

10   by the employer," absent certain circumstances where the employee earns more than twice the

11   minimum wage.  8 Cal. Code Regs. § 11140(9)(B).  This requirement cannot be waived by the

12   employee.  *See Gattuso*, 42 Cal. 4th at 561 (citing Cal. Labor Code § 2804).

13         In support of their motion for certification of this subclass, plaintiffs' counsel has

14   submitted a declaration stating that an inventory of the tools purchased shows that defendants

15   bought the following tools in the relevant years:  in 2011, four tree pruning shears and 1,093

16   grape clippers; in 2012, seven tree pruning shears and 1,200 grape clippers; in 2013, 112 tree

17   pruning shears and 1,500 grape clippers; in 2014, zero tree pruning shears, 504 citrus clippers,

18   and 1,300 grape clippers; and, in 2015, 252 tree pruning shears, 652 citrus clippers, and 4,274

19   grape clippers.  (Doc. No. 145-1 at 14.)  According to plaintiffs, defendants made "no significant

20   purchases for repair or replacement parts for tools during the 2011 – 2015 period."  (*Id.*)  Further,

21   defendants purchased 93 grape pruning shears in 2011, and never again purchased grape pruners

22   during the four-year period involved.  (*Id.*)  Plaintiffs represent there was no record of defendants

23   purchasing any cloth gloves, holsters, or files to sharpen tools.  (*See* Doc. No. 145 at 56.)

24   Additionally, plaintiffs state that there were many more employees who needed various tools than

25   there were tools purchased.  For instance, plaintiffs state defendants employ 1,200 to 1,600 citrus

26   harvesters a year and yet bought no citrus clippers until 2014, and even then purchased only a

27   total of 1,156 citrus clippers throughout both 2014 and 2015.  (Doc. No. 145 at 57.)  Defendants'

28   PMK estimated at deposition that there were between 2,500 and 3,000 grape harvesters employed

1   by defendants during the 2015 season.  (Doc. No. 145-1 at 102.)  Plaintiffs point out that it was

2   only in 2015 that the company first purchased enough grape clippers for every employee.[24]

3        Plaintiffs have also submitted declarations stating that numerous tools beyond those

4   provided by defendants were required to perform the assigned work, including leather gloves,

5   cloth gloves, files, oil, safety glasses, heavy-duty pruning shears, long pruning shears, picking

6   shears, citrus clippers, harvesting scissors, sheaths, and various replacement parts.  (Doc. No.

7   145-4 at 6 (Magdaleno); *id.* at 27 (Estrella); *id.* at 34 (Zepeda); *id.* at 41 (Vega); *id.* at 48

8   (Gonzalez); *id.* at 56–57 (Vargas); *id.* at 64 (de Estrella); *id.* at 70 (Rojas); *id.* at 80 (Hinojosa); *id.*

9   at 87–88 (Carranza); *id.* at 96–97 (Orozco); *id.* at 104–05 (Villafuerte); *id.* at 111–12 (Garcia);

10  Doc. No. 145-5 at 6 (Reyna); *id.* at 32 (Patron); *id.* at 41–42 (Carrera); *id.* at 47 (Melendres); *id.*

11  at 56 (De Leon); *id.* at 65 (Alvarez); *id.* at 71 (Gutierrez); *id.* at 79 (Esquivel); *id.* at 87 (Reyes);

12  *id.* at 94 (Machuca); *id.* at 107 (Sanchez); *id.* at 116 (de Sanchez); Doc. No. 145-6 at 6 (Sanchez);

13  *id.* at 12–13 (Arteaga); *id.* at 18–19 (Orosco); *id.* at 25 (Orozco); *id.* at 31 (Saldana); *id.* at 37

14  (Cisneros); *id.* at 42 (Saldana); *id.* at 50 (Saldana); *id.* at 57–58 (Gonzalez); *id.* at 65–66 (Garcia);

15  *id.* at 74 (Cabrales); *id.* at 79–80 (Hernandez); *id.* at 87–88 (Monzon).)  These declarations also

16  recount that the employees were forced to purchase each of these on their own, and were never

17  reimbursed for them.  Moreover, in the declarations it is reported that some of these items were

18  actually sold to the putative class members by their forepersons.  (Doc. No. 145-4 at 27 (Estrella);

19  *id.* at 34 (Zepeda); *id.* at 64 (de Estrella); *id.* at 70 (Rojas); *id.* at 80 (Hinojosa); *id.* at 87–88

20  (Carranza); *id.* at 96–97 (Orozco); *id.* at 104–05 (Villafuerte); *id.* at 111–12 (Garcia); Doc. No.

21  145-5 at 41–42 (Carrera); *id.* at 47 (Melendres); *id.* at 56 (De Leon); *id.* at 65 (Alvarez); *id.* at 94

22  (Machuca); Doc. No. 145-6 at 57–58 (Gonzalez); *id.* at 79–80 (Hernandez); *id.* at 87–88

23  (Monzon).)

24        In 2015, defendants' policy concerning provision of tools changed.  (*See* Doc. No. 145-1

25  at 482–85.)  The policies adopted by defendants in 2015 contained forms that forepersons were to

26  ―――――――――――――――――――

27  [24]  Defendants argue that they provided a sufficient number of tools for the class members to
    perform their jobs and therefore were in compliance with California law.  (Doc. No. 147 at 58.)
    This is an argument going to the merits of plaintiffs' claim, rather than one relevant to whether

28  certification of the subclass is appropriate.

1    have employees complete indicating whether they chose to use the employers' tools or declined

2    to do so, which tools they were using, and when they took them.  (*Id.*)

3        Defendants concede that some tools are necessary for certain jobs class members perform.

4    (*See* Doc. No. 145 at 58) (conceding hand clippers are necessary for mandarin and grape

5    harvesting).  However, defendants dispute whether other tools identified by plaintiffs are

6    necessary.  (*See id.*) (disputing whether cloth gloves, files, and holsters are necessary tools).

7    These two sets of tools—those of conceded necessity and those of disputed necessity—pose

8    different issues, though it is clear that common issues nevertheless predominate.  For the first set,

9    it is clear the only liability determination that will need to be made is whether defendants

10   purchased a sufficient number of concededly necessary tools.  For the second set, it is apparently

11   undisputed defendants bought none of these tools.  Instead defendants assert only that these tools

12   are not necessary to perform the work in question.  The sole liability issues to be determined with

13   respect to this subclass, therefore, are whether a given tool is necessary to perform a particular job

14   and whether a sufficient number of those tools were purchased by defendants.  Both of these

15   questions are suitable for determination across a wide number of employees, and will

16   predominate over any individual questions that may be present among this subclass.

17                    *c.    Superiority*

18       Further, a class action is clearly a superior vehicle for addressing this dispute.  There is no

19   demonstrated interest that class members have in controlling the litigation individually.  No

20   showing has been made that other cases concerning this subject matter are pending.  Because of

21   the predominance of common issues and the small amounts of damages in question, it is desirable

22   to concentrate the litigation in a class action.  Finally, there has been no showing of the presence

23   of difficulties that persuade the court that it will struggle to manage this subclass.  Therefore, the

24   following subclass is certified by the court:

25           <u>Tools Subclass</u>

26           All individuals who were employed by Defendants as a non-exempt
             "field worker" or agricultural worker from March 17, 2011 to
27           present who purchased gloves, files, oil, safety glasses, shears,
             clippers, scissors, sheaths, or replacement parts for their work for
28           Defendants.

1          7.      Unpaid Work Subclass

2          Plaintiffs seek certification of three separate subclasses posing primarily allegations that

3  class members were not compensated for all of their work time:  the waiting time, pre-shift work,

4  and post-shift work subclasses.  (Doc. No. 145 at 3.)  As referenced at the hearing on the pending

5  motion for certification, the court believes these subclasses can be formulated into one subclass,

6  rather than three separate ones, since they all involve allegations of the same legal injury, i.e., that

7  employees were not compensated for time they spent working.  Accordingly, these subclasses

8  will be addressed jointly below.

9          Plaintiffs allege that employees were required to spend time on work-related duties both

10 before and after their shifts, and were regularly required to wait for trees to dry during their shifts

11 before they could begin picking.  According to plaintiffs, the pre- and post-shift work included

12 attending training sessions conducted by the defendants' forepersons, performing safety

13 inspections, unloading and setting up equipment, and breaking down and stowing equipment.

14 None of this time was recorded.  Defendants oppose certification of this subclass because

15 employees are not required to work off the clock, and any instances of individuals doing so are

16 the exception not the rule.  (Doc. No. 147 at 59–61.)  The court finds that defendants' opposition,

17 in essence, goes to the merits of plaintiffs' claims and fails to provide a rationale for why the

18 subclass should not be certified.  Accordingly, the court will treat certification of this subclass as

19 unopposed.  Nevertheless, because the court has an independent duty to ensure that the

20 requirements of Rule 23 are met, *see In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D.

21 652, 660 (S.D. Cal. 2010), it examines those requirements with respect to this subclass below.

22          *a.      Commonality*

23          The applicable wage order states that employers shall maintain records showing when

24 employees begin and end each work period, as well as total hours worked and what the rate of

25 pay was for each.  8 Cal. Code Regs. § 11140(7)(A); *see also* Cal. Labor Code §§ 1174(d)

26 (requiring maintenance of records) and 226(a) (requiring employer to furnish employee a

27 statement of total hours worked with each paycheck).  In California, employees must be

28 compensated for each hour worked at least at the legal minimum wage, which cannot be arrived

1    at by averaging.  *Bluford*, 216 Cal. App. 4th at 872; *Armenta*, 135 Cal. App. 4th at 324.  The

2    wage order defines "hours worked" as "the time during which an employee is subject to the

3    control of an employer, and includes all the time the employee is suffered or permitted to work,

4    whether or not required to do so."  8 Cal. Code Regs. § 11140(2)(G).  Additionally, federal law

5    requires employers to pay seasonal agricultural workers all wages owed when due.  29 U.S.C.

6    § 1832(a).

7         Plaintiffs have submitted numerous declarations supporting their claims that this

8    uncompensated work time was routine, with the declarants noting that they frequently worked

9    fifteen to twenty-five minutes before a shift, ten to thirty minutes after a shift, and spent thirty

10   minutes to two hours waiting for trees to dry, with each type of uncompensated work time

11   occurring several times a week.  (*See, e.g.*, Doc. No. 145-4 at 4–5 (Magdaleno); *id.* at 11–12

12   (Hinojosa); *id.* at 18 (Torres); *id.* at 24–26 (Estrella); *id.* at 32–33 (Zepeda); *id.* at 39–41 (Vega);

13   *id.* at 46–48 (Gonzalez); *id.* at 54–56 (Vargas); *id.* at 62–63, 65 (de Estrella); *id.* at 71–72

14   (Rojas).)  Thus, common legal questions such as whether defendants must compensate class

15   members for the time at issue and common factual questions such as whether subclass members

16   were required to arrive early or stay late or wait for trees to dry before working run throughout

17   the subclass.

18              *b.    Predominance*

19         Additionally, the court must determine that common issues predominate over individual

20   ones.  As noted, common legal or factual questions run throughout this subclass.  As indicated,

21   defendants' primary objection to this subclass is based upon the contention that their employees

22   were not required to work off the clock.  To that end, defendants have provided numerous

23   declarations from employees or former employees in which they state they were always

24   compensated for time setting up and tearing down ladders, that they were called the day before

25   and told to report to work late if the fruit was wet, that any training sessions always happened

26   after they clocked in for work, and that on any occasions they might have arrived early to work

27   they did so voluntarily and did not expect to be paid.  (*See, e.g.*, Doc. No. 147-8 at 5 (Guzman);

28   *id.* at 9–10 (Alvarez); *id.* at 14–15 (Amador); *id.* at 19–20 (Andrade); *id.* at 31–32 (Arteaga); *id.*

1    at 78–79 (Corona); *id.* at 85–86 (Cotino).)  These arguments advanced by defendants, however,

2    go to the *extent* of liability—i.e., the damages subclass members have suffered—not whether the

3    subclass can establish liability on the part of defendants.  As often stated herein, issues with

4    respect to damages cannot prevent certification of this subclass.  *Leyva*, 716 F.3d at 513–14

5    (holding individualized damages calculations do not defeat class certification); *Yokoyama*, 594

6    F.3d at 1094 (same).[25]

7           Additionally, there are numerous issues that are common to this subclass that will

8    predominate during a merits determination.  Aside from the general question of whether

9    defendants were required to compensate class members for the time spent in training, setting up

10   and tearing down work equipment, and waiting for fruit to dry prior to harvesting, at least one of

11   the defenses defendants anticipate raising—whether individuals volunteered to come to work

12   early—is one for which a subclass-wide determination is likely suitable.  *See Alberts*, 241 Cal.

13   App. 4th at 419 (noting a "nonexempt employee . . . may not lawfully volunteer to work off-the-

14   clock without compensation"); *see also* Cal. Labor Code § 1194 (employee may file suit to

15   collect minimum wage "[n]otwithstanding any agreement to work for a lesser wage"); *Barrentine

16   v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740–41 (1981) (noting minimum wage and

17   overtime are non-waivable under the FLSA); *Gentry v. Superior Court of L.A. Cty.*, 42 Cal. 4th

18   443, 455 (2007) ("By its terms, the rights to the legal minimum wage and legal overtime

19   compensation conferred by the [California] statute are unwaivable.").  Moreover, employers are

20   generally not liable for off-duty work being performed by their employees about which they have

21   no knowledge.  *Brinker*, 53 Cal. 4th at 1051; *Morillion* at 585.  Thus, another crucial issue at the

22   liability phase of this case is whether defendants had constructive knowledge of the activities of

23   their agents, who were directing any unpaid work.  *See, e.g.*, Restatement (Third) of Agency,

24   § 5.03 (imputing notice of facts that an agent knows to principal).  Finally, the liability

25   ―――――――――――
     [25] Plaintiffs' expert Dr. Petersen notes that he will employ a surveying method for determining

26   liability for the unpaid work time subclass.  He anticipates, from reviewing a selection of the
     relevant declarations, class members would be able to both identify and quantify the amounts of

27   unpaid time they worked in response to such a survey.  (Doc. No. 145-3 at ¶¶ 29–30.)  Since no
     surveying has yet been conducted, the question of whether this will be a sufficient measure of

28   class-wide damages is not yet before the court.

1    determination for all shifts that were worked on a piece rate basis will undoubtedly be subject to

2    common proof:  if defendants were required to pay employees separately for this non-productive

3    time and no non-productive time is noted in the payroll records, it would appear likely that

4    liability will be established across the subclass.[26]  For all these reasons, the court finds that

5    common issues will predominate over individual ones with respect to this subclass.

6                                    *c.*       *Superiority*

7            The court also concludes that a class action will be a superior vehicle for the resolution of

8    this dispute.  As with the other subclasses, there has been no showing of any other individual suits

9    being filed or any interest among class members of proceeding individually on these claims.

10   Again, the size and number of the claims make it highly desirable to concentrate them into a

11   single proceeding.  Therefore, the following subclass is certified by the court:

12            Unpaid Work Subclass

13            All individuals who were employed by Defendants as a non-exempt
         "field worker" or agricultural worker from March 17, 2011 to
14            present who were required to arrive before their shift or perform
         duties after their shift, or wait for fruit to dry before beginning
15            work.

16            8.       Inaccurate Wage Statement Subclass

17           Plaintiffs seek certification of a subclass to contest violations of law due to the failure to

18   provide itemized wage statements.  California law requires employers to furnish to employees "an

19   accurate itemized statement" which must be in writing and show the following:

20            (1) gross wages earned, (2) total hours worked by the employee . . .
         (3) the number of piece-rate units earned and any applicable piece
21            rate if the employee is paid on a piece-rate basis, (4) all deductions,
         provided that all deductions made on written orders of the
22            employee may be aggregated and shown as one item, (5) net wages
         earned, (6) the inclusive dates of the period for which the employee
23            is paid, (7) the name of the employee and only the last four digits of
         his or her social security number or an employee identification
24            number other than a social security number, (8) the name and
         address of the legal entity that is the employer and, if the employer
25            is a farm labor contractor, as defined in subdivision (b) of Section

26   _____

27   [26]  While the court is somewhat less certain whether shifts paid on an hourly basis will be subject
     to common proof, it does appear that some payroll records reflect hourly wage payments for non-
     productive time.  (*See, e.g.*, Doc. No. 145-1 at 406.)  Therefore, the court declines to differentiate
28   this subclass between shifts paid on hourly and piece rate bases in ruling on the pending motion.

1       1682, the name and address of the legal entity that secured the
        services of the employer, and (9) all applicable hourly rates in
2       effect during the pay period and the corresponding number of hours
        worked at each hourly rate by the employee . . .
3

4    Labor Code § 226(a).  In addition, the statute provides that "a copy of the statement and the

5    record of the deductions shall be kept on file by the employer for at least three years."  *Id.*

6    Employees who can demonstrate a knowing and intentional failure by the employers to provide

7    the above or to maintain records appropriately are entitled to statutory damages.  *Id.* § 226(e)(1).

8           Plaintiffs maintain that two different theories warrant certification of this subclass.  First,

9    they argue that the violations detailed in the piece rate rest period, unpaid travel time, meal

10   period, ghost worker, and off-the-clock work subclasses also reflect violations of the § 226

11   recordkeeping requirement as derivative claims.  (Doc. No. 145 at 65.)  To the extent that

12   plaintiffs assert claims of § 226 violations as strictly derivative claims, the court sees no need to

13   certify a separate subclass to address them.

14          Second, plaintiffs indicated at the hearing on the pending motion that their claims include

15   allegations of independent, non-derivative violations of § 226:  namely, plaintiffs assert that

16   defendants failed to maintain *any* records of itemized wage statements with respect to the putative

17   class, and therefore did not retain the records for the three years required by state law.  (Doc. No.

18   145 at 64–65.)  At his deposition defendants' PMK appears to have conceded as much.  (*See* Doc.

19   No. 145-1 at 59 (Rodriguez) ("We don't have the itemized wage statements or pay stubs.  We

20   don't have copies of those pay stubs."); *see also id.* at 15 (noting that they keep payroll records,

21   but that these do not have identical information as that which is included on a wage stub, which

22   reflects more information.))  Further, defendants' counsel represented to plaintiff's counsel that

23   their clients do not create paystubs themselves, and that the third-party service that does so

24   maintains no copies of these records.  (*Id.* at 513) ("[W]e can only produce reports from Datatech

25   that do not contain all of the itemized totals that appear on the paystubs.").

26          Defendants presented no argument in their briefing concerning why this subclass should

27   not be certified.  At oral argument, defense counsel asserted that defendants were not required to

28   maintain these records as a matter of law, and that defendants were only legally required to

1    provide such records to the employees.  Defendants' contention in this regard is a merits-phase

2    argument that would apply to the entire subclass, and thus bolsters this court's conclusion that

3    certification of this subclass is appropriate.

4          In short, there are common questions of fact and law that run throughout this subclass,

5    those issues predominate, and a class action provides a superior vehicle by which to decide the

6    disputes related to this subclass.  Accordingly, the following subclass is certified by the court

7    concerning liability under § 226:

8                    Inaccurate Wage Statement Subclass

9                    All individuals who were employed at any of the Defendants
                     between March 17, 2012 and present as non-exempt field or
10                   agricultural workers for the Defendants.

11          9.    Other Derivative Subclasses

12          Plaintiffs also sought certification of several additional subclasses in order to bring claims

13   that are purely derivative of other claims alleged here.  (Doc. No. 145 at 65–66.)  Defendants did

14   not oppose certification of these derivative claims separately from the subclasses with respect to

15   which they are derivative.  Class counsel explained at the hearing on the pending motion that such

16   subclasses were unnecessary, and that the request was only included by plaintiffs out of an

17   abundance of caution to ensure defendants did not later object.  The court sees no need to certify a

18   separate subclass for claims that are purely derivative of claims relating to subclasses that have

19   already been certified.  Any derivative claims may be brought on behalf of the appropriate

20   subclass.  Therefore, certification of the derivative subclasses is denied.

21          **D.    Motion for a Trial Plan**

22          Finally, defendants filed a motion seeking an order requiring plaintiffs to submit a trial

23   plan.  (Doc. No. 149.)  This motion essentially renews arguments previously decided when the

24   court rejected the last such motion.  (*See* Doc. No. 77.)  For many of the same reasons previously

25   expressed, the court once again denies defendants' motion for a trial plan.

26          As previously recognized by the court, a trial plan request is "properly raised after

27   significant merits-phase discovery has taken place."  (*Id.* at 3.)  Plaintiffs are only required at the

28   present stage of this litigation, to make the showing necessary to warrant class certification.  They

                                            58

1    have sought to do so and the court has agreed with some of their arguments and rejected others, as

2    set forth in detail above.  There is no requirement under the Federal Rules of Civil Procedure that

3    plaintiffs submit a trial plan listing the items defendants have requested in their motion for a trial

4    plan, and the court declines to read one into those rules.  *See Briseno*, 844 F.3d at 1126

5    ("Supreme Court precedent also counsels in favor of hewing closely to the text of Rule 23.").

6        Additionally, plaintiffs have moved for the award of sanctions under 28 U.S.C. § 1927 to

7    require defense counsel to pay their fees and costs incurred in opposing the motion for a trial

8    plan.  (*See* Doc. No. 165 at 9–10.)  According to the statute relied upon by plaintiffs in this

9    regard, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and

10   vexatiously may be required by the court to satisfy personally the excess costs, expenses, and

11   attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  The Ninth

12   Circuit has held that sanctions under this provision may be imposed for reckless conduct, while

13   sanctions imposed under the district court's inherent authority require a bad faith finding.  *Lahiri*

14   *v. Universal Music & Video Dist. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010).  The Ninth Circuit

15   has reversed the imposition of sanctions under § 1927 where the supposedly groundless issues

16   raised were quickly dismissed, and "so . . . did not vexatiously multiply the proceedings," but in

17   doing so has suggested that sanctions might be warranted if the offending attorney "file[d]

18   repetitive motions or generate an extraordinary volume of paperwork."  *Braunstein v. Ariz. Dep't*

19   *of Transp.*, 683 F.3d 1177, 1189 (9th Cir. 2012).

20       As indicated at the hearing on these motions, the court is not inclined to impose sanctions

21   at this time.  It is not quite accurate to say, as plaintiffs assert, that the court's prior order

22   contained an "express instruction" to defendants not to file another motion for a trial plan until

23   later in the case.  (*See* Doc. No. 165 at 9–10; Doc. No. 167 at 9–10.)  Instead, the court noted in

24   its prior order that "normally" such requests are "properly raised after significant merits-phase

25   discovery has taken place."  (Doc. No. 77 at 3.)  Notwithstanding whether the court's statement

26   in its prior order was an "express instruction," defendants' motion appears to pay little regard to

27   the spirit or the clear import of the court's prior order, as no merits-phase discovery has yet taken

28   place in this action.  Nonetheless, the court declines to impose monetary sanctions at this time.

1    However, defendants are warned that future motions for such a trial plan prior to the close of

2    merits-phase discovery will likely result in the award of sanctions, absent a showing that the

3    requested trial plan is required by law.  Simply put, plaintiffs are entitled to full discovery on their

4    claims before being required to demonstrate how they will present their evidence at trial.

5                                              **CONCLUSION**

6            For all of the reasons set forth above:

7    1.    The court grants plaintiffs' motion for class certification (Doc. No. 145) in part, and the

8          following subclasses are certified:

9            a.    Piece Rate Rest Period Subclass

10                 All individuals who were employed by Defendants as a non-exempt
11                 "field worker" or agricultural worker from March 17, 2011 to
                   present, and were compensated on a piece rate basis.

12           b.    Unpaid Travel Time Subclass

13                 All individuals who were employed by Defendants as a non-exempt
14                 "field worker" or agricultural worker from March 17, 2011 to
                   present, and worked at two or more fields in one day.

15           c.    Vehicle Expense Subclass

16                 All individuals who were employed by Defendants as a non-exempt
17                 "field worker" or agricultural worker from March 17, 2011 to
                   present, worked at two or more fields in one day, and drove their
18                 own cars between fields.

19           d.    Meal Period Subclass

20                 All individuals who were employed by Defendants as a non-exempt
                   "field worker" or agricultural worker from March 17, 2011 to
21                 present, for whom no meal period was recorded on at least one day
                   in which the employee worked more than five hours.

22           e.    Tools Subclass

23                 All individuals who were employed by Defendants as a non-exempt
                   "field worker" or agricultural worker from March 17, 2011 to
24                 present who purchased gloves, files, oil, safety glasses, shears,
                   clippers, scissors, sheaths, or replacement parts for their work for
25                 Defendants.

26           f.    Unpaid Work Subclass

27                 All individuals who were employed by Defendants as a non-exempt
                   "field worker" or agricultural worker from March 17, 2011 to
28                 present who were required to arrive before their shift or perform

duties after their shift, or wait for fruit to dry before beginning work.

g.  Inaccurate Wage Statement Subclass

All individuals who were employed at any of the Defendants between March 17, 2012 and present as non-exempt field or agricultural workers for the Defendants.

2.  Because the court separately certifies each of the above subclasses under Rule 23, the court denies certification of an overarching main class.  Additionally, pursuant to Rule 23(b)(3), the court denies certification as to all other subclasses not specifically addressed in clause 1, paragraphs a through g above, particularly the Ghost Worker Crew Subclass and each of the subclasses proposed solely for the purpose of bringing a derivative claim;

3.  The court denies plaintiffs' motion to certify any of the subclasses under Rule 23(b)(2) for the purpose of seeking injunctive relief based upon its conclusion that the named plaintiffs lack standing to seek injunctive relief;

4.  The court finds plaintiffs Avalos and Aldapa to be adequate class representatives, and confirms them as class representatives for each of the certified subclasses, except for the Vehicle Expense Subclass, for which only plaintiff Avalos is a class representative;

5.  The court finds plaintiffs' counsel to be adequate to represent the class in this proceeding, and the firms of Martinez, Aguilasocho, & Lynch APLC ("MAL") and Bush Gottlieb ALC are hereby confirmed as class counsel;

6.  Defendants' motion for a trial plan (Doc. No. 149) is denied without prejudice to being re-raised following the conclusion of merits-phase discovery;

7.  Plaintiffs' request for the imposition of sanctions under 28 U.S.C. § 1927 (Doc. No. 165) is denied;

8.  The parties are directed to meet and confer promptly upon service of this order concerning the submission of a joint stipulated class notice and distribution plan, based on the subclasses as certified in this order.  The parties shall file either a stipulated class notice and distribution plan or a notice that no stipulation can be reached within twenty-one (21) days of service of this order.  If the parties cannot agree to a class notice or distribution

plan, plaintiffs shall submit a proposed class notice and distribution plan within thirty-five

(35) days of service of this order.  Defendants will have fourteen (14) days following

plaintiffs' submission of a proposed class notice and distribution plan to file any

objections thereto.  Plaintiffs will have seven (7) days thereafter to submit a reply; and

9. This matter is referred back to the assigned magistrate judge for further scheduling and

other proceedings consistent with this order.

IT IS SO ORDERED.

Dated:  __**January 24, 2018**__                    _____
                                                    UNITED STATES DISTRICT JUDGE

# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN LOFTON, | Case No.  13-cv-05665-YGR   (JSC) |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART MOTIONS TO COMPEL AND FOR SANCTIONS** |
| VERIZON WIRELESS (VAW) LLC, | |
| Defendant. | Re: Dkt. Nos. 119, 129 |

Plaintiff John Lofton ("Plaintiff") brings this putative class action challenging Defendant Verizon Wireless (VAW) LLC's debt collection practices.  Plaintiff alleges that Verizon engaged a third party, Collecto, Inc., to collect Verizon's past due accounts as Verizon's agent, and that in doing so Collecto violated state and federal law.  In particular, Plaintiff alleges that he was not a current or former Verizon customer, but that Collecto nonetheless telephoned him on his cell phone on numerous occasions in violation of the California Invasion of Privacy Act ("IPA"), Cal. Penal Code § 630-38, and the federal Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A).  Plaintiff alleges Verizon, through Collecto, violated the IPA by recording telephone calls with persons, such as Plaintiff, without the recipient's permission, and violated the TCPA by using an automatic telephone dialing system to make the calls.  The action has been referred to the undersigned magistrate judge for resolution of discovery disputes.

Now pending before the Court is Plaintiff's motion to compel Verizon to respond to a number of outstanding discovery requests and Plaintiff's motion seeking sanctions against Verizon and Collecto.  Having considered the parties' submissions, and having had the benefit of oral argument on June 4, 2015, the Court GRANTS IN PART Plaintiff's motion to compel and GRANTS IN PART his motion for sanctions.

relevant to what sanction, if any, is imposed." *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 523 (N.D. Cal. 2009).

However, courts often decline to impose sanctions for spoliation where the documents withheld are unlikely to material affect the outcome of the case, insofar as other evidence exists to provide the same information. *See Ahcom, Ltd. v. Smeding*, No. 07-1139 SC, 2011 WL 3443499, at *8-9 (N.D. Cal. Aug. 8, 2011) (declining to impose sanctions for destruction of a computer that contained the defendant's financial information where the plaintiff had other documents that provided "extensive information" about the defendant's finances); *see also Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 825 (9th Cir. 2002) (affirming district court's denial of sanctions where loss of original evidence was remedied by sufficient substitute).

Here, Collecto and Verizon concede that the call detail records are relevant to Plaintiff's claims and that Collecto deleted the call detail records for two years while this case was pending. And the Court concludes that Collecto was on notice of its duty to preserve the documents based on the filing of Plaintiff's complaint and even the *Powell* litigation before it, *see Montoya v. Orange Cnty. Sheriff's Dep't*, No. 11-1922, 2013 WL 6706992, at *7-9 (C.D. Cal. Dec. 18, 2013) (noting that the duty to preserve documents can arise from similar prior litigation). That Collecto nevertheless allowed the documents to be destroyed is spoliation—whether or not Collecto did so with a culpable mind. *See Glover*, 6 F.3d at 1329.

But this case does not involve spoliation of an entire swath of evidence with no possible substitution. Rather, Collecto still maintained archives for all of its dialers and has provided these records in discovery. On the other hand, Plaintiff has proffered sufficient evidence why that evidence is lacking. For one, it is more expensive and time-consuming to digest. Moreover, Plaintiff's review indicated that it was missing wrong number codes for a substantial portion of calls. On the other hand, Collecto's expert consultant has submitted a declaration explaining that the archived data provided contains the data that Plaintiff seeks. The Court therefore ORDERS Collecto and Verizon to bear the cost of having their own expert, Aaron Woolfson, reconstruct the archived data for the time period lacking call logs according to the categories Plaintiff identifies.

16

# EXHIBIT 6

| npa | isInclude | state | stateName | npa | isInclude | state | stateName |
|-----|-----------|-------|-----------|-----|-----------|-------|-----------|
| 907 | YES | AK | Alaska | 651 | YES | MN | Minnesota |
| 205 | YES | AL | Alabama | 763 | YES | MN | Minnesota |
| 251 | YES | AL | Alabama | 952 | YES | MN | Minnesota |
| 256 | YES | AL | Alabama | 314 | YES | MO | Missouri |
| 334 | YES | AL | Alabama | 417 | YES | MO | Missouri |
| 659 | YES | AL | Alabama | 557 | YES | MO | Missouri |
| 938 | YES | AL | Alabama | 573 | YES | MO | Missouri |
| 479 | YES | AR | Arkansas | 636 | YES | MO | Missouri |
| 501 | YES | AR | Arkansas | 660 | YES | MO | Missouri |
| 870 | YES | AR | Arkansas | 816 | YES | MO | Missouri |
| 684 | YES | AS | American Samoa | 975 | YES | MO | Missouri |
| 480 | YES | AZ | Arizona | 670 | YES | MP | Northern Mariana Islands |
| 520 | YES | AZ | Arizona | 228 | YES | MS | Mississippi |
| 602 | YES | AZ | Arizona | 601 | YES | MS | Mississippi |
| 623 | YES | AZ | Arizona | 662 | YES | MS | Mississippi |
| 928 | YES | AZ | Arizona | 769 | YES | MS | Mississippi |
| 209 | YES | CA | California | 406 | YES | MT | Montana |
| 213 | YES | CA | California | 252 | YES | NC | North Carolina |
| 279 | YES | CA | California | 336 | YES | NC | North Carolina |
| 310 | YES | CA | California | 472 | YES | NC | North Carolina |
| 323 | YES | CA | California | 704 | YES | NC | North Carolina |
| 341 | YES | CA | California | 743 | YES | NC | North Carolina |
| 350 | YES | CA | California | 828 | YES | NC | North Carolina |
| 369 | YES | CA | California | 910 | YES | NC | North Carolina |
| 408 | YES | CA | California | 919 | YES | NC | North Carolina |
| 415 | YES | CA | California | 980 | YES | NC | North Carolina |
| 424 | YES | CA | California | 984 | YES | NC | North Carolina |
| 442 | YES | CA | California | 701 | YES | ND | North Dakota |
| 510 | YES | CA | California | 308 | YES | NE | Nebraska |
| 530 | YES | CA | California | 402 | YES | NE | Nebraska |
| 559 | YES | CA | California | 531 | YES | NE | Nebraska |
| 562 | YES | CA | California | 603 | YES | NH | New Hampshire |
| 619 | YES | CA | California | 201 | YES | NJ | New Jersey |
| 626 | YES | CA | California | 551 | YES | NJ | New Jersey |
| 628 | YES | CA | California | 609 | YES | NJ | New Jersey |
| 650 | YES | CA | California | 640 | YES | NJ | New Jersey |
| 657 | YES | CA | California | 732 | YES | NJ | New Jersey |
| 661 | YES | CA | California | 848 | YES | NJ | New Jersey |
| 669 | YES | CA | California | 856 | YES | NJ | New Jersey |
| 707 | YES | CA | California | 862 | YES | NJ | New Jersey |
| 714 | YES | CA | California | 908 | YES | NJ | New Jersey |
| 747 | YES | CA | California | 973 | YES | NJ | New Jersey |
| 760 | YES | CA | California | 505 | YES | NM | New Mexico |
| 805 | YES | CA | California | 575 | YES | NM | New Mexico |
| 818 | YES | CA | California | 702 | YES | NV | Nevada |
| 820 | YES | CA | California | 725 | YES | NV | Nevada |
| 831 | YES | CA | California | 775 | YES | NV | Nevada |
| 840 | YES | CA | California | 212 | YES | NY | New York |
| 858 | YES | CA | California | 315 | YES | NY | New York |
| 909 | YES | CA | California | 329 | YES | NY | New York |
| 916 | YES | CA | California | 332 | YES | NY | New York |
| 925 | YES | CA | California | 347 | YES | NY | New York |
| 949 | YES | CA | California | 363 | YES | NY | New York |
| 951 | YES | CA | California | 516 | YES | NY | New York |

| 303 | YES | CO | Colorado | 518 | YES | NY | New York |
| 719 | YES | CO | Colorado | 585 | YES | NY | New York |
| 720 | YES | CO | Colorado | 607 | YES | NY | New York |
| 970 | YES | CO | Colorado | 624 | YES | NY | New York |
| 983 | YES | CO | Colorado | 631 | YES | NY | New York |
| 203 | YES | CT | Connecticut | 646 | YES | NY | New York |
| 475 | YES | CT | Connecticut | 680 | YES | NY | New York |
| 860 | YES | CT | Connecticut | 716 | YES | NY | New York |
| 959 | YES | CT | Connecticut | 718 | YES | NY | New York |
| 202 | YES | DC | District of Columbia | 838 | YES | NY | New York |
| 771 | YES | DC | District of Columbia | 845 | YES | NY | New York |
| 302 | YES | DE | Delaware | 914 | YES | NY | New York |
| 239 | YES | FL | Florida | 917 | YES | NY | New York |
| 305 | YES | FL | Florida | 929 | YES | NY | New York |
| 321 | YES | FL | Florida | 934 | YES | NY | New York |
| 352 | YES | FL | Florida | 216 | YES | OH | Ohio |
| 386 | YES | FL | Florida | 220 | YES | OH | Ohio |
| 407 | YES | FL | Florida | 234 | YES | OH | Ohio |
| 448 | YES | FL | Florida | 283 | YES | OH | Ohio |
| 561 | YES | FL | Florida | 326 | YES | OH | Ohio |
| 645 | YES | FL | Florida | 330 | YES | OH | Ohio |
| 656 | YES | FL | Florida | 380 | YES | OH | Ohio |
| 689 | YES | FL | Florida | 419 | YES | OH | Ohio |
| 727 | YES | FL | Florida | 440 | YES | OH | Ohio |
| 728 | YES | FL | Florida | 513 | YES | OH | Ohio |
| 754 | YES | FL | Florida | 567 | YES | OH | Ohio |
| 772 | YES | FL | Florida | 614 | YES | OH | Ohio |
| 786 | YES | FL | Florida | 740 | YES | OH | Ohio |
| 813 | YES | FL | Florida | 937 | YES | OH | Ohio |
| 850 | YES | FL | Florida | 405 | YES | OK | Oklahoma |
| 863 | YES | FL | Florida | 539 | YES | OK | Oklahoma |
| 904 | YES | FL | Florida | 572 | YES | OK | Oklahoma |
| 941 | YES | FL | Florida | 580 | YES | OK | Oklahoma |
| 954 | YES | FL | Florida | 918 | YES | OK | Oklahoma |
| 229 | YES | GA | Georgia | 458 | YES | OR | Oregon |
| 404 | YES | GA | Georgia | 503 | YES | OR | Oregon |
| 470 | YES | GA | Georgia | 541 | YES | OR | Oregon |
| 478 | YES | GA | Georgia | 971 | YES | OR | Oregon |
| 678 | YES | GA | Georgia | 215 | YES | PA | Pennsylvania |
| 706 | YES | GA | Georgia | 223 | YES | PA | Pennsylvania |
| 762 | YES | GA | Georgia | 267 | YES | PA | Pennsylvania |
| 770 | YES | GA | Georgia | 272 | YES | PA | Pennsylvania |
| 912 | YES | GA | Georgia | 412 | YES | PA | Pennsylvania |
| 943 | YES | GA | Georgia | 445 | YES | PA | Pennsylvania |
| 671 | YES | GU | Guam | 484 | YES | PA | Pennsylvania |
| 808 | YES | HI | Hawaii | 570 | YES | PA | Pennsylvania |
| 319 | YES | IA | Iowa | 582 | YES | PA | Pennsylvania |
| 515 | YES | IA | Iowa | 610 | YES | PA | Pennsylvania |
| 563 | YES | IA | Iowa | 717 | YES | PA | Pennsylvania |
| 641 | YES | IA | Iowa | 724 | YES | PA | Pennsylvania |
| 712 | YES | IA | Iowa | 814 | YES | PA | Pennsylvania |
| 208 | YES | ID | Idaho | 835 | YES | PA | Pennsylvania |
| 986 | YES | ID | Idaho | 878 | YES | PA | Pennsylvania |
| 217 | YES | IL | Illinois | 787 | YES | PR | Puero Rico |
| 224 | YES | IL | Illinois | 939 | YES | PR | Puero Rico |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 309 | YES | IL | Illinois | 401 | YES | RI | Rhode Island |
| 312 | YES | IL | Illinois | 803 | YES | SC | South Carolina |
| 331 | YES | IL | Illinois | 839 | YES | SC | South Carolina |
| 447 | YES | IL | Illinois | 843 | YES | SC | South Carolina |
| 464 | YES | IL | Illinois | 854 | YES | SC | South Carolina |
| 618 | YES | IL | Illinois | 864 | YES | SC | South Carolina |
| 630 | YES | IL | Illinois | 605 | YES | SD | South Dakota |
| 708 | YES | IL | Illinois | 423 | YES | TN | Tennessee |
| 730 | YES | IL | Illinois | 615 | YES | TN | Tennessee |
| 773 | YES | IL | Illinois | 629 | YES | TN | Tennessee |
| 779 | YES | IL | Illinois | 731 | YES | TN | Tennessee |
| 815 | YES | IL | Illinois | 865 | YES | TN | Tennessee |
| 847 | YES | IL | Illinois | 901 | YES | TN | Tennessee |
| 861 | YES | IL | Illinois | 931 | YES | TN | Tennessee |
| 872 | YES | IL | Illinois | 210 | YES | TX | Texas |
| 219 | YES | IN | Indiana | 214 | YES | TX | Texas |
| 260 | YES | IN | Indiana | 254 | YES | TX | Texas |
| 317 | YES | IN | Indiana | 281 | YES | TX | Texas |
| 463 | YES | IN | Indiana | 325 | YES | TX | Texas |
| 574 | YES | IN | Indiana | 346 | YES | TX | Texas |
| 765 | YES | IN | Indiana | 361 | YES | TX | Texas |
| 812 | YES | IN | Indiana | 409 | YES | TX | Texas |
| 930 | YES | IN | Indiana | 430 | YES | TX | Texas |
| 316 | YES | KS | Kansas | 432 | YES | TX | Texas |
| 620 | YES | KS | Kansas | 469 | YES | TX | Texas |
| 785 | YES | KS | Kansas | 512 | YES | TX | Texas |
| 913 | YES | KS | Kansas | 682 | YES | TX | Texas |
| 270 | YES | KY | Kentucky | 713 | YES | TX | Texas |
| 364 | YES | KY | Kentucky | 726 | YES | TX | Texas |
| 502 | YES | KY | Kentucky | 737 | YES | TX | Texas |
| 606 | YES | KY | Kentucky | 806 | YES | TX | Texas |
| 859 | YES | KY | Kentucky | 817 | YES | TX | Texas |
| 225 | YES | LA | Louisiana | 830 | YES | TX | Texas |
| 318 | YES | LA | Louisiana | 832 | YES | TX | Texas |
| 337 | YES | LA | Louisiana | 903 | YES | TX | Texas |
| 504 | YES | LA | Louisiana | 915 | YES | TX | Texas |
| 985 | YES | LA | Louisiana | 936 | YES | TX | Texas |
| 339 | YES | MA | Massachusetts | 940 | YES | TX | Texas |
| 351 | YES | MA | Massachusetts | 945 | YES | TX | Texas |
| 413 | YES | MA | Massachusetts | 956 | YES | TX | Texas |
| 508 | YES | MA | Massachusetts | 972 | YES | TX | Texas |
| 617 | YES | MA | Massachusetts | 979 | YES | TX | Texas |
| 774 | YES | MA | Massachusetts | 385 | YES | UT | Utah |
| 781 | YES | MA | Massachusetts | 435 | YES | UT | Utah |
| 857 | YES | MA | Massachusetts | 801 | YES | UT | Utah |
| 978 | YES | MA | Massachusetts | 276 | YES | VA | Virginia |
| 227 | YES | MD | Maryland | 434 | YES | VA | Virginia |
| 240 | YES | MD | Maryland | 540 | YES | VA | Virginia |
| 301 | YES | MD | Maryland | 571 | YES | VA | Virginia |
| 410 | YES | MD | Maryland | 703 | YES | VA | Virginia |
| 443 | YES | MD | Maryland | 757 | YES | VA | Virginia |
| 667 | YES | MD | Maryland | 804 | YES | VA | Virginia |
| 207 | YES | ME | Maine | 826 | YES | VA | Virginia |
| 231 | YES | MI | Michigan | 948 | YES | VA | Virginia |
| 248 | YES | MI | Michigan | 340 | YES | VI | US Virgin Islands |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 269 | YES | MI | Michigan | 802 | YES | VT | Vermont |
| 313 | YES | MI | Michigan | 206 | YES | WA | Washington |
| 517 | YES | MI | Michigan | 253 | YES | WA | Washington |
| 586 | YES | MI | Michigan | 360 | YES | WA | Washington |
| 616 | YES | MI | Michigan | 425 | YES | WA | Washington |
| 734 | YES | MI | Michigan | 509 | YES | WA | Washington |
| 810 | YES | MI | Michigan | 564 | YES | WA | Washington |
| 906 | YES | MI | Michigan | 262 | YES | WI | Wisconsin |
| 947 | YES | MI | Michigan | 274 | YES | WI | Wisconsin |
| 989 | YES | MI | Michigan | 353 | YES | WI | Wisconsin |
| 218 | YES | MN | Minnesota | 414 | YES | WI | Wisconsin |
| 320 | YES | MN | Minnesota | 534 | YES | WI | Wisconsin |
| 507 | YES | MN | Minnesota | 608 | YES | WI | Wisconsin |
| 612 | YES | MN | Minnesota | 715 | YES | WI | Wisconsin |
| | | | | 920 | YES | WI | Wisconsin |
| | | | | 304 | YES | WV | West Virginia |
| | | | | 681 | YES | WV | West Virginia |
| | | | | 307 | YES | WY | Wyoming |