**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **EMILY TEMAN**, on behalf of herself and all others similarly situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>**SELECT JUSTICE, LLC**,<br><br>　　　　　　　　　Defendant. | No. 1:24-cv-12656-LTS |

**EMILY TEMAN AND HER NON-PARTY FAMILY MEMBERS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO QUASH OR MODIFY SUBPOENAS AND FOR A <u>PROTECTIVE ORDER</u>**

Emily Teman moves to Court for relief because Select Justice is intruding on her family life, seeking to dissuade her from representing the class here by dragging her family into a case they lack any connection to. This is a worn, yet effective tactic meant to intimidate class representatives into giving up their claims, as their stake in the action is not worth allowing opposing counsel to snoop in on their family members' lives. Ms. Teman has tried to resolve the issue without the Court's help, offering information proving her children lack any connection to this case. Yet Select Justice has served subpoenas seeking to seize their devices, their internet histories, and to force them travel for in-person depositions—even when its counsel have admitted Select Justice does not know if they have *any* knowledge related to this case. As a result, Ms. Teman and her family members, including Glenn Teman, Stacey Sibulesky, Daniel Sibulesky, Kerry Tamm, and Terence Tamm, ask this Court to curtail Select Justice's discovery conduct. The need to protect against overbroad discovery is increased when the requests are targeted at non-parties, as here.

As background, this is a TCPA class action alleging Select Justice spammed Ms. Teman's phone with calls soliciting her to participate in "rideshare" litigation against companies like Uber and Lyft. Ms. Teman has never ridden on a rideshare like Uber or Lyft, did not consent to Select Justice's calls, and repeatedly asked Select Justice to stop calling.

For a time, Select Justice insisted Ms. Teman had consented to its calls, producing a "consent" form it now acknowledges she never completed. Because Select Justice cannot reasonably dispute that Ms. Teman did not consent to the calls, it recently served Amended Notices of Deposition and Document Requests[1] on Ms. Teman's family members, including Glenn Teman (her husband), Stacey Sibulesky (her daughter), Daniel Sibulesky (her son-in-law), Kerry Tamm (her daughter), and Terence Tamm (her son-in-law), speculating that someone close to Ms. Teman must have provided consent for the calls through an advertisement form on Facebook. And it developed this theory because a third-party subpoena response suggested a consent form may have been executed online at her daughter's residence. Ms. Teman has asserted that the consent form appears to have been created through fraud either by Select Justice or a vendor providing the consent form. As a result, Ms. Teman has explained the parties should investigate the origin of the consent form before dragging  Ms. Sibulesky into a case she has no connection to.

But Select Justice has refused. Worse, it has subpoenaed family members it acknowledges lack any established connection to the consent form or this case, including Mr. Sibulesky, Mr. Tamm, and Ms. Tamm—demanding their devices for "forensic examinations," their internet histories (including website visits and searches lacking any connection to this case), and to depose them in-person an hour from their homes. This is even though each child has offered to provide their Facebook activity histories from the days at issue to prove they did not complete Select

---

[1] Select Justice previously served subpoenas on Glenn Teman, Stacey Sibulesky, Kerry Tamm, and Terence Tamm and agreed to withdraw the subpoenas, but only after personally serving them on Ms. Teman's family members.

Justice's consent forms. But Select Justice is refusing because discovering evidence is not its goal—its goal is to harass.

As a result, the Court should limit Select Justice's discovery on three grounds. _First,_ the Court should order the parties to complete discovery on how Select Justice obtained the consent form. _Second,_ Ms. Sibulesky, Mr. Sibulesky, Ms. Tamm, and Mr. Tamm (Ms. Teman's children and their spouses) request that this Court quash their deposition notices, as they lack any verified connection to this case. _Third,_ to the extent the subpoenas are not quashed in their entirety, all family members request that this Court quash Document Request Numbers 10 and 11 as irrelevant, overbroad, and invasive, as they seek internet histories that have no bearing on this case. And _fourth_, Plaintiff and Mr. Teman (Ms. Teman's husband) request that their depositions be taken back-to-back on the same day via videoconference or in person in Framingham, MA, and that Mr. Teman's deposition be limited to two hours.

## BACKGROUND

### A.  Defendant uses illegal telemarketing practices.

This case arises from Select Justice's illegal telemarketing practices. _See_ Doc. 1 ("Compl."), ¶ 3. Ms. Teman registered her personal residential phone number with the National Do Not Call Registry over two decades ago (in August 2003). _Id_. ¶¶ 14–16. But Select Justice disregarded the law and flooded Ms. Teman with "more than a dozen calls" and "several harassing voicemails" over several months in 2023. _Id_. ¶¶ 17–19. In the voicemails, Select Justice urged Ms. Teman "to be a part of class action suits related to talcum powder and rideshare assault" and wrongly implied that Ms. Teman "had contacted Select Justice . . . and solicited their services in representing her." _Id_. ¶ 20. Ms. Teman has never been a customer of Select Justice and has "never consented to receive calls from Select Justice." _Id_. ¶ 21. Thus, Ms. Teman attempted to call Select

Justice back to request to be placed on Defendant's Internal Do Not Call list, but Select Justice did not answer Ms. Teman's many calls. *Id*. ¶ 23. Later, on December 1, 2023, Ms. Teman sent a cease-and-desist letter to Select Justice via certified mail, and yet, Select Justice continued to call her. *Id*. ¶¶ 24-25. Then, Ms. Teman filed a formal complaint with the Massachusetts Attorney General on January 26, 2024. *Id*. ¶ 26. And again, Select Justice continued to call her. *Id*. ¶ 27. Thus, on October 20, 2024, Ms. Teman filed her class action lawsuit in this Court. *See* Doc. 1.

**B. Defendant's consent defense.**

Select Justice originally insisted that neither it nor its agents called Ms. Teman as alleged in her complaint, but its discovery documents proved that wrong, with its records establishing Select Justice called her six times, at minimum. Exhibit A. *See also* Doc. 40-3, Ex. C to Plaintiff's Reply in Support of Motion to Compel, SEL0001. So Select Justice instead insisted Ms. Teman had consented to its calls through a Facebook advertisement soliciting claims against the rideshare company Uber. But that certainty dissolved when Select Justice discovered Ms. Teman has never used a rideshare service, much less been assaulted in one, and its supposed "consent" derived from an IP address that does not belong to her. *See* Doc. 40-1, Ex. A to Plaintiff's Reply in Support of Motion to Compel, Declaration of Emily Teman. Now, Select Justic asserts that someone in Ms. Teman's family provided Ms. Teman's consent to be called.

The "evidence" Select Justice relies on for its most recent theory are two leads it purchased from an undisclosed seller for $1.16, that purport to show someone submitted Ms. Teman's contact information to Select Justice through its Rideshare advertisement on Facebook on October 19 and October 28, 2023. Exhibit B. *See also* Doc. 39-6, Ex. F of Defendant's Supplemental Brief in Support of its Cross-Motion to Stay Discovery. Select Justice's "leads" were not produced in native format, are partially illegible, and appear to be internally generated. While the leads include Ms.

Teman's phone number and zip code, they also contain erroneous information, including a false email address and the following poorly-worded explanation of the alleged rideshare assault: "I didn't consent for someone to kiss me. It by [*sic*] unexpected." *Id.* This is not a sentence that would have been written by the Plaintiff, who has 21 years of experience as a Technical Writer and Editor, nor is it one that would have been written by Ms. Sibulesky, a software quality control analyst with a Master's degree in Education, since both individuals pay close attention to detail and grammar.

The "leads" also contains an IP address allegedly linked to Mr. Sibulesky and Ms. Sibulesky's residence, and two unique Facebook click IDs that were allegedly created when the Facebook user clicked Select Justice's Rideshare advertisement on October 19 and October 28, 2023. *Id.* According to Select Justice:

> The submissions were recorded by Facebook, a website whose reputation is beyond reproach, on which Defendant runs ad campaigns for its services to assist individuals in seeking recovery for injuries sustained in rideshare vehicles. Plaintiff's dual submissions generated two unique Facebook Click IDs…which passed directly into Defendant's system and reflects validation that Plaintiff responded directly to Defendant's Facebook advertisements.

*See* Doc. 40-2, Ex. B to Plaintiff's Reply in Support of Motion to Compel, Def.'s Amend. Resp. to Pl.'s First Disc. Requests, Interrog. Resp. ¶ 6. But Ms. Teman affirmed under oath that she has never contacted Select Justice about rideshare litigation, and has never even used a rideshare service, much less been assaulted in one. Doc. 40-1, *supra*. In that same declaration, Ms. Teman also confirmed that she spoke to her daughter Ms. Sibulesky, who expressly denied providing any information to Select Justice through its Facebook advertisements or otherwise. *Id.*

To get to the bottom of the alleged consent obtained through Facebook, both parties subpoenaed Facebook for information linking the IP address, click IDs, and consent submissions to any Facebook account. Ms. Teman originally moved to quash Select Justice's overbroad subpoena to Facebook, which demanded that Facebook produce "all documents and account

information concerning Emily Teman." Doc. 24, Plaintiff's Motion to Quash Subpoenas. Ms. Teman withdrew the motion to quash after Select Justice agreed to narrow its requests. Doc. 25, Assented to Motion for Disclosure of Information; Doc. 27, Notice Withdrawing Motion to Quash. Although Select Justice's evidence purports to show that "the submissions were recorded by Facebook, Facebook produced no evidence that anyone from Ms. Teman's family (or anyone at all) submitted the leads. Facebook's subpoena response reflects that it has no documents associated with the purported click IDs associated with Select Justice's Rideshare campaign.[2]

Facebook's response to the subpoenas, coupled with the facially erroneous data contained in the "leads" such as Ms. Teman's email address and the poorly worded explanation of the assault, and the fact that the IP address is not associated with Ms. Teman, calls into the question the accuracy of the purported "leads" Select Justice purchased for $1.16. To run down the origins of these leads, on October 4, 2025, Plaintiff issued a notice of deposition to Dax Valdez, the manager of LeadClient[3] and the signatory of Select Justice's amended interrogatory responses, which is currently set for December 5, 2025. Plaintiff also subpoenaed LeadClient seeking:

> Documents, communications, and materials from January 1, 2023, to the present, which identify any third-party vendors, contractors, affiliates, or entities that were engaged by or on behalf of Select Justice, LLC, or any of its agents, to source, identify, acquire, purchase, generate, or provide consumer leads or contact information for potential clients of Select Justice. For purposes of clarity, this request specifically seeks identification and documentation of any entity involved in the generation, sourcing, sale, or provision of leads to Select Justice, LLC, whether or not that entity directly placed calls.

In response to the subpoena, on November 5, 2025, LeadClient produced no documents and raised a litany of boilerplate objections—including that the requests were vague, overbroad, unduly

---

[2] Facebook responded informally through counsel, and counsel confirmed it lacked any responsive information.
[3] *See* https://leadclient.com/legacy/ ("As Chief Operating Officer, Dax Valdez is the central point of contact across all LeadClient divisions, ensuring seamless alignment between business development, media buying, engineering, and executive leadership") and https://www.linkedin.com/in/dax-valdez-191868/ ("Dax Valdez, Manager at LeadClient").

burdensome, disproportionate, irrelevant, or sought information protected by privilege, work product, trade secret, or otherwise obtainable from Select Justice. <u>Exhibit C</u>. This response is disingenuous given that both Select Justice and LeadClient are managed by the same individual, Dax Valdez, who also signed Select Justice's discovery responses.

**C. The invasive subpoenas on Ms. Teman's Family.**

On September 26, 2025, Select Justice served "Amended Notices of Deposition and Document Requests" on Ms. Teman's family members including Glenn Teman (her husband), Stacey Sibulesky (her daughter), Daniel Sibulesky (her son-in-law), Kerry Tamm (her daughter), and Terence Tamm (her son-in-law). The subpoenas are attached as <u>Exhibit D</u>, and Ms. Teman's family's responses to the subpoenas are attached as <u>Exhibit E</u>. The subpoenas seek irrelevant information, highly private information, and information protected by attorney-client privilege. Despite that, Mr. Teman, Ms. Sibulesky, and Mr. Sibulesky responded to all of Select Justice's document requests, except the following:

> No. 10 – For each device that YOU have used to access the internet and/or Facebook (n/k/a Meta) between September and December, 2023, including but not limited to any smart phone, laptop, desktop, or tablet, produce all DOCUMENTS and electronically-stored information, including DIGITAL FOOTPRINT EVIDENCE, evidencing YOUR web browsing history during such time period.

> No. 11 – In lieu of responding to Request No. 10, above, produce each device that YOU have used to access the internet and/or Facebook (n/k/a Meta) between September and December, 2023, and permit SELECT JUSTICE or its representative(s) to conduct inspection, copying, testing, and/or sampling of the device's electronically-stored information, including DIGITAL FOOTPRINT EVIDENCE, during that time period.s

Ms. Teman was also served with a notice of deposition. Ms. Teman and Mr. Teman agreed to sit for a deposition, but requested that it take place the same day, and by videoconference or in person in Framingham, MA. Select Justice refused their request, and insisted they drive to Boston, MA, for the deposition. Mr. Sibulesky and Ms. Sibulesky offered to produce their Facebook

Activity Report, as well as declarations, in lieu of sitting for a deposition. Select Justice refused their reasonable offer. Mr. Tamm and Ms. Tamm objected to all of Select Justices document requests, and do not agree to sit for a deposition, because they do not live with Ms. Teman or Ms. Sibulesky, and have no connection to this case, aside from their familial relationship.[4] Select Justice has failed to explain Mr. Tamm and Ms. Tamm's connection to this case.

### D. Plaintiff's meet and confer efforts.

On September 30, 2025, Plaintiff's counsel accepted service of Select Justice's subpoenas to Ms. Teman's family members. Since then, the parties have discussed the subpoena by videoconference, and email. In November, the parties reached an impasse.

On October 14, 2025, the Parties conferred by video conference, with two of Plaintiff's attorneys present, Carly Roman and Alex Phillips, and two of Select Justice's attorneys present, Michael Lane and Tomio Narita. During that call, Plaintiff's counsel agreed to produce Mr. Teman and Ms. Teman for deposition the week of November 20, 2025, but requested a videoconference given their childcare obligations. Defendant insisted on in-person depositions. Plaintiff's counsel then requested that the depositions be scheduled back-to-back on one day in Framingham near their home given the Temans' childcare obligations, and that Defendant agree to limit Mr. Teman's deposition to a specific amount of time. Defendant would not agree to limit Mr. Teman's deposition to a specific amount of time or to conduct the depositions by videoconference, but appeared willing to at least consider an alternative location for the depositions. Finally, Plaintiff's counsel asked Defendant to withdraw the deposition notices for Ms. Teman's remaining family members without prejudice, and in exchange, Plaintiff offered to provide the Facebook Activity Report of Ms. Teman, Ms. Sibulesky, and Mr. Sibulesky. The Facebook Activity Report includes a history of

---

[4] These requests are directed to all family members, but for Glenn Teman, they are numbered 9 and 10 instead of 10 and 11. Ex. A.

every advertisement the Facebook user has ever clicked on Facebook, and every business the user has ever interacted with through Facebook, so to the extent Select Justice obtained consent through its Rideshare Advertisement campaign on Facebook, the Facebook Activity Reports would show it. On the same day (October 14, 2025) Plaintiff's counsel sent an email summarizing her understanding of the discussion, and requested a detailed explanation of the relevance of Ms. Sibulesky, Mr. Sibulesky, Ms. Tamm, and Mr. Tamm's testimony. Exhibit F.

On October 21, 2025, Defendant rejected Plaintiff's proposal to depose Mr. Teman and Ms. Teman in Framingham the week of November 20, but agreed to schedule them back-to-back rather than dual-track given their childcare obligations. *Id.* Defendant also refused to withdraw the family members' deposition subpoenas without prejudice, claiming that "whoever submitted the consent form" had access to Ms. Sibulesky's IP address and "personal information regarding" Plaintiff, and did so on "two occasions, 9 days apart, (including once very late at night) so it is unlikely that the consent was submitted by a neighbor over for a cookout or someone performing services inside the house during regular business hours." *Id.* On October 24, 2025, Plaintiff's counsel again requested that the depositions of Mr. Teman and Ms. Teman occur in Framingham or by videoconference, and also renewed her offer to provide documentation to Select Justice in exchange for Select Justice withdrawing the remaining subpoenas without prejudice, including the Facebook Activity Reports of Mr. Sibulesky and Ms. Sibulesky, as well as declarations of Mr. Sibulesky, Ms. Sibulesky, Mr. Tamm, and Ms. Tamm confirming that they lack access to their mother's Facebook account and did not provide any consent to be contacted about the Rideshare Assault Campaign through Facebook or otherwise. *Id.*

On November 4, 2025, Defendant rejected Plaintiff's offer to provide documentation in exchange for withdrawing the subpoenas, and insisted that Ms. Teman's deposition take place in

person, in Boston. Exhibit G. Defendant also acknowledged that the parties had reached an impasse. *Id.* Plaintiff's counsel then sought to confirm the one issue the Parties had reached agreement—Mr. Teman and Ms. Teman's deposition, noticed for November 20, 2025. Exhibit H. Defendant replied, "I believe that [Nov. 20] works but let me confirm on Monday [Nov. 10] as I am currently traveling out of state." *Id.* Defendant did not reply by Monday. *Id.* On Tuesday, at 5:10 PM CST, after Plaintiff's counsel had followed up multiple times to confirm Mr. Teman and Ms. Teman's deposition would proceed as noticed, Defendant's counsel stated that it intended to proceed with all depositions in succession, or reschedule them, effectively canceling the depositions of Mr. Teman and Ms. Teman. *Id.*

Select Justice's handling of these depositions from the very start has been marked by reversals and last-minute cancellations, as well as refusals to make reasonable accommodations such as video depositions or depositions in Framingham. Indeed, Select Justice first improperly served deposition notices directly on Ms. Teman's family members, and then withdrew them, only to re-notice those same depositions on unilaterally selected dates, before cancelling them again a week before they were to proceed. This conduct appears intended to burden and harass Ms. Teman and her family rather than advance legitimate discovery.

## LEGAL STANDARD

A court must quash or modify a subpoena if it "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). These discovery controls are particularly important when the discovery is requested from non-parties. *See Cusumano v. Microsoft Corp.,* 162 F.3d 708, 717 (1st. Cir. 1998) ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs."). As such, Select Justice is required to "take reasonable steps to avoid imposing undue burden or expense" because the subpoenas were served

on family members, who are not parties here. *Ponder v. Ocwen Loan Servicing, LLC*, 2019 U.S. Dist. LEXIS 87616, at *3 (D. Mass. 2019); *see also* Fed. R. Civ. P. 45(d)(1). A court "must quash or modify a subpoena that . . . subjects a person to undue burden on timely motion from a party or non-party." *Id*. (quoting Fed. R. Civ. P. 45(d)(3)). In determining whether a subpoena imposes an undue burden, courts consider such factors as "the relevance of the documents sought, the necessity of the documents sought, the breadth of the request, the time period covered by the request, the particularity with which the documents are described, and the burden in fact imposed. In addition, a non-party is given consideration regarding inconvenience and expense." *Demers v. Lamontagne,* 1999 U.S. Dist. LEXIS 17500, at *4-5 (D. Mass., May 5, 1999).

A court may also forbid certain discovery or limit its scope to protect a nonparty from "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Additionally, "[c]ourts are required to limit discovery if it 'can be obtained from some other source that is more convenient, less burdensome, or less expensive.'" *Cumby v. Am. Med. Response, Inc.*, 2019 U.S. Dist. LEXIS 38181, at *12 (quoting Fed. R. Civ. P. 26(b)(2)(C)(i)). As a result, a party may seek "a protective order relating to document requests served on a third party." *Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, 2017 U.S. Dist. LEXIS 189229, at *7 (N.D. Ill. Nov. 15, 2017). A motion for a protective order or motion to quash is timely if made before the subpoena's return date. *See Estate of Ungar v. Palestinian Auth.*, 451 F. Supp. 2d 607, 610 (S.D.N.Y. 2006).

## ARGUMENT

### A.  The subpoenas are subject to a mandatory motion to quash under Rule 45(d)(3) because they subject Plaintiff's family members to an undue burden.

Broad as modern discovery may be, it is not unbridled. Where, as here, subpoenas seek irrelevant, disproportional discovery from non-parties, they impose an undue burden on the recipients and the court must quash the requests. *See* Fed. R. Civ. P. 45(d)(3)(A)(iv).

1. **The subpoenas seek irrelevant information from Ms. Teman's children and their spouses, which can be obtained elsewhere.**

The subpoenas seek irrelevant material and therefore do not meet the requirements of Rule 26(b)(1) regarding the proper scope of discovery. While Select Justice bears the burden of proof regarding its consent defense, its discovery efforts should be directed toward obtaining evidence that Ms. Teman herself authorized Select Justice to contact her, rather than evidence suggesting that her family members provided such consent.

The standard for consent in this case is specified at 42 U.S.C. § 227(a)(4) and 47 C.F.R. §§ 64.1200(c)(2)(ii). In the TCPA, "[t]he term 'telephone solicitation' does not include a call or message (A) to any person with ***that person's*** prior express invitation or permission." 42 U.S.C. § 227(a)(4) (emphasis added). Likewise, under the TCPA's implementing regulations, a caller is not liable if the caller obtained "*the subscriber's* prior express invitation or permission…evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed." 47 C.F.R. §§ 64.1200(c)(2)(ii). *See also Mantha v. Quotewizard.com, LLC,* 2021 U.S. Dist. LEXIS 245059, at *19 (D. Mass. Dec. 3, 2021), rep. and rec. adopted in *Mantha v. Quotewizard.com, LLC,* 2022 U.S. Dist. LEXIS 19502 (D. Mass. Feb. 3, 2022) (emphasis added) ("Absent any evidence that ***plaintiff*** visited the website, the court recommends concluding that no reasonable jury could find that he did so.")

Select Justice's consent defense discovery efforts therefore ought to try to obtain information that Ms. Teman *herself* authorized Select Justice to call her, as TCPA liability turns on whether the called party provided prior express consent. Moreover, the TCPA is a strict liability statute, so it is irrelevant whether Select Justice had a "good faith basis" to rely on its cheaply purchased leads containing erroneous information. *Mantha,* 2021 U.S. Dist. LEXIS 245059, at *27

("The court recommends that a good faith reliance defense should not be recognized as relieving defendant from liability for contacting plaintiff in violation of the TCPA.") And even if Select Justice could prove Ms. Teman herself visited Select Justice's Rideshare advertisement on Facebook, and consented to the calls (it cannot), such evidence would be of little help here, where Ms. Teman repeatedly asked Select Justice to stop calling her. Indeed, "courts have consistently recognized that such a right [to revoke consent] exists, and that consent may be revoked orally." *Gibbs v. SolarCity Corp.*, 239 F.Supp.3d 391, 396 (D. Mass 2017) (collecting cases).

The subpoenas directed at Ms. Teman's family members are irrelevant, as the only consent that matters under the TCPA is Ms. Teman's own. Any interactions her family members may have had with Select Justice cannot establish whether Ms. Teman herself authorized the calls. Given the matters at stake here, discovery must be tightly confined to the core issues: the calls at issue, Ms. Teman's consent, and the reliability of the so-called "leads" that purport to provide her consent. Attempts to expand discovery to Ms. Teman's family sidestep the central question of whether Select Justice obtained lawful consent from Ms. Teman herself.

### 2. Forcing Ms. Teman's children and their spouses to sit for depositions is not proportional to the needs of this case, logistically burdensome, and harassing.

Even if the Court were to find the testimony of Ms. Teman's children and their spouses relevant, relevance alone does not justify the extraordinary burden Select Justice seeks to impose. The need for deposition testimony and subpoenaed material must be carefully weighed against the burden, especially in the case of non-parties. *Heidelberg Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd.,* 333 F.3d 38, 42 (1st Cir. 2003) (upholding district court order quashing subpoena on non-party to underlying litigation where there was imbalance between the need for the subpoena and the burden sought to be placed on the non-party). Discovery from non-parties must therefore be proportional. Rule 45(d)(1) also requires that a party issuing a subpoena take "reasonable steps to avoid

imposing undue burden or expense." *See also Ponder*, 2019 U.S. Dist. LEXIS 87616, at *3. Moreover, "the status of a witness as a non-party to the underlying litigation entitles [the witness] to consideration regarding expense and inconvenience." *Concord Boat Corp. v. Brunswick Corp.,* 169 F.R.D. 44, 49 (S.D.N.Y. 1996) (internal quotation marks and citation omitted).

Allowing these subpoenas to stand would place an undue logistical, emotional, and financial burden on Ms. Teman's family, without advancing the merits of Select Justice's consent defense. Deposition preparation will already be especially burdensome and stressful for Ms. Teman's family, as they are non-parties who are unfamiliar with litigation, but here Select Justice further exacerbates that burden by also refusing to allow depositions by videoconference or at a location near the family's residence in Framingham. Rather than take the reasonable steps required under Rule 45 to minimize burden and expense, Select Justice demands in-person depositions in downtown Boston, so that Ms. Teman's family is forced to navigate travel, traffic, and parking, while rearranging work and childcare responsibilities, just to provide testimony that has no relevance to Select Justice's defenses. *See Hampton v. Steen*, 2014 U.S. Dist. LEXIS 87720, at *19-*20 (D. Or. June 27, 2014) (quashing subpoenas that were " irrelevant and unduly burdensome, and clearly served to harass" family members, where "the only connection Ms. Brann has to this case appears to be that she is the sister of Mr. Hostetter…[and] Ms. Hostetter's only connection to this case appears to be that she is married to Mr. Hostetter."). Select Justice's refusal to make even basic accommodations underscores that its subpoenas are designed to harass.

Any speculative benefit Select Justice hopes to obtain does not outweigh the burden, disruption, and privacy invasion imposed on non-party family members, particularly when the "leads" at issue can be investigated directly from the entities that generated or sold them. *See Rossman v. EN Eng'g, LLC*, 467 F. Supp. 3d 586, 590 (N.D. Ill. 2020) ("A non-party subpoena

seeking information that is readily available from a party through discovery may be quashed as duplicative or cumulative."). Rather than harassing Ms. Teman's family, Select Justice should verify its own error-prone and cheaply purchased "consent" data. If the Court believes any of Ms. Teman's family members might possess relevant information, compelling their depositions now would be premature and inefficient until the parties have examined the source and legitimacy of Select Justice's purported "leads." The deposition of Dax Valdez, who is the manager of LeadClient and signatory of Select Justice's discovery responses, and Plaintiff's subpoena to LeadClient are the proper avenues to obtain this information. Mr. Valdez's deposition is scheduled for December 5, 2025, and the LeadClient's response was due November 7, 2025. This subpoena gets to the heart of the matter—are the leads Select Justice claims to have received from LeadClient, an entity managed by the signatory of its discovery responses, even legitimate? However, rather than responding to Plaintiff's subpoena, LeadClient raised a litany of boilerplate objections. Exhibit C.

Furthermore, Ms. Teman's family offered a reasonable compromise, asking Select Justice to withdraw the subpoenas directed toward Mr. Sibulesky, Ms. Sibulesky, Mr. Tamm, and Ms. Tamm without prejudice in exchange for the following: (1) Ms. Sibulesky's Facebook Activity Report; (2) Mr. Sibulesky's Facebook Activity Report; (3) Ms. Teman's Facebook Activity Report; and (4) declarations from Ms. Teman's children and their spouses confirming that they lack access to their mother's Facebook account and never provided consent to be contacted about the Rideshare Assault Campaign through Facebook or otherwise. A Facebook Activity Report includes a user's Activity Log on Facebook, which shows a chronological list of things the user has done on the platform (*e.g.,* posts, comments, likes, searches, etc.). But Select Justice refused this

reasonable offer, and instead insists on in-person depositions in downtown Boston without any time limitation. The Court should quash or otherwise prohibit these subpoenas.

### 3. The request for the browsing history or devices of Ms. Teman's family members is particularly invasive, and must be quashed.

To the extent the subpoenas are not quashed in their entirety, Ms. Teman's family seeks to specifically quash Document Request Nos. 10 and 11, quoted above, which seek their complete browsing history from September to December 2023 for every device they "used to access the internet and/or Facebook," or in the alternative, the devices they "used to access the internet and/or Facebook" during that same time period for forensic examination.

Requiring non-parties to produce their devices or full web browsing history presents serious privacy concerns, which have been explicitly recognized by the Supreme Court. *See Riley v. California*, 134 S. Ct. 2472, 2490 (2014) ("An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD."). Although *Riley* was a criminal case, courts have also applied its observations about the significant privacy concerns associated with modern cell phones in the context of seeking internet browsing histories or devices for forensic examination in civil discovery. *Henson v. Turn, Inc.,* 2018 U.S. Dist. LEXIS 181037, at *20 (N.D. Cal. Oct. 22, 2018) (citing *Riley* in denying civil-discovery request for plaintiffs' complete browsing history); *Bakhit v. Safety Marking, Inc.*, 2014 U.S. Dist. LEXIS 86761, at *3 (D. Conn. June 26, 2014) (citing *Riley* in denying civil-discovery request to inspect personal defendants' cell phones).

Indeed, people use the internet to research health conditions, legal issues, finances, religion, sexuality, and political views. This kind of information is highly intimate and for this reason, requests for browsing histories or forensic devices are often denied in TCPA cases, even when the

requests are directed at the plaintiff. *See, e.g., Bratcher v. Navient Sols., Inc.,* 249 F. Supp. 3d 1283, 1286 (M.D. Fla. 2017) (denying motion to inspect TCPA plaintiff's smartphone; "[t]here is no routine right of direct access to a party's electronic information system…The Eleventh Circuit has held absent a factual finding of some noncompliance with [the] discovery rules, direct access is unwarranted"); *Tillman v. Ally Fin. Inc.*, 2017 U.S. Dist. LEXIS 185900, at *11 (M.D. Fla. Nov. 9, 2017) (request to inspect TCPA plaintiff's smartphone did not amount to "exceptional circumstances" that would warrant it). *See also Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 925 (N.D. Ill. 2019) ("Forensic examination of a party's computers…is no routine matter[,]" and "[c]ivil litigation should not be approached as if information systems were crime scenes that justify forensic investigation at every opportunity to identify and preserve every detail.") (citations omitted).

Likewise here, compliance with Select Justice's requests would require Ms. Teman's family to disclose their entire internet browsing histories over a 120-day period or to submit their personal devices to forensic inspection. Such demands are extraordinary and wholly inappropriate in a civil TCPA case. Ms. Teman's family members are not parties, have not been accused of any wrongdoing, and cannot be subjected to the equivalent of a digital search merely because of their relation to the plaintiff. The requested discovery is grossly disproportionate to the needs of the case and constitutes an impermissible intrusion into core privacy interests.

Additionally, Select Justice's request for Ms. Teman's family's browsing history is neither temporally nor substantively limited to the specific leads it produced. The leads were allegedly submitted on October 19 and October 28, 2023, yet Select Justice seeks the family's entire internet browsing history from September through December 2023. Even when a party properly seeks internet activity from an opposing party (which is not the case here) courts recognize that such

information is highly sensitive and require that any disclosure be narrowly tailored, if allowed at all. *See, e.g., Davis v. Reliance First Cap., LLC*, 2022 U.S. Dist. LEXIS 210097, at \*7-\*8 (E.D.N.C. Nov. 18, 2022) (narrowing request for internet history from over a year to two days, finding subpoena to carrier "look[ed] like an attempt to embarrass" the plaintiff and "no reason why  [defendant] should be entitled to [plaintiff]'s…website traffic writ large").  The breadth of information sought reflects a pretext for harassment rather than a desire to secure discovery relating to a valid consent defense. No justification exists to burden Ms. Teman's family with a massive invasion of their privacy, when it is highly unlikely to yield anything relevant.

**B.  A protective order is proper under Rule 26(c).**

A person from whom discovery is sought may move for a protective order, and the court may, for good cause, issue an order to protect that party or person from annoyance, embarrassment, oppression, or undue burden or expense. See Fed. R. Civ. P. 26(c). "Under Rule 26, the trial court is required to balance the burden of proposed discovery against the likely benefit." *Id*. (quoting *Gill v. Gulfstream Park Racing Association, Inc*., 399 F.3d 391, 400 (1st Cir. 2005)).

As explained above, Select Justice's subpoenas seek information that is irrelevant, overbroad, and intrusive, and would impose an undue burden on Ms. Teman's family. If the Court does not quash the subpoenas, it should issue a protective order under Rule (c) precluding Select Justice from seeking the browsing history or devices of Ms. Teman's family members. If the Court agrees that any of Ms. Teman's children or their spouses ought to be deposed, Plaintiff requests that the protective order: (1) limit the scope of the deposition to Ms. Teman's consent and the calls at issue; (2) limit the time of the deposition to 1 hour; (3) require the deposition to take place by videoconference.

### C.  Ms. Teman's family is entitled to recoup expenses it has incurred.

Pursuant to Federal Rules of Civil Procedure 26, 37, and 45, Ms. Teman and her family are entitled to their attorneys' fees and costs incurred in seeking relief from Select Justice's improper subpoenas, which Select Justice refused to withdraw or limit in any way, necessitating this Motion. Federal Rule of Civil Procedure 26(c)(3), which concerns protective orders, provides that Rule 37(a)(5) applies to the award of expenses. Under Rule 37(a)(5)(A), if a motion for a protective order is granted, the court must require the party whose conduct necessitated the motion to pay the reasonable expenses incurred in making the motion, including attorney's fees, unless the party acted substantially justified or other circumstances make an award unjust. Additionally, Rule 45(d)(1) authorizes the court to impose appropriate sanctions, including attorney's fees, on a party who issues a subpoena without taking reasonable steps to avoid imposing an undue burden or expense on the person subject to the subpoena.

Despite multiple meet-and-confers, Select Justice refused to withdraw the subpoenas, limit any document requests, or take reasonable steps to reduce the burden on Ms. Teman and her family. For example, Select Justice could have agreed to depose Ms. Teman and her family via videoconference or in Framingham, MA, where they reside, but refused. This refusal underscores the abusive and harassing nature of Select Justice's conduct. By contrast, counsel for Ms. Teman and her family repeatedly sought compromise by offering relevant Facebook Activity reports and declarations from Ms. Teman's children and their spouses in exchange for Select Justice to withdraw the subpoenas without prejudice. Additionally, Mr. Teman will be produced for deposition the week of November 20, 2025, and Mr. Teman, Ms. Sibulesky, and Mr. Sibulesky responded to in full to Select Justice's document requests, aside from Requests 10 and 11, discussed *supra*. Select Justice, however, has taken no steps to narrow or limit the subpoenas.

Courts recognize that where a party fails to take reasonable steps to avoid imposing an undue burden on a non-party, an award of reasonable attorneys' fees is appropriate. See *Am. Fed'n of Musicians of the United States & Canada v. Skodam Films, LLC*, 313 F.R.D. 39, 58 (N.D. Tex. 2015) ("[A]n order requiring, among other things, a subpoenaed party's reasonable attorneys' fees is mandated where the party issuing the subpoena failed to take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."). Accordingly, Ms. Teman and her family seek recovery of the reasonable attorneys' fees incurred in preparing and filing this Motion.

## CONCLUSION

There is no justifiable basis for Select Justice to bother Ms. Teman's children and their spouses with depositions and invasive document requests, who are living their own lives and have nothing to do with this case. For these reasons, Stacey Sibulesky, Daniel Sibulesky, Kerry Tamm, and Terence Tamm respectfully request that the Court quash their deposition notices and the overbroad subpoenas. All family members also request that this Court specifically quash document request numbers 10 and 11, the extent the subpoenas are not quashed in their entirety. Finally, Glenn Teman and Emily Teman request that their depositions be taken back-to-back on the same day via videoconference or in person in Framingham, MA, and that Glenn Teman's deposition be limited to two hours.

*[Counsel signature block to follow on next page.]*

Dated: November 13, 2025

Respectfully submitted,

*/s/ Alex Phillips*

Alex Phillips *(pro hac vice)*
Samuel J. Strauss *(pro hac vice)*
**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: 872-263-1100
Fax: 872-263-1109
aphillips@straussborrelli.com
sam@straussborrelli.com

Anthony I. Paronich
**PARONICH LAW, P.C**.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: 508-221-1510
anthony@paronichlaw.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 13, 2025, I served the foregoing through the Court's

CM/ECF system, which sent notice to all counsel of record.

Respectfully submitted,

*/s/ Alex Phillips*

Alex Phillips *(pro hac vice)*
**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: 872-263-1100
Fax: 872-263-1109
aphillips@straussborrelli.com